No. 24-1045

# UNITED STATES COURT OF APPEALS
# FOR THE THIRD CIRCUIT

STEVEN DEFRANK, ET AL.,
*Appellants*,

v.

TRANSOURCE PENNSYLVANIA, LLC.,
*Appellee*.

_____

*On Appeal from the United States District Court for the
Middle District of Pennsylvania*

_____

## BRIEF OF APPELLEE TRANSOURCE PENNSYLVANIA, LLC

_____

Precious S. Jacobs-Perry
Jenner & Block LLP
353 N. Clark Street
Chicago, IL 60654
312-222-9350
pjacobs-perry@jenner.com

Allison N. Douglis
Jenner & Block LLP
1155 Avenue of the Americas
New York NY 10036
212-891-1600
adouglis@jenner.com

Matthew E. Price
Arjun R. Ramamurti
Jenner & Block LLP
1099 New York Avenue, NW Suite 900
Washington, DC 20001
202-639-6000
mprice@jenner.com
aramamurti@jenner.com

*Counsel for Appellee Transource Pennsylvania, LLC*

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 26.1 and Third Circuit R. 26.1.1, Appellee states as follows:

Transource Pennsylvania, LLC is owned 100% by Transource Energy, LLC. Transource Energy, LLC is owned 86.5% by AEP Transmission Holding Company, LLC and 13.5% by Evergy Transmission Company, LLC. AEP Transmission Holding Company, LLC is a wholly owned subsidiary of American Electric Power Company, Inc., which is a publicly traded company. Evergy Transmission Company, LLC, is owned by Evergy, Inc., which is a publicly traded company.

No publicly traded company owns 10 percent or more of the stock of American Electric Power Company, Inc., or Evergy, Inc.

No publicly held corporation has a financial interest in the outcome of the proceeding other than the parties disclosed above.

*/s/ Matthew E. Price*
Matthew E. Price

## TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ..............................................i

TABLE OF AUTHORITIES..................................................................iv

GLOSSARY .......................................................................................x

INTRODUCTION ................................................................................1

COUNTERSTATEMENT OF ISSUES .................................................7

STATEMENT OF RELATED CASES ..................................................7

STATEMENT OF THE CASE...............................................................8

I.    Legal and Factual Background .......................................................8

    A.    FERC Seeks to Address Congestion. ...................................8

    B.    Transource Proposes Project 9A. .......................................13

    C.    The PUC Denies Transource's Siting Application...............15

II.    Procedural History .......................................................................18

    A.    Transource Seeks Federal-Court and State-Court Review.................18

    B.    The Parties' Federal Motion Practice and the Commonwealth Court Decision.....................................................19

    C.    The District Court Grants Summary Judgment to Transource............20

SUMMARY OF ARGUMENT..............................................................22

ARGUMENT ......................................................................................25

I.    The PUC Order Is Preempted.......................................................25

    A.    The PUC's Conflicting Methodology for Assessing Wholesale Price Impacts Poses an Obstacle to Federal Objectives.....................26

    B.    Appellants' Arguments to the Contrary Lack Merit............30

|     | 1.  | The PUC's Traditional Authority Over Siting Does Not Support Its Order. | 30 |

| | 1. | The PUC's Traditional Authority Over Siting Does Not Support Its Order. ..................................30 |

| | 2. | Transource Does Not Conflate Transmission Planning and Siting. ..................................39 |

II. The PUC Order Violates the Dormant Commerce Clause. ...........................42

A. The PUC Order Is *Per Se* Invalid. ........................................42

B. The PUC Order Burdens Commerce in a Manner Disproportionate to Any Legitimate Local Benefits. ...........................44

C. The PUC's Arguments in Response Are Meritless. ...........................45

| | 1. | Congress Has Not Expressly Authorized the PUC to Discriminate Against Interstate Commerce. ...........................45 |

| | 2. | The PUC Order Was Discriminatory. ........................................48 |

III. Transource's Claims Are Not Precluded. ........................................51

A. Transource Preserved Its Federal Claims Under *England*. .................51

B. Transource's Preemption Claim Is Not Barred by Issue Preclusion. ........................................56

CONCLUSION ..........................................60

# TABLE OF AUTHORITIES

**CASES**

*Appalachian Power Co. v. Public Service Commission of West Virginia*, 812 F.2d 898 (4th Cir. 1987) ............................................... 29, 33

*Astoria Federal Savings & Loan Ass'n v. Solimino*, 501 U.S. 104 (1991) ............................................................................................. 57

*Bacchus Imports, Ltd. v. Dias*, 468 U.S. 263 (1984) ............................... 42

*Bernardsville Quarry v. Borough of Bernardsville*, 929 F.2d 927 (3d Cir. 1991) ........................................................................................ 55

*Birdman v. Office of the Governor*, 677 F.3d 167 (3d Cir. 2012) ........... 45

*Bradley v. Pittsburgh Board of Education*, 913 F.2d 1064 (3d Cir. 1990) ............................................................................................. 52, 55

*C&A Carbone, Inc. v. Town of Clarkstown*, 511 U.S. 383 (1994) .......... 43

*California ex rel. Lockyer v. Dynegy, Inc.*, 375 F.3d 831 (9th Cir.), *opinion amended on denial of reh'g*, 387 F.3d 966 (9th Cir. 2004) ................. 27

*Cloverland-Green Spring Dairies, Inc. v. Pennsylvania Milk Marketing Board*, 298 F.3d 201 (3d Cir. 2002) .............................................. 5, 42

*Crosby v. National Foreign Trade Council*, 530 U.S. 363 (2000) .................... 29, 39

*Crossroads Cogeneration Corp. v. Orange & Rockland Utilities, Inc.*, 159 F.3d 129 (3d Cir. 1998) ............................................................. 59

*Dean Milk Co. v. City of Madison*, 340 U.S. 349 (1951) ........................ 50

*DePolo v. Board of Supervisors Tredyffrin Township*, 835 F.3d 381 (3d Cir. 2016) ........................................................................................ 58

*Deweese v. National Railroad Passenger Corp. (Amtrak)*, 590 F.3d 239 (3d Cir. 2009) .............................................................................. 25, 29, 39

*Edmundson v. Borough of Kennett Square*, 4 F.3d 186 (3d Cir. 1993) ............ 57

*England v. Louisiana Board of Medical Examiners*, 375 U.S. 411 (1964) .................................................................6, 19, 51, 52, 53, 55

*Evans v. Board of County Commissioners of County of Boulder*, 994 F.2d 755 (10th Cir. 1993) ...................................................59

*Farina v. Nokia Inc.*, 625 F.3d 97 (3d Cir. 2010) ................................26, 27, 28, 38

*Fields v. Sarasota Manatee Airport Authority*, 953 F.2d 1299 (11th Cir. 1992) .........................................................................55

*Freehold Cogeneration Associates, L.P. v. Board of Regulatory Commissioners of New Jersey*, 44 F.3d 1178 (3d Cir. 1995) ...........................59

*Garza v. Citigroup Inc.*, 881 F.3d 277 (3d Cir. 2018) ...........................................56

*Healy v. Beer Institute, Inc.*, 491 U.S. 324 (1989) ........................................... 44-45

*Hughes v. Long*, 242 F.3d 121 (3d Cir. 2001) .......................................................26

*Hunt v. Washington State Apple Advertising Commission*, 432 U.S. 333 (1977) ..........................................................................50

*Instructional Systems, Inc. v. Computer Curriculum Corp.*, 35 F.3d 813 (3d Cir. 1994) ......................................................................6, 52, 55

*Iowa Network Services, Inc. v. Qwest Corp.*, 363 F.3d 683 (8th Cir. 2004) ...........................................................................59

*Ivy Club v. Edwards*, 943 F.2d 270 (3d Cir. 1991) ...............................................55

*Kentucky West Virginia Gas Co. v. Pennsylvania Public Utility Commission*, 721 F. Supp. 710 (M.D. Pa. 1989) ..................................................54

*Kentucky West Virginia Gas Co. v. Pennsylvania Public Utility Commission*, 837 F.2d 600 (3d Cir. 1988) .........................................................58

*Keystone Redevelopment Partners, LLC v. Decker*, 674 F. Supp. 2d 629 (M.D. Pa. 2009), *rev'd on other grounds*, 631 F.3d 89 (3d Cir. 2011) .......................................................................54

v

*Levy v. Sterling Holding Co., LLC*, 544 F.3d 493 (3d Cir. 2008) ..........................25

*Medtronic, Inc. v. Lohr*, 518 U.S. 470 (1996) ..........................................26

*Metropolitan Edison Co. v. Pennsylvania Public Utility Commission*, 767 F.3d 335 (2014)..................................................................58

*Mississippi Power & Light Co. v. Mississippi ex rel. Moore*, 487 U.S. 354 (1988)..................................................................33, 34, 35

*Nantahala Power & Light Co. v. Thornburg*, 476 U.S. 953 (1986)......................33

*National Meat Ass'n v. Harris*, 565 U.S. 452 (2012) ..................................33

*National Pork Producers Council v. Ross*, 598 U.S. 356 (2023) ...........................51

*New Energy Co. of Indiana v. Limbach*, 486 U.S. 269 (1988)................................50

*New England Power Co. v. New Hampshire*, 455 U.S. 331 (1982) ...... 43, 44, 46-47

*New Jersey Education Ass'n v. Burke*, 579 F.2d 764 (3d Cir. 1978) .....................52

*New York v. FERC*, 535 U.S. 1 (2002) ..............................................31, 38

*Northwest Central Pipeline Corp. v. State Corporation Commission of Kansas*, 489 U.S. 493 (1989).......................................................47, 48

*Oneok, Inc. v Learjet, Inc.*, 575 U.S. 373 (2015).......................................26

*Piedmont Environmental Council v. FERC*, 558 F.3d 304 (4th Cir. 2009) ..................................................................................32

*Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970) ..............................5, 42, 44, 51

*PLIVA, Inc. v. Mensing*, 564 U.S. 607 (2011) .........................................25

*PPL Energyplus, LLC v. Solomon*, 766 F.3d 241 (3d Cir. 2014) ...........................59

*Public Utility Commission of Rhode Island v. Attleboro Steam & Electric Co.*, 273 U.S. 83 (1927) ....................................................38

*Sharpley v. Davis*, 786 F.2d 1109 (11th Cir. 1986)....................................55

vi

*South Carolina Public Service Authority v. FERC*, 762 F.3d 41 (D.C. Cir. 2014) ..................................................................13, 15, 27

*Sprint Communications, Inc. v. Jacobs*, 571 U.S. 69 (2013)...................................59

*Tampa Electric Co. v. Garcia*, 767 So. 2d 428 (Fla. 2000)....................................47

*Tri-M Group, LLC v. Sharp*, 638 F.3d 406 (3d Cir. 2011) ....................................46

*United Haulers Ass'n v. Oneida-Herkimer Solid Waste Management Authority*, 550 U.S. 330 (2007) ............................................................42

*University of Tennessee v. Elliott*, 478 U.S. 788 (1986)...........................................56

*Verizon Maryland, Inc. v. Public Service Commission of Maryland*, 535 U.S. 635 (2002)...................................................................59

*West Lynn Creamery, Inc. v. Healy*, 512 U.S. 186 (1994) .....................................50

*Western & Southern Life Insurance Co. v. State Board of Equalization of California*, 451 U.S. 648 (1981)................................................45, 46

*Williams v. Pennsylvania*, 579 U.S. 1 (2016) .........................................................58

*Wos v. E.M.A. ex rel. Johnson*, 568 U.S. 627 (2013) ...............................................33

*Wyoming v. Oklahoma*, 502 U.S. 437 (1992) ....................................................46, 47

## STATUTES

66 Pa. Cons. Stat. § 301(b) ........................................................................57

66 Pa. Cons. Stat. § 1501 ..........................................................................35

16 U.S.C. § 824(a) ..............................................................................31, 46

16 U.S.C. § 824(b) ............................................................................1, 8, 27

16 U.S.C. § 824(c) ...................................................................................8

16 U.S.C. § 824(d) ...............................................................................1, 8

16 U.S.C. § 824a-3(f)(1) ...........................................................59

16 U.S.C. § 824d(a) ............................................................8, 27

16 U.S.C. § 824d(c) ................................................................10

16 U.S.C. § 824e(a) ............................................................8, 27

16 U.S.C. § 824p .....................................................................31

16 U.S.C. § 824p(b) ................................................................31

28 U.S.C. § 1738 .....................................................................54

Energy Policy Act of 1992, Pub. L. No. 102-486, § 731, 106 Stat. 2776,
2921 .....................................................................................47

## ADMINISTRATIVE RULINGS

*In re Application of Transource Maryland LLC*, No. 9471, 2020 WL
3977589 (Md. Pub. Serv. Comm'n June 30, 2020)...........................33

*Building for the Future Through Electric Regional Transmission
Planning & Cost Allocation & Generator Interconnection*, 179
FERC ¶ 61,028 (2024) ............................................................36

*PJM Interconnection, L.L.C.*, 119 FERC ¶ 61,265 (2007)....................10

*PJM Interconnection, L.L.C.*, 123 FERC ¶ 61,051 (2008).....................9, 11, 12, 27

*PJM Interconnection, L.L.C.*, 156 FERC ¶ 61,120 (2016)....................41

*Regional Transmission Organizations*, Order No. 2000, 89 FERC
¶ 61,285, 1999 WL 33505505 (1999), *on reh'g*, 90 FERC ¶ 61,201
(2000) ...............................................................................2, 8

*Transmission Planning and Cost Allocation by Transmission Owning
and Operating Public Utilities*, FERC Order No. 1000, 76 Fed. Reg.
49,842 (Aug. 11, 2011) ..........................................................12, 13, 27

*TranSource, LLC v. PJM Interconnection, L.L.C.*, 168 FERC ¶ 61,119
(2019) .................................................................................41

**OTHER AUTHORITIES**

18 C.F.R. § 35.34(k)(7)(i) ...................................................................8

52 Pa. Code § 57.76(a) ......................................................................16

52 Pa. Code § 57.76(a)(1) ..............................................................3, 35

52 Pa. Code § 57.76(a)(2) ............................................................17, 37

52 Pa. Code § 57.76(a)(3) ............................................................17, 37

52 Pa. Code § 57.76(a)(4) ............................................................17, 37

Fed. R. Civ. P. 56(a) .........................................................................25

PJM, *Regional Transmission Expansion Planning: Planning the Future of the Grid, Today* (2019), https://pjm.com/-/media/library/reports-notices/2019-rtep/regional-transmission-expansion-planning-planning-the-future-of-grid-today.ashx ....................................................36

Jim Rossi, *The Trojan Horse of Electric Power Transmission Line Siting Authority*, 39 Env't L. 1015 (2009) .........................................37

# GLOSSARY

| | |
|---|---|
| ALJ | Administrative Law Judge |
| FERC | Federal Energy Regulatory Commission |
| FPA | Federal Power Act |
| IMM | Independent Market Monitor for PJM Interconnection, L.L.C. |
| PJM | PJM Interconnection, L.L.C. |
| PUC | Pennsylvania Public Utility Commission |
| RTEP | Regional Transmission Expansion Plan |
| RTO | Regional Transmission Organization |
| Transource | Transource Pennsylvania, LLC |

## INTRODUCTION

This case concerns a planned electric transmission project, Project 9A, that Transource was selected to construct to reduce congestion on the interstate grid. "Congestion" results from insufficient transmission capacity and is like a traffic jam on the grid: electricity is unable to flow freely from areas where generation is cheaper to areas where generation is more costly, resulting in inefficiencies and higher costs for consumers on the wrong side of the constraint. Project 9A would relieve a bottleneck inhibiting the flow of power from Pennsylvania and points west, where wholesale electricity prices are comparatively lower, to Maryland, Virginia, and the District of Columbia, where wholesale electricity prices are higher.[1]

The Federal Power Act ("FPA") vests the Federal Energy Regulatory Commission ("FERC") with responsibility for regulating the "transmission of electric energy in interstate commerce" and the "sale of electric energy at wholesale in interstate commerce." 16 U.S.C. § 824(b). FERC in turn authorized "regional transmission organizations" ("RTOs") to operate the transmission system and plan new transmission projects needed to ensure reliability and relieve congestion on the

---

[1] Wholesale electricity is electricity sold for resale, *see* 16 U.S.C. § 824(d)—for example, by power plants to utilities, which then resell the electricity to end-users like homes and businesses.

interstate grid. *See Regional Transmission Organizations*, FERC Order No. 2000, 89 FERC ¶ 61,285, 1999 WL 33505505, at *2-3 & n.3 (Dec. 20, 1999) ("Order 2000").

PJM Interconnection, L.L.C. ("PJM") is an RTO covering Pennsylvania, twelve other states, and Washington, D.C. Applying a FERC-approved methodology, PJM determined that Project 9A was cost-justified and needed to reduce congestion. Under that methodology, PJM determines (a) the amount by which wholesale electricity payments will fall for customers whose access to cheaper electricity is currently constrained, and (b) the costs of constructing the line, which will be fully paid for by those same customers. So long as the ratio of benefits to costs exceeds 1.25, the line is cost-justified.

When electricity can flow more freely out of Pennsylvania to other states, wholesale electricity payments in Pennsylvania will increase. However, according to the FERC-approved methodology designed to ensure just and reasonable rates for all customers, that increase should not count as a cost because it results from reducing inefficiencies in the grid. Pennsylvania customers currently pay artificially suppressed prices because a large pool of relatively inexpensive power is trapped in Pennsylvania due to inadequate transmission capacity. Higher wholesale electricity

prices in Pennsylvania are the natural consequence of a more efficient interstate grid that allows energy to flow more freely.

The Pennsylvania Public Utility Commission ("PUC") must provide siting approval for electric transmission projects before construction can begin. When Transource applied for siting approval for Project 9A, however, the PUC took a different view than FERC of how benefits and costs of an interstate transmission project should be determined. In the PUC's view, the increase in wholesale electricity prices for Pennsylvania customers *should* be counted as a cost of the Project. Based on that methodological dispute with FERC, the PUC reweighed the benefits and costs; determined that Project 9A was not "need[ed]"; and denied permission to site the line under 52 Pa. Code § 57.76(a)(1), under which the PUC evaluates whether "there is a need" for a new transmission line when considering whether to grant approval. *Id.*

The question in this case is narrow: whether the PUC may, under the guise of its siting authority, redo the regional transmission planning analysis and deny approval of an interstate electric transmission line based on a methodological disagreement with FERC about which wholesale price impacts should be considered in determining whether the line is cost-justified.

3

The district court correctly concluded that the PUC Order is preempted.  It directly conflicts with FERC's methodology by including wholesale payments that FERC determined should be *excluded* from the analysis, and thereby poses an obstacle to federal objectives.  The PUC seeks to preserve the very wholesale pricing disparity that PJM, through its FERC-approved methodology, seeks to resolve by reducing transmission constraints.  If states were free to deny siting approval on the parochial basis that reducing transmission constraints would result in increased prices for their residents, new congestion-relieving interstate transmission lines addressing regional problems would never be built, and FERC would be hamstrung.

Contrary to the PUC and its *amici*, this case does not involve a broad attack on state siting authority.  The district court's holding does not preempt the PUC from assessing whether a line is "needed" when there has been no federal benefit-cost determination—as is the case for the vast majority of new transmission lines, which solve local problems rather than addressing region-wide inefficiencies.  Nor does it prevent the PUC from denying siting approval for reasons genuinely related to siting—for instance, concerns about health, safety, or the environment—rather than based on a disagreement with FERC about how to account for wholesale price impacts.  The district court's holding simply prohibits "the PUC's second-guessing of the methods sanctioned by federal law and employed by [PJM]," which "would

4

severely handicap the ability of FERC to ensure just and reasonable rates." JA46. This Court should affirm.

This Court should also affirm the district court regarding the dormant Commerce Clause. States may not engage in economic protectionism by using their regulatory power to hoard low-cost electricity and block its export to other states. Yet here, the PUC blocked the Project because allowing the freer flow of electricity across state lines "would result in higher rates in Pennsylvania." JA281-82.[2] Thus, the district court correctly held that "the PUC's opposition to the Project is rooted in economic protectionism in the form of maintaining the status quo imbalance of access to low-priced electricity." JA63.

The PUC Order also violates the dormant Commerce Clause under *Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970), because the burdens it imposes on interstate commerce are "clearly excessive in relation to the putative local benefits." *Cloverland-Green Spring Dairies, Inc. v. Pa. Milk Mktg. Bd.*, 298 F.3d 201, 211 (3d Cir. 2002) (quoting *Pike*, 397 U.S. at 142). As the district court correctly explained, "if other states adopted a regime similar to the PUC, it would eviscerate FERC's

---

[2] Transource's Rule 56.1 Statement of Material Facts ("SMF") is at JA490-537. Citations to accompanying exhibits are to the Joint Appendix pages on which the cited exhibit appears.

attempts to reduce congestion.  Instead, each state could put forth its own analysis and effectively deploy a veto as to whether regional transmission projects were desirable as congestion-reducing projects."  JA65.

Finally, Transource's federal-law claims are not claim-precluded.  Transource expressly reserved its right to pursue federal claims in a federal forum and litigated only state-law claims in state court.  *See England v. La. Bd. of Med. Exam'rs*, 375 U.S. 411 (1964); *Instructional Sys., Inc. v. Comput. Curriculum Corp.*, 35 F.3d 813 (3d Cir. 1994).  Nor are they issue-precluded.  The district court found that defense was waived, a determination that Appellants do not dispute.  Thus, it is now doubly waived.  In any event, the PUC's unreviewed determination that its *own order* was not preempted does not preclude Transource from litigating that issue in court.

Though the scope of this dispute is narrow, the stakes are high.  Our nation has an urgent need for new interstate transmission lines.  If states can abuse their siting authority to override federally approved methodologies for assessing a new interstate line's benefits and costs, the result will be a fragmented transmission grid limited to solutions that are cost-beneficial at the local level—with enormous costs to customers nationwide who would otherwise benefit from an expanded interstate grid.

## COUNTERSTATEMENT OF ISSUES

1. Whether the district court correctly held that the PUC Order was preempted because it conflicts with the FERC-approved methodology for determining which wholesale price impacts should be considered in determining whether a project is cost-justified, and thereby creates an obstacle to federal objectives.

2. Whether the district court correctly held that the PUC Order violated the dormant Commerce Clause, when the PUC's rationale for rejecting the transmission project was to prevent the export of inexpensive power out-of-state.

3. Whether the district court correctly held that Transource's claims were not precluded.

## STATEMENT OF RELATED CASES

This case is related to No. 21-2567 (3d Cir. June 22, 2022), which affirmed the district court's denial of intervenor status to the County of Franklin.

It is also related to *Transource Pennsylvania, LLC v. Pa. PUC*, 278 A.3d 942 (Pa. Commw. 2022), JA713-57, in which the Commonwealth Court held that the PUC Order did not violate state law and acknowledged Transource's reservation of federal claims for federal-court adjudication.

**STATEMENT OF THE CASE**

## I. Legal and Factual Background

### A. FERC Seeks to Address Congestion.

The FPA vests FERC with authority to regulate the sale of electricity for resale ("wholesale" sales of electricity) and the transmission of electricity in interstate commerce. 16 U.S.C. § 824(b)-(d). FERC is also charged with regulating practices that affect the rates for those activities to ensure that rates remain "just and reasonable." *Id.* §§ 824d(a), 824e(a). Exercising that authority, FERC encouraged the formation of regional transmission organizations ("RTOs") to operate the transmission system and plan new transmission projects. Order 2000 at *2-3 & n.3.

In particular, FERC was concerned with "congestion management." *Id.* at *2 n.3; *see also* 18 C.F.R. § 35.34(k)(7)(i) (directing RTOs' planning and expansion process to "encourage market-driven operating and investment actions for preventing and relieving congestion"). "Congestion" occurs when there are "constraints"—areas of the regional grid where electricity cannot flow freely because of insufficient transmission capacity. JA10; JA89 (Finding #35); JA567. Constraints cause disparities in wholesale prices for energy. As Transource's expert Steven Herling explained, customers on one side of the constraint will "pay higher costs for energy—as they will need to rely on higher cost generation available to

them—than they would if the transmission system were capable of transmitting electricity freely across the entire grid." JA567; *see also PJM Interconnection, L.L.C.*, 123 FERC ¶ 61,051, P 26 (2008) ("2008 FERC Order") (JA598). Customers on the other side will pay less than if congestion did not exist because their area benefits from lower-cost power that cannot make it past the transmission bottleneck. JA568. This is illustrated below:



Lots of Cheap Power

Transmission Constraint
Limits Movement
of Cheap Power, Causing
Congestion

Expensive Power

With expanded transmission capacity, the inexpensive power plants on the left of the constraint could transmit electricity to customers on the right, in place of the costly power plant currently serving them.

PJM is the RTO responsible for maintaining the interstate transmission system and operating a multi-state regional energy market in a 13-state region (plus D.C.)

that includes Pennsylvania. JA7; JA225; JA694 (map). PJM operates under a tariff filed with and approved by FERC. *See* 16 U.S.C. § 824d(c); JA561-64. The tariff requires PJM to create a Regional Transmission Expansion Plan ("RTEP") to identify interstate transmission needs and solutions. JA225; JA543. The planning process includes a "market efficiency" analysis to identify congestion and potential solutions. JA10-11; JA225; JA544-51.

In 2006, PJM proposed tariff changes to address persistent congestion, including a process to identify "market efficiency" transmission projects that would mitigate it. *See* JA573; JA611-23. FERC directed PJM to "describe[] exactly how any metrics will be calculated, weighed, considered and combined" in evaluating market efficiency projects. *See* JA10; JA573; *PJM Interconnection, L.L.C.*, 119 FERC ¶ 61,265, PP 30-31 (2007) (JA629).[3] PJM proposed to measure a project's congestion-reducing benefits, the total cost of constructing the project, and the ratio of benefits to costs. *PJM*, Compliance Filing at 5-6, Docket No. ER06-1474-004 (Oct. 9, 2007) (JA637-38). A project is cost-justified, and therefore included in the regional transmission plan, if the ratio of benefits to costs is at least 1.25:1.0. JA638.

---

[3] Congestion can sometimes be mitigated by "hedging" via "financial transmission rights." App. Br. 5-7. However, Project 9A addresses persistent "unhedged" congestion that cannot be mitigated in that way, as Appellants acknowledge. App. Br. 8; *see* JA572, JA582.

To calculate the benefits for the class of transmission facilities relevant to this case, PJM proposed to sum the expected change in wholesale electricity payments over the next 15 years "for only those zones that [would] experience reduced energy payments [due to the project]—which are the zones that would be assigned the costs of these facilities." 2008 FERC Order, P 67 (JA603); JA641-42. PJM would then compare those benefits to the project's construction cost. *Id.* at P 17 (JA596). Of course, a market efficiency project would also be expected to *increase* wholesale electricity payments in zones that currently enjoy lower prices due to congestion. *Id.* at P 67 (JA603). But PJM did not propose to include that increase in its evaluation. After all, customers enjoying artificially lower prices due to congestion benefit from an inefficiency that transmission planning seeks to eliminate. These suppressed prices are a "financial windfall … at the expense of another group due to inefficiencies in the grid." JA576. Treating as a "cost" the increased payments by these customers once congestion is reduced "effectively could preclude … economic-based enhancements or expansions that could relieve local congestion." JA642. The PUC intervened in this FERC proceeding but did not object to PJM's proposed benefit-cost methodology. JA788 ¶ 23.

In 2008, FERC issued an order expressly approving PJM's proposed methodology. *See* JA594-610. It emphasized the importance of PJM's planning

process to federal regulatory goals, explaining that "without a process for identifying economic transmission, PJM's customers ... separated from the rest of the system by congested transmission bottlenecks[] will have few opportunities to access alternative resources that have lower prices for electricity." 2008 FERC Order, P 26 (JA598). It specifically approved PJM's method for assessing benefits and costs, finding the "approach reasonable because it … would evaluate the load payment benefits of those loads that will be assigned the costs of the new" line. *Id.* at P 67 (JA603). That method became part of PJM's tariff. JA547 (top of page).[4]

In 2011, FERC issued Order 1000, which reaffirmed the central importance of regional transmission planning to the federal regulatory scheme. Order 1000's primary objectives were: (1) to "[e]nsure that transmission planning processes at the regional level … produce a transmission plan that can *meet transmission needs more efficiently and cost-effectively*"; and (2) to "ensure that the costs of transmission solutions chosen *to meet regional transmission needs* are allocated fairly to those who receive benefits from them." *Transmission Planning and Cost Allocation by Transmission Owning and Operating Public Utilities*, FERC Order No. 1000, 76

---

[4] Subsequent tariff revisions tweaked certain details for evaluating benefits and costs, but continued to exclude from consideration the increase in wholesale electricity payments for customers currently benefiting from congestion. JA648.

Fed. Reg. 49,842, P 4 (Aug. 11, 2011) ("Order 1000") (emphasis added). Order 1000 directed RTOs "to identify and evaluate *transmission system needs* and potential solutions to those needs." *Id.* at P 10 (emphasis added). Projects included in a regional plan would still require state siting approval. *Id.*

The D.C. Circuit affirmed federal jurisdiction over regional transmission planning on review of Order 1000. It held that "ensuring the proper functioning of the interconnected grid … fits comfortably within" FERC's authority to regulate the interstate transmission of electricity, and it noted the connection between transmission planning and FERC's wholesale rate jurisdiction. *S.C. Pub. Serv. Auth. v. FERC*, 762 F.3d 41, 63 (D.C. Cir. 2014); *see also* Order 1000 at P 12 (Order 1000 "will fulfill our statutory obligation to ensure that Commission-jurisdictional services are provided at rates, terms, and conditions of service that are just and reasonable.").

## B.     Transource Proposes Project 9A.

PJM's planning process identified persistent congestion in the AP South Reactive Interface—a set of four 500kV transmission lines originating in West Virginia and terminating in Maryland—and related constraints running through Pennsylvania. JA12; JA122; JA225-26. This transmission bottleneck traps low-cost electricity in Pennsylvania and prevents it from reaching Virginia, Maryland, and

D.C., increasing wholesale electricity prices there. JA122; *see also* JA94 (Finding #62). From 2012 to 2016, the congestion elevated total wholesale electricity payments in constrained zones by more than $800 million. JA85 (Finding #8); JA225; JA681.

As part of its regional planning process, PJM solicited proposals to alleviate this congestion and selected Project 9A, submitted by Transource Energy, LLC, Transource's parent company. JA225. Project 9A's main component is the "IEC Project," which consists of two new transmission lines spanning the Pennsylvania-Maryland border. JA225-26. Once built, the Project would lower wholesale electricity payments in the zones on the "constrained" side of the bottleneck by $845 million over 15 years by facilitating the freer flow of the low-cost electricity currently trapped in Pennsylvania. JA13; JA94 (Finding #65); JA168. The Project would also raise wholesale electricity payments elsewhere—largely in central and eastern Pennsylvania—by $812 million over 15 years. JA94 (Finding #65); JA168; JA692-93 (tables showing the Project's impact on wholesale electricity payments). The cost of constructing the Project—approximately $509-$528 million—would be borne by the customers who would benefit from the lower wholesale electricity payments. JA104 (Finding #111); JA173 n.25.

PJM applied the FERC-approved methodology in its tariff to assess whether the Project was cost-justified. JA545-48 (PJM Tariff Sched. 6, Section 1.5.7(d)); *see also* JA681-84. The Project passed: its total benefits of $845 million in reduced wholesale electricity payments exceeded the total project cost of $509-$528 million by more than a 1.25:1.0 ratio. JA226; JA122, JA137-38; JA582. Consistent with its FERC-approved tariff, PJM's assessment did not consider the $812 million in increased wholesale electricity payments that would be experienced largely by the Pennsylvania customers currently benefiting from congestion.[5]

## C.    The PUC Denies Transource's Siting Application

Although FERC has authority over interstate transmission planning, states retain authority over siting and construction. *See South Carolina*, 762 F.3d at 62-64. In Pennsylvania, the PUC oversees siting and construction. JA9; JA695. Therefore, Transource applied to the PUC for a certificate of public convenience authorizing construction. JA226-27.

---

[5] Appellants state that congestion has diminished. App. Br. 13-14. But the Project has been regularly reevaluated. JA530-31; JA582. As of the date the record closed, the benefit-cost ratio of Project 9A was 3.64 after excluding costs that had already been incurred, and 2.48 based on total costs. JA18; JA530-31.

Under 52 Pa. Code § 57.76, the PUC must find the following about a proposed transmission line before granting a certificate:

(1) That there is a need for it.

(2) That it will not create an unreasonable risk of danger to the health and safety of the public.

(3) That it is in compliance with applicable statutes and regulations providing for the protection of the natural resources of this Commonwealth.

(4) That it will have minimum adverse environmental impact, considering the electric power needs of the public, the state of available technology and the available alternatives.

52 Pa. Code § 57.76(a).

An Administrative Law Judge ("ALJ") recommended denying Transource's application. The ALJ concluded that Transource had "*failed to show need* for the project within the meaning of [PUC] regulations and the Pennsylvania Public Utility Code." JA72. The ALJ accepted as true that "PJM saw a need in 2015-2016 to remove a congestion constraint," JA151, but nevertheless concluded that the PUC had "exclusive jurisdiction over … whether the proposed transmission infrastructure is needed," JA157. In explaining why the Project was not needed, the ALJ stated that "[t]his is a costly project to Pennsylvania compared to the net benefits to address vague constraints," citing the record showing the $812 million increase in expected wholesale electricity payments, largely impacting Pennsylvania customers, if congestion were alleviated. JA168. Adopting the very method for weighing benefits

16

and costs that FERC had explicitly rejected in its 2008 Order, the ALJ offset the $845 million in benefits of reduced congestion by the $812 million expected increase in wholesale electricity payments for customers currently benefiting from congestion, and concluded that the Project would bring only $32 million in net benefits. *Id.*; *see also* JA102-03 (Findings #106-10). The ALJ then determined that "under these particular circumstances" the "project does not provide sufficient benefits to Pennsylvania or the PJM region as a whole." JA168.

Transource challenged the ALJ's decision before the PUC. On May 24, 2021, the PUC agreed with the ALJ that Transource had not demonstrated "need" under Pennsylvania law. JA274-75, JA285.[6] Per the PUC, "need, established under the applicable federal standards imposed by FERC and implemented by PJM, do[es] not necessarily satisfy the requirement for 'need'" under Pennsylvania law. JA276. The PUC then endorsed the ALJ's benefit-cost analysis. JA280-81. It stated that "the consequences of Project 9A would be to alleviate the economic congestion on a regional level, which in turn would result in higher rates in Pennsylvania," and emphasized that "[t]he potential negative and practical impact on the citizens and consumers of Pennsylvania is our concern" and "within the scope of our

---

[6] The ALJ had additionally recommended denying siting approval based on the factors under Section 57.76(a)(2)-(4), but the PUC did not reach them. JA274-75.

consideration …on the issue of 'need.'"  JA281.  The PUC then held that "the ALJ properly considered the negative impacts to Pennsylvania in evaluating" whether the Project was "needed" under state law, and on that basis, properly found that Transource had not demonstrated "need."  *Id.*; JA285-86.  Accordingly, the PUC denied Transource's application and rescinded a provisional certificate it had previously granted.  JA285-88; JA291-94.

## II.    Procedural History

### A.    Transource Seeks Federal-Court and State-Court Review.

On June 22, 2021, Transource filed a complaint in district court against the PUC and its Commissioners in their official capacities (the "Federal Complaint"). Transource sought declaratory and injunctive relief and raised two federal-law claims: (1) preemption, and (2) the dormant Commerce Clause.  JA326-67.

Transource subsequently petitioned for review of the PUC Order in the Commonwealth Court of Pennsylvania (the "State Petition").  JA697-704. Transource raised exclusively state-law grounds for reversal, namely that the PUC Order violated the relevant Pennsylvania statutes and regulations; was unsupported by substantial evidence; and was inconsistent with prior PUC precedent.  *Id.* Transource apprised the Commonwealth Court of the Federal Complaint in its

petition for review and brief, and expressly reserved its right to litigate its federal claims in federal court under *England*, 375 U.S. 411.  JA704; JA706-07; JA709-12.

**B.      The Parties' Federal Motion Practice and the Commonwealth Court Decision.**

Before the district court, Transource moved for pre-discovery summary judgment, Doc. 20, and Appellants moved to dismiss, arguing that Transource lacked standing, Transource's claims were barred by issue preclusion and claim preclusion, and Transource failed to state a claim on the merits.  Docs. 57, 58.  In August 2021, the district court denied Appellants' motion to dismiss regarding standing and otherwise abstained pending the Commonwealth Court's decision on the State Petition.  Doc. 82.

On May 5, 2022, the Commonwealth Court rejected Transource's state-law challenges.  JA713-56.  It did "not address the federal claims that Transource has reserved for consideration in the District Court and focus[ed] instead on whether the Commission's decision is correct under Pennsylvania law."  JA729-30 n.12.  And it held that Transource had not impliedly placed the federal issues before it.  *Id.*

On August 8, 2022, the district court denied the remainder of Appellants' motion to dismiss.  JA411-12.  Regarding whether Transource preserved its federal claims for federal-court adjudication under *England*, the court deferred its decision until it had the full state court record.  As to issue preclusion, the court held that the

issues Transource sought to raise in federal court were unreviewed by any state court, so the PUC Order was not entitled to preclusive effect. *Id.*

At a status conference three days later, the district court set a schedule for limited discovery and summary judgment briefing. It stated that "what I'm clearly trying to convey to you, and now I will say expressly, is that I would like all of the issues in this case addressed in the summary judgment motions." JA849-50.

## C. The District Court Grants Summary Judgment to Transource.

The parties cross-moved for summary judgment. Docs. 146, 156. On December 6, 2023, the district court denied Appellants' motion for summary judgment and granted Transource's cross-motion. Doc. 186.

First, the court held that the PUC Order was preempted as an obstacle to federal objectives. JA44-46. As the court explained, "by disagreeing with PJM's FERC-approved benefit-cost methodology, the PUC seeks to undercut the foundational goal of congestion-alleviating projects. The PUC insists that any benefit-cost ratio must include projected rate increases for areas that currently benefit from congestion—areas which will not contribute to payment for the Project. This directly contradicts PJM's FERC-approved tariff." JA45. The court continued, "If permitted, the PUC's second-guessing of the methods sanctioned by federal law

and employed by the RTO would severely handicap the ability of FERC to ensure to just and reasonable rates." JA46.

The court rejected Appellants' attempt to label the PUC Order as one about "siting." JA47-57. As the court explained, "the PUC's analysis … clearly overlaps with PJM's regional transmission planning analysis. That analysis was undisputedly regional transmission planning when FERC approved it and PJM carried it out. Why should it be something else when the PUC does the same kind of analysis?" JA56. Moreover, the argument that such analysis concerns "siting" lacks any connection to how the term "siting" is "commonly understood." JA56-57. The court concluded, "Although the PUC now terms its denial an exercise of siting authority, it was regional transmission planning in reality." JA57.

Second, the court granted summary judgment to Transource on the dormant Commerce Clause claim, holding that "the PUC's decision was a per se violation … driven by economic protectionism." JA63. As the court explained, "the very nature of the Project is to improve the flow of wholesale electricity across state lines to places that currently have less access and therefore higher prices…. [T]he PUC's opposition … is rooted in economic protectionism in the form of maintaining the status quo imbalance of access to low-priced electricity." *Id.*

Independently, the court held that the PUC Order violated the dormant Commerce Clause under *Pike* because any putative local benefits could not outweigh the burden on interstate commerce. If other states were also allowed to "effectively deploy a veto as to whether regional transmission projects were desirable as congestion-reducing projects," that "would eviscerate FERC's attempts to reduce congestion." JA64-65.

Finally, the district court rejected Appellants' preclusion defenses. Regarding claim preclusion, the court held that Transource had preserved its ability to raise its federal claims in federal court under *England*. JA30. The court rejected Appellants' argument that Transource was required to invoke *England* before the PUC, since its federal claims arose only after the PUC acted. JA31. Regarding issue preclusion, the court held that the defense had been waived. JA31-32. Despite the court's instruction to raise all issues in summary judgment briefing, Appellants referenced issue preclusion only in a footnote. *Id.*

## SUMMARY OF ARGUMENT

I.A. The PUC Order is preempted. The PUC rejected a new transmission line based on a benefit-cost methodology that conflicted directly with the methodology FERC approved, by giving weight to projected wholesale price increases that FERC determined should not be considered. The PUC Order is an obstacle to the federal

objectives of mitigating transmission congestion to ensure that wholesale electricity prices remain just and reasonable.

I.B.  Appellants' primary response is that States have traditional authority over siting determinations.  This attacks a straw man.  Pennsylvania certainly may deny certificates based on legitimate siting considerations, including, for example, risk to health and safety, protection of natural resources, and environmental impact.  The narrow question here, however, is whether a state's "siting" authority encompasses a "need" determination that reweighs the wholesale energy cost consequences of an interstate transmission project and treats higher wholesale energy payments for some customers as a "cost," when FERC—the regulator responsible for both regional transmission planning and wholesale price regulation—has expressly rejected that approach.  Appellants have offered no persuasive argument that such "need" determinations fall under traditional state siting authority, nor how a state could make such determinations without interfering with federal objectives.  Summary judgment was therefore warranted on preemption grounds.

II.A.  The PUC Order also violates the dormant Commerce Clause.  The PUC Order is explicitly based on the adverse economic consequences for Pennsylvania customers that would result if electricity were able to flow freely across state lines. The PUC's attempt to protect local economic benefits by blocking an instrumentality

of interstate commerce is paradigmatic economic protectionism. Appellants make no attempt to identify a legitimate local interest that would justify Pennsylvania's attempt to hoard cheap electricity for its own benefit.

II.B. The PUC Order also violates the dormant Commerce Clause because the burden it imposes on interstate commerce substantially outweighs the local benefits. If states could block new regional transmission lines to protect local economic advantages resulting from existing inefficiencies, new congestion-reducing lines could never get built, and the interstate grid would be hobbled.

II.C. Appellants' contrary arguments are meritless. For the first time, Appellants argue that Congress authorized states to regulate interstate commerce via states' siting authority. But neither of the cited statutes clearly authorizes states to regulate without regard to the dormant Commerce Clause, as the case law requires.

III. Finally, Transource's claims are neither claim-precluded nor issue-precluded. Transource properly reserved its federal claims for federal court under *England*. It was not obligated to invoke *England* before the PUC because its federal claims did not exist until after the PUC issued its order. And the district court correctly held that issue preclusion had been waived, a holding that Appellants do not challenge in their brief. Accordingly, issue preclusion has been doubly waived.

In any event, a state agency's unreviewed determination of federal law is not issue-preclusive in federal court.

## ARGUMENT

***Standard of Review*:** Summary judgment is reviewed *de novo*. *Levy v. Sterling Holding Co., LLC*, 544 F.3d 493, 501 (3d Cir. 2008). Summary judgment is warranted when there is no genuine dispute of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a).

## I. The PUC Order Is Preempted.

The "Supreme Court has identified three types of preemption: express preemption, field preemption, and implied conflict preemption." *Deweese v. Nat'l R.R. Passenger Corp. (Amtrak)*, 590 F.3d 239, 245 (3d Cir. 2009) (citing *Hillsborough Cnty. v. Automated Med. Labs., Inc.*, 471 U.S. 707, 713 (1985)). This case concerns implied conflict preemption, which occurs "[w]here state and federal law 'directly conflict,'" *PLIVA, Inc. v. Mensing*, 564 U.S. 607, 617 (2011), or where "under the circumstances of [a] particular case, [the state law] stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Deweese*, 590 F.3d at 246 (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67

(1941) (alterations in original)); *see also Oneok, Inc. v Learjet, Inc.*, 575 U.S. 373, 377 (2015).[7]

### A. The PUC's Conflicting Methodology for Assessing Wholesale Price Impacts Poses an Obstacle to Federal Objectives.

The PUC Order is preempted because it adopted a methodology for assessing "need" that directly conflicts with PJM's FERC-approved methodology for considering the wholesale price impacts of a new transmission line in assessing whether the line is cost-justified. The Order therefore poses an obstacle to federal objectives to enhance the efficiency of the interstate grid, reduce wholesale pricing disparities, and ensure just and reasonable rates.

To determine whether the actions of a State are preempted, the "ultimate touchstone" is the "purpose of Congress." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996) (quotation marks omitted); *Farina v. Nokia Inc.*, 625 F.3d 97, 115 (3d Cir. 2010). Here, the Federal Power Act sets forth the relevant federal purposes. Congress authorized FERC to regulate the "transmission of electric energy in interstate commerce" and "the sale of electric energy at wholesale in interstate

---

[7] The district court granted summary judgment with respect to obstacle preemption, but both strands of implied conflict preemption were presented and are supported by the record, and this Court may affirm on either ground. *See, e.g.*, *Hughes v. Long*, 242 F.3d 121, 122 n.1 (3d Cir. 2001).

commerce," 16 U.S.C. § 824(b), to ensure that wholesale electricity prices are just and reasonable, *id.* §§ 824d(a), 824e(a). Regional transmission planning—"processes used to identify and evaluate transmission system needs and potential solutions to those needs," Order 1000 at P 107—is critical to achieving that goal. *Id.* at P 52; *South Carolina*, 762 F.3d at 63.

In exercising its authority under the FPA, FERC specifically approved PJM's methodology for determining which wholesale price impacts should be considered in assessing whether a congestion-reducing project is cost-justified. FERC's determination reflects a policy choice about how to balance the interests of the different publics whose rates will be affected by a new transmission line, and FERC used its "reasoned judgment to weigh the relevant considerations." *Farina*, 625 F.3d at 123. As part of its obligation to ensure just and reasonable rates for all customers, FERC intentionally chose not to consider as costs any increase in wholesale electricity payments by customers presently benefiting from congestion. 2008 FERC Order at P 67 (JA603). PJM incorporated FERC's methodology into its tariff, JA545-48 (PJM Tariff Sched. 6, Section 1.5.7(d)). That tariff, as the filed rate, has the force of law. *See California ex rel. Lockyer v. Dynegy, Inc*., 375 F.3d 831, 839 (9th Cir.), *opinion amended on denial of reh'g*, 387 F.3d 966 (9th Cir. 2004) ("Once filed with a federal agency, such tariffs are the equivalent of a federal regulation.").

27

Against this backdrop, the preemption problem is clear. FERC was required to "strike a balance" between competing objectives, and the PUC upset that balance by adopting a "state-law standard that is more protective of one objective"—protecting Pennsylvania customers from cost increases—and "less protective of others," namely, enabling the freer flow of electricity across the grid to lower wholesale energy prices elsewhere. *Farina*, 625 F.3d at 123. The PUC Order therefore conflicted directly with federal law and is preempted.

Indeed, the PUC expressly stated that it would not "disregard" the "negative impact … to the customers in the Commonwealth" as required "under the PJM-approved criteria and methodology," because the "potential negative and practical impact on the citizens and consumers of Pennsylvania is our concern, and it is properly within the scope of our consideration of the weight of all the evidence on the issue of 'need.'" JA281. And the PUC admitted that its consideration of increased wholesale energy costs diverged from FERC's approach, acknowledging that "'need' from a PJM planning perspective may or may not be[] … 'consistent with the standard for need under Pennsylvania law.'" JA276. But it nevertheless held that the PUC, "not PJM, … decide[s] whether the PJM planning perspective is, or is not, in line with the Pennsylvania standard for 'need.'" JA276-77. In other words, the PUC impermissibly undertook an "identical, independent inquir[y]

regarding [a project's] merits" from the "perspective of different public interests" and "reach[ed] conflicting conclusions." *Appalachian Power Co. v. Pub. Serv. Comm'n of W. Va.*, 812 F.2d 898, 905 (4th Cir. 1987).[8]

In addition, as the district court correctly concluded, the PUC Order poses an obstacle to federal objectives reflected in the FPA. In the specific context of obstacle preemption, what qualifies as a "sufficient obstacle is a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purposes and intended effects." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000); *Deweese*, 590 F.3d at 246.

Here, the federal objective is ensuring the efficiency and reliability of the interstate grid by cost-effectively reducing wholesale price disparities caused by congestion. Yet the PUC Order overrode the federal wholesale rate-related determination by adopting its own, conflicting benefit-cost methodology counting costs that FERC said should not be considered. The frustration of federal objectives is obvious. As Transource's expert witness Mr. Herling explained in unrebutted

---

[8] The PUC cites the Independent Market Monitor for PJM ("IMM"), who has unsuccessfully tried to persuade FERC to treat increased wholesale electricity payments as "costs" in the benefit-cost analysis. *See* App. Br. 14 (citing JA667-70); *see also, e.g.*, JA442. The IMM conceded that this methodology is "not consistent" with and "absolutely" directly conflicts with PJM's FERC-approved methodology. JA442.

testimony, "If the [PUC] approach were adopted, it is likely that no transmission project could satisfy a 1.25 benefit-cost ratio test, which would result in persistent congestion and the resulting energy price disparities." JA583-84. If states could deny permission to build projects on that basis, that would "essentially Balkaniz[e] the planning process and requir[e] solutions to be designed within individual states where needs exist and benefits can locally be proven, and in direct contradiction to regional transmission planning goals identified by FERC." JA584. As the district court rightly concluded, "If permitted, the PUC's second-guessing of the methods sanctioned by federal law and employed by the RTO would severely handicap the ability of FERC to ensure just and reasonable rates." JA46.

## B. Appellants' Arguments to the Contrary Lack Merit.

### 1. The PUC's Traditional Authority Over Siting Does Not Support Its Order.

Appellants' primary argument is that "States have traditionally assumed all jurisdiction to approve or deny permits for the siting of high-voltage transmission lines." App. Br. 24. Transource does not dispute this proposition in the abstract. The narrow issue here, however, is whether the PUC, under the guise of "siting," can make a "need" determination that second-guesses and conflicts with FERC's method for weighing region-wide wholesale price impacts to determine whether a

new line is cost-justified. The PUC offers no case holding that "siting" reaches so far, and as far as Transource is aware, no state commission has ever claimed such authority before.

Appellants begin by referencing the FPA's policy statement that federal regulation of transmission and sale "extend only to those matters which are not subject to regulation by the States." 16 U.S.C. § 824(a); App. Br. 29. That reservation of authority does not even mention siting, much less the still more particular question posed here. Anyway, the Supreme Court has made clear that Section 824(a) is a "mere policy declaration" that "cannot nullify a clear and specific grant of jurisdiction" to FERC. *New York v. FERC*, 535 U.S. 1, 22 (2002) (internal quotation marks omitted).

Similarly, Appellants rely on general statements from Order 1000 and Order 1000-A to the effect that state authority over construction and siting is preserved. *See, e.g.*, App. Br. 36-38. Again, no one disputes that abstract proposition.

Appellants' reliance on 16 U.S.C. § 824p is equally misplaced. *Cf.* App. Br. 30-32, 41; NARUC Br. 9-10, 22-23. That provision authorizes FERC to preempt a state's siting authority and "issue" a construction "permit" for a transmission line even when the state has denied that permit, if the line is located in an area designated as a "national interest electric transmission corridor." 16 U.S.C. § 824p(b);

31

*Piedmont Env't Council v. FERC*, 558 F.3d 304, 313 (4th Cir. 2009).[9]  The PUC says

that Congress did not give FERC that authority here.  *Cf.* App. Br. 32 (making a

similar point with respect to FERC's more expansive authority regarding natural

gas).  But no one is arguing that FERC can issue a construction permit for Project

9A.  The state has siting authority over the Project, but the question here concerns

the *boundaries* of that authority.

That is where Appellants falter.  Appellants offer no support for their view that

a state's traditional authority over "siting" encompasses the kind of need

determination the PUC made here.  The district court concluded that the ordinary

meaning of "siting" is "[t]he action of locating something in a particular place."

JA57 (quoting *Oxford Dictionaries*).  Appellants say that is overly narrow, but

regardless, siting does not extend to the "need" assessment undertaken here, where

the PUC reweighed regional wholesale cost impacts to second-guess a federal

assessment of regional need and prioritized "negative impacts" to Pennsylvania in

the form of higher wholesale energy payments.  JA281.  Indeed, Appellants have not

---

[9] *Piedmont* does not aid Appellants.  The Fourth Circuit spoke in passing about state commissions' consideration of costs and benefits, *Piedmont*, 558 F.3d at 314, but did not address whether a state commission may expressly reject a FERC-approved method for determining whether a line is needed to reduce regional congestion.

identified a single case in which *any* state utility commission has done anything like that. Notably, the Maryland Public Service Commission rejected the same argument from its consumer counsel, holding that "pursuant to FERC Order No. 1000 and PJM's Tariff," need "must be evaluated on a regional, not on a state-specific basis." *In re Application of Transource Maryland LLC*, No. 9471, 2020 WL 3977589, at *41 (Md. Pub. Serv. Comm'n June 30, 2020).

In response, Appellants suggest that because the PUC's benefit-cost determination was "made in the context of a siting proceeding," it is necessarily a siting determination. App. Br. 39. But, as the district court correctly recognized, preemption is not controlled by the formal label affixed to the state's action. JA57. "In a pre-emption case," a "proper analysis requires consideration of what the state law in fact does, not how" a regulator "might choose to describe it." *Wos v. E.M.A. ex rel. Johnson*, 568 U.S. 627, 637 (2013); *Nat'l Meat Ass'n v. Harris*, 565 U.S. 452, 464 (2012) (characterizing a state statute as non-preempted based purely on how it was "fram[ed]" would "make a mockery of the ... preemption provision").

Cases like *Nantahala Power & Light Co. v. Thornburg*, 476 U.S. 953 (1986), *Mississippi Power & Light Co. v. Mississippi ex rel. Moore*, 487 U.S. 354 (1988), and *Appalachian Power Co.*, 812 F.2d 898, confirm this conclusion. In each, the state *purported* to exercise an authority reserved to it by Congress—in those cases,

33

setting retail rates—but *in substance* the state was using that purported authority to override a determination made by FERC acting within authority Congress granted. The state action was therefore preempted.

In *Mississippi*, for example, FERC allocated the costs of a nuclear power plant among various utilities based on a systemwide assessment of the utilities' needs. Mississippi, purportedly exercising its retail ratemaking authority to assess prudence, asserted that fewer costs should be allocated to the state's customers "in light of local conditions." 487 U.S. at 376. The Supreme Court held this was preempted: the state commission "lack[ed] jurisdiction to reevaluate the reasonableness of those transactions" because doing so would "travers[e] matters squarely within FERC's jurisdiction." *Id.* This case is analogous: FERC has approved a methodology for determining whether a transmission line is needed to reduce congestion on the interstate grid, which depends upon a view about how burdens should be allocated among customers in different parts of the grid. Pennsylvania, purporting to exercise its siting authority, expressly rejected that methodology in favor of one that gave weight to "the potential negative impact, including rate increases, to the customers in the Commonwealth." JA281. As in *Mississippi*, "a state agency's efforts to regulate commerce must fall when they conflict with or interfere with federal authority over the same activity." *Mississippi*,

487 U.S. at 377 (internal quotation marks omitted).

Here, deciding what weight to give to the wholesale price impacts of a new transmission line in a benefit-cost analysis is a quintessential regional planning determination—not a traditional siting determination. FERC is in charge of ensuring that wholesale electricity prices remain just and reasonable; the price impacts of a new line are felt across the entire interstate region; and whether the line is economically justified in light of those impacts is a basic planning decision, concerning whether the project should be considered a potential solution for congestion. No one disputes that FERC acted within its authority in specifying how PJM should consider wholesale price impacts in assessing the benefits and costs of a line. As the district court rightly asked, "That analysis was undisputedly regional transmission planning when FERC approved it and PJM carried it out. Why should it be something else when the PUC does the same kind of analysis?" JA56.

Appellants also point to the fact that Pennsylvania requires a demonstration of "need" as part of its siting processes. *See* 66 Pa. Cons. Stat. § 1501; 52 Pa. Code § 57.76(a)(1); *see also* App. Br. 40 (citing various states' need requirements). But such requirements merely authorize state utility commissions to make a planning decision in the many cases (unlike this one) where a federal planning determination has not been made. Most transmission projects are "local" or "supplemental"

35

projects proposed by transmission owners, for which PJM conducts no benefit-cost analysis.[10]  Indeed, FERC recently noted that "[t]he vast majority of investment in transmission facilities since the issuance of Order No. 1000 has been in local transmission facilities," and "in PJM, about two-thirds of the total transmission investment in the region went to resolving local needs."  *Building for the Future Through Electric Regional Transmission Planning & Cost Allocation & Generator Interconnection*, 179 FERC ¶ 61,028, P 40 (2024).  For these types of projects, there will be no conflict with any federal benefit-cost methodology or specific federal need determination.  Thus, the Pennsylvania scheme's direction to the PUC to consider whether the project is needed still does a lot of work across the full range of potential applications.

But when it comes to regional projects to which PJM has applied a FERC-approved benefit-cost methodology and determined are cost-beneficial to reduce congestion on the interstate grid, Pennsylvania cannot countermand that determination by invoking "need" or vague allusions to its broader siting authority.  A state-law requirement to assess need does not give the PUC a blank check to

---

[10] *See* PJM, *Regional Transmission Expansion Planning: Planning the Future of the Grid, Today* (2019), at 3, https://pjm.com/-/media/library/reports-notices/2019-rtep/regional-transmission-expansion-planning-planning-the-future-of-grid-today.ashx.

reassess whether a project is cost-beneficial at reducing regional grid congestion according to a conflicting methodology that FERC has already rejected. The state's authority to assess "need" is highly circumscribed in the context of an interstate transmission line for which need has already been determined under federal law.[11]

Appellants' remaining arguments aim at a straw man. Appellants and their *amici* mischaracterize Transource's position as turning the PUC into a "rubber stamp" if a federal need determination has been made. *See, e.g.*, App. Br. 39 (incorrectly asserting that Transource is "effectively advocating" that it "be allowed to build without state approval"); App. Br. 43 (citing *Order on Abandoned Plant Incentive*, 187 FERC ¶ 61,030 (2024) (Christie, dissenting); OCA Br. 15-16; General Assembly Br. 20-21; NARUC Br. 19 (*amici* assertions that Transource's position turns the PUC into a "rubber stamp"). That is not so. State law gives the PUC authority to consider a number of factors as relevant to siting, 52 Pa. Code § 57.76(a)(2)-(4), and the PUC did not address these.[12] For example, the proposed

---

[11] Appellants' own materials make this exact point. *See, e.g.*, Jim Rossi, *The Trojan Horse of Electric Power Transmission Line Siting Authority*, 39 Env't L. 1015, 1025 (2009) ("[T]he state-specific review of need is less meaningful in the context of multistate markets."). Appellants say that, in its siting application, Transource recognized it would "be required to demonstrate" need. App. Br. 39 (quoting JA458). Transource did so demonstrate: the need for the line was established by PJM's analysis, which Transource presented to the PUC.

[12] Of course, these bases cannot be used as a pretext.

line must not "create an unreasonable risk of danger to the health and safety of the public"; it must be "in compliance with applicable statutes and regulations providing for the protection of the natural resources of this Commonwealth"; and it must "have minimum adverse environmental impact." *Id.* Transource does not disturb this authority in the slightest.

Appellants also argue that the district court erred in not applying a presumption against preemption because the "siting of transmission lines is a matter falling within the domain of the States' 'historic police powers.'" App. Br. 34 (quoting *New York*, 535 U.S. at 17-18). But Appellants misunderstand the relevant domain. The presumption "does not apply where state regulation has traditionally been absent." *Farina*, 625 F.3d at 116. Here, as discussed, Appellants have not established that states traditionally made determinations of need based on the impact that reducing congestion would have on wholesale pricing disparities across an interstate region. If anything, the Supreme Court has recognized that states *lacked* authority to make such determinations—a gap that the FPA was intended to fill. *Cf. Pub. Util. Comm'n of R.I. v. Attleboro Steam & Elec. Co.*, 273 U.S. 83, 90 (1927); *New York*, 535 U.S. at 6-7, 20-21.

Regardless, the application of the presumption against preemption would not make a difference in this case. As the Supreme Court has recognized, "If the purpose

of the act cannot otherwise be accomplished," then "the state law must yield to the regulation of Congress within the sphere of its delegated power." *Crosby*, 530 U.S. at 373 (quotation marks omitted). That is so whether or not a presumption of preemption is applied. In *Deweese*, for example, this Court acknowledged the existence of a "presumption against preemption" but concluded that "conflicts that are implied by operation of state law are 'of no less force than that which is expressed.'" 590 F.3d at 246 (quoting *Crosby*, 530 U.S. at 373). Given the FPA's conferral of federal authority to regulate interstate transmission and wholesale electricity prices, Congress has clearly expressed its intent that federal determinations should overcome conflicting state determinations as to which lines are needed to reduce persistent congestion and permit the free flow of power on the interstate grid.

### 2. Transource Does Not Conflate Transmission Planning and Siting.

Appellants also contend that "regional transmission planning determinations are distinct and serve different objectives than siting determinations," App. Br. 24, and that planning is just a "screening process" while "siting [is] the final decision," App. Br. 37; *see also* App. Br. 35 (arguing that "[t]he district court erred in conflating

the planning and siting stages").

It is undisputed that construction cannot proceed without a state permit. However, once again, the question in this case is whether the PUC, in making "the final decision," can deny a project on a basis that directly conflicts with FERC's planning determination. That is what the PUC has done here, as the district court correctly found. The PUC's determination was made in the context of a siting proceeding, but in substance it was a planning decision that "supplant[ed] the role of [PJM] and expand[ed] [the PUC's] state authority into the regulatory territory occupied by the federal government." JA46.

Appellants relatedly argue that planning is a matter of process, while siting is a matter of substance. App. Br. 36-37. That does not help the PUC, however. The problem here is that the PUC's basis for rejecting the Project is its disagreement with PJM's methodology for identifying potential solutions. The PUC is free to deny siting permission for other non-pretextual reasons supported by evidence—to conclude, for example, that although a proposed transmission line is a potential solution to reduce congestion, it cannot go forward because of environmental impacts. What the PUC *cannot* do, but what it did here, is deny siting because of a disagreement with PJM's FERC-approved methodology about how to assess the wholesale price impacts of a given project. If states were free to adopt their own

bespoke methodologies for reweighing the economic benefits and costs of regional projects, there would be little point to PJM's coordinated regional planning.

Finally, Appellants and their *amici* raise concerns about their ability to challenge need determinations made as part of PJM's transmission planning process. *See, e.g.*, App. Br. 44-45; STFC Br. 2-3; OCA Br. 9-11. Those procedural concerns are a red herring. If Appellants believe that FERC's method for weighing costs and benefits should be changed, they can try to persuade FERC to do so—as the IMM unsuccessfully did. JA442. If they believe PJM's calculations are mistaken, or that PJM has failed to comply with its tariff, they likewise can file a complaint with FERC. *See, e.g.*, *PJM Interconnection, L.L.C.*, 156 FERC ¶ 61,120 (2016) (entertaining but rejecting on the merits requests to remove a particular project from the regional transmission plan based on allegations that PJM's benefits analysis was faulty). They can likewise present to FERC any gripes about PJM's transparency or governance. *See, e.g.*, *TranSource, LLC v. PJM Interconnection, L.L.C.*, 168 FERC ¶ 61,119 at PP 78-85 (2019) (considering and rejecting a transparency challenge to PJM's practices). But the PUC cannot take matters into its own hands and use a siting proceeding to impose its own preferred methodology in place of FERC's for determining whether a project is cost-beneficial.

## II. The PUC Order Violates the Dormant Commerce Clause.

The dormant Commerce Clause "prohibits the states from imposing restrictions that benefit in-state economic interests at out-of-state interests' expense." *Cloverland-Green*, 298 F.3d at 210. A state action "motivated by simple economic protectionism" is "subject to a virtually *per se* rule of invalidity." *United Haulers Ass'n v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330, 338-39 (2007). Such an action is valid only if the state can show it "has no other means to advance a legitimate local purpose." *Id.* This rule applies where a state acts with "discriminatory purpose," *Bacchus Imports, Ltd. v. Dias*, 468 U.S. 263, 270 (1984), or where the regulation "discriminates against interstate commerce 'either on its face or in practical effect.'" *Cloverland-Green*, 298 F.3d at 210 (citation omitted).

In addition, under *Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970), an "even-handed[]" regulation that "incidentally" burdens interstate commerce is invalid if the burdens are "clearly excessive in relation to the putative local benefits." *Cloverland-Green*, 298 F.3d at 211 (quoting *Pike*, 397 U.S. at 142). The PUC Order fails that standard as well.

### A. The PUC Order Is *Per Se* Invalid.

The district court correctly concluded that the "PUC's decision was a *per se* violation of the dormant Commerce Clause driven by economic protectionism."

JA63.  The PUC blocked development of an instrumentality of interstate commerce for reasons "rooted in economic protectionism in the form of maintaining the status quo imbalance of access to low-priced electricity." *Id.*  As the PUC stated, although the Project "would … alleviate the economic congestion on a regional level," that "would result in higher rates in Pennsylvania," and the "potential negative and practical impact on the citizens and consumers of Pennsylvania is [the PUC's] concern."  JA281.

The PUC's reasoning violates Supreme Court precedent.  In *New England Power v. New Hampshire*, the Court invalidated a state commission order prohibiting a utility from selling low-cost hydroelectric power outside the state to "gain an economic advantage for New Hampshire citizens at the expense of … customers in neighboring states" by preventing the export of low-cost power.  455 U.S. 331, 339 (1982).  That order was "precisely the sort of protectionist regulation that the Commerce Clause declares off-limits."  *Id.*  A state may not "hoard a local resource … for the benefit of local" interests.  *C&A Carbone, Inc. v. Town of Clarkstown*, 511 U.S. 383, 392 (1994).

The PUC Order is also discriminatory in effect.  As the district court explained, by treating "the projected increase in pricing to those who currently benefit from congestion" as a cost, the PUC Order necessarily discriminates against

43

out-of-state interests.  JA64.  Under the PUC's approach, improving out-of-state "access to low-cost electricity is only desirable to the extent that it does not raise prices to those who currently benefit from congestion," located predominantly in-state. *Id.*

Because the PUC Order discriminates on its face and in effect, it must survive heightened scrutiny.  Appellants make no argument that it can, nor could they: "simple economic protectionism" is not a legitimate state interest. *See New England Power*, 455 U.S. at 339.  The PUC Order violates the dormant Commerce Clause.

## B.    The PUC Order Burdens Commerce in a Manner Disproportionate to Any Legitimate Local Benefits.

In addition, even a facially neutral state policy is invalid if its "burdens" on interstate commerce are "clearly excessive in relation to the putative local benefits." *Pike*, 397 U.S. at 142.  That is so here.

The burden here is preventing the alleviation of congestion across state lines. PJM sought to alleviate congestion that would cause largely out-of-state customers to pay $845 million more for electricity.  The PUC Order keeps low-cost electricity trapped in Pennsylvania based on a "Pennsylvania-only" or "Pennsylvania-also" standard for "need" that prioritizes in-state interests.  JA281.

The burdens on interstate commerce are even more significant when considering the effect if other states acted similarly. *See Healy v. Beer Inst., Inc.,*

491 U.S. 324, 336-37 (1989) (courts must determine "what effect would arise if not one, but many or every, [jurisdiction] adopted similar [regimes]"). As the district court concluded, "if other states adopted a regime similar to the PUC, it would eviscerate FERC's attempts to reduce congestion." JA65. "[E]ach state could put forth its own analysis and effectively deploy a veto" whenever alleviating regional congestion might raise prices for in-state customers. JA65. The burden that Pennsylvania's policy imposes on interstate commerce is wholly excessive compared to any putative local benefits.

### C. The PUC's Arguments in Response Are Meritless.

#### 1. Congress Has Not Expressly Authorized the PUC to Discriminate Against Interstate Commerce.

For the first time, Appellants argue that Congress exempted state siting decisions from dormant Commerce Clause constraints. *See* App. Br. 46-49. That argument is waived. Arguments that are "asserted for the first time on appeal are deemed to be waived and consequently are not susceptible to review … absent exceptional circumstances." *Birdman v. Office of the Governor*, 677 F.3d 167, 173 (3d Cir. 2012).

In any event, no statute authorizes states to use siting authority as a means for economic protectionism. To be sure, Congress may permit States to "regulate an aspect of interstate commerce," *Western & Southern Life Insurance Co. v. State*

45

*Board of Equalization of California*, 451 U.S. 648, 652-53 (1981), but when Congress intends to free states from the dormant Commerce Clause's constraints, it must state that intent clearly and expressly. *See, e.g.*, *Wyoming v. Oklahoma*, 502 U.S. 437, 458 (1992); *Tri-M Grp., LLC v. Sharp*, 638 F.3d 406, 430 (3d Cir. 2011). For example, in *Western & Southern Life*, the McCarran-Ferguson Act stated the "business of insurance … shall be subject to the laws of the several States which relate to the regulation or taxation of such business." 451 U.S. at 653 (quoting 15 U.S.C. § 1012(a) (ellipsis in original)).

Neither of Appellants' cited statutory provisions provides anything close to the needed clear statement. Critically, both provisions are framed in the negative, speaking to what Congress is *not* doing in enacting federal legislation. That language differs from the rare situation where Congress expressly *authorizes* state regulation of interstate commerce. First, Appellants cite Section 824(a), but that simply says that federal regulation of transmission "extend[s] only to those matters which are not subject to regulation by the States." It does not authorize the state to discriminate against out-of-state commerce. Moreover, the Supreme Court has already held that similar language elsewhere in the FPA "is in no sense an affirmative grant of power to the states to burden interstate commerce in a manner which would otherwise not be permissible." *New England Power*, 455 U.S. at 341 (internal

quotation marks omitted) (construing 16 U.S.C. § 824(b)(1)); *see also Wyoming*, 502 U.S. at 458 (same).  Second, Appellants cite the Energy Policy Act of 1992, which provides generally that "[n]othing in this title or in any amendment made by this title shall be construed as affecting or intending to affect, or in any way to interfere with, the authority of any State … relating to … the siting of facilities."  Pub. L. No. 102-486, § 731, 106 Stat. 2776, 2921.  This savings provision does not grant states authority to discriminate in intent or effect.[13]

Finally, Appellants argue that *Northwest Central Pipeline Corp. v. State Corp. Commission of Kansas* holds that no dormant Commerce Clause violation occurs where Congress knew that state regulation would "have some effect on interstate commerce."  489 U.S. 493, 524 (1989).  But there, the Court upheld the challenged state action because it was "incident" to the state's "efforts to regulate … under the powers saved to the States" in the Natural Gas Act, and because the effect of the state action in fact aligned with "current federal policy."  489 U.S. at 523-24.  Neither is true here: the effects on interstate commerce are not "incident" to a proper exercise of siting authority and the effects on interstate commerce are not "indirect and

---

[13] Appellants (Br. 48) also cite *Tampa Electric Co. v. Garcia*, 767 So. 2d 428, 436 (Fla. 2000), but that case treated the constitutional arguments in a single sentence and holds at most that states exercise authority over siting.

speculative." *Id.* at 523, 525. To the contrary, preserving low prices for in-state customers by preventing the flow of power out of state was the explicit basis for the PUC's decision, and there is no "congruity" between state and federal goals.

## 2. The PUC Order Was Discriminatory.

Assuming the dormant Commerce Clause applies to the PUC Order in this case—which it does—Appellants offer little response on the merits. Appellants suggest that the Pennsylvania law governing need is facially neutral. *See* App. Br. 51 (citing 52 Pa. Code § 57.76(a)(1); 66 Pa. Cons. Stat. § 1501). But Transource is not challenging the regulation on its face. The relevant state action here is the PUC Order applying that regulation to the Project. And *the PUC Order* plainly discriminates on its face: the PUC determined that "the consequences of Project 9A would be to alleviate the economic congestion on a regional level, which in turn would result in higher rates in Pennsylvania," JA281, and it blocked the Project out of concern for the "potential negative and practical impact on the citizens and consumers of Pennsylvania" in the form of price increases. *Id.*

Appellants dispute that conclusion, arguing that its "practical application of these facially-neutral laws … did not favor in-state need." App. Br. 51. But the district court found to the contrary, and there is no other way to make sense of the PUC's repeated statements to that effect. *Cf.* JA63 ("Although various statements

48

by the PUC place greater emphasis on Pennsylvania interests and others place more emphasis on regional interests, the PUC's own words make clear that it was focused on protecting the interests of Pennsylvanians.").

Appellants argue that the district court should have turned a blind eye to those repeated statements in the PUC Order because the "district court should have given the Commonwealth Court's factual finding that the PUC considered need on a regional basis preclusive effect." App. Br. 52. That is not a factual finding—it is a characterization of the PUC Order—and the preclusion argument fails for the same reasons given in Part III, *infra*. In any case, even if Appellants are correct that the PUC did in fact consider regional need rather than parochial local interests, that conclusion would only supercharge Transource's preemption argument. As the district court concluded, Appellants' "arguments about the merits of PJM's congestion analysis and how the Project should be assessed do them no favors in this legal context" because they "only underscore the extent to which the PUC's decision constitutes an obstacle to FERC achieving its goals of reducing congestion and achieving just and reasonable rates." JA46.

Finally, even if the PUC considered need on a regional basis, that would show only that the PUC Order was not discriminatory *on its face*. Appellants have offered *no* argument that the Order was not discriminatory *in effect*, nor could they: the Order

is clear that denying approval would have the effect of benefiting in-state customers by preserving existing disparities in wholesale prices.[14] The possibility that residents of some other states might also be incidentally benefited by the PUC's protectionism is irrelevant under the dormant Commerce Clause. *See Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 349, 350-54 (1977) (North Carolina statute limiting ability to label food in a specific way violated the dormant Commerce Clause, even though six other states would also benefit); *New Energy Co. of Ind. v. Limbach*, 486 U.S. 269, 273-74 (1988) (state scheme discriminatory despite providing benefits to other states). It is likewise irrelevant that a small number of Pennsylvania customers might benefit from reduced congestion. *See Dean Milk Co. v. City of Madison*, 340 U.S. 349, 354 n.4 (1951). All that matters is that Pennsylvania chose to impede the flow of electricity across state lines because the interstate flow of electricity would increase prices for Pennsylvania customers. JA281.

Finally, Appellants offer barely any response with respect to *Pike*, which

---

[14] Appellants criticize Transource for "proposing that Pennsylvania must permit the construction of transmission lines *within its own borders* in order to benefit citizens outside its borders, even if those lines will not benefit Pennsylvanians," which Appellants construe as requiring "Pennsylvania [to] discriminate against itself." App. Br. 55 n.19. Not so. Pennsylvania simply cannot privilege is own citizens at the expense of those out-of-state; the dormant Commerce Clause ensures a "unitary national market." *West Lynn Creamery, Inc. v. Healy*, 512 U.S. 186, 193 (1994).

independently establishes a dormant Commerce Clause violation. They argue only that *Pike* is not triggered because, in their view, *National Pork Producers* eliminates *Pike* as a separate basis for a dormant Commerce Clause violation beyond a discrimination claim. *Cf.* App. Br. 50 (citing *Nat'l Pork Producers v. Ross*, 598 U.S. 356, 377 (2023)). But even as construed by *National Pork Producers*, the *Pike* balancing test remains a valid way for plaintiffs to smoke out discrimination by showing that the "burden imposed on [interstate] commerce is clearly excessive in relation to the putative local benefits." *Pike*, 397 U.S. at 142. Appellants do not dispute this test is satisfied. The district court correctly granted summary judgment to Transource on its dormant Commerce Clause claim.

## III. Transource's Claims Are Not Precluded.

Finally, Appellants briefly argue that Transource failed to preserve its ability to bring federal claims in federal court, and that its preemption claim is issue-precluded. App. Br. 56. Those arguments fail.

### A. Transource Preserved Its Federal Claims Under *England*.

Under *England*, 375 U.S. 411, a party aggrieved by a state agency decision can pursue state-law claims in state court, while preserving federal-law claims for federal court, without facing claim preclusion as a result of the state-court judgment. As this Court has explained, the *England* rule is an exception to claim preclusion.

While the Full Faith and Credit Statute, 28 U.S.C. § 1738, generally requires federal courts to give claim-preclusive effect to state-court judgments, in *England* the Supreme Court carved out an exception to "balance the parties' right to a federal forum with … federalism concerns." *Instructional Sys.,* 35 F.3d at 820. Accordingly, "claim preclusion does not apply to state court proceedings when [a] proper *England* reservation [is] made." *Id.* at 822.

*England* allows a party to "preserve its right to return to federal court by making an express reservation in the state court" and specifying "'that [it] intends, should the state courts hold against [it] on the question of state law, to return to the District Court for disposition of [its] federal contentions.'" *Id.* at 820 (quoting *England*, 375 U.S. at 421). In this scenario, "the traditional rules of res judicata and collateral estoppel … do not apply[.]" *Id.* at 822.[15] *England* stressed that a federal court must then decide the plaintiff's federal claims "unless it clearly appears that he voluntarily … and fully litigated his federal claims in the state courts." 375 U.S. at 421.

Transource met *England*'s requirements. Transource initially filed in the

---

[15] Although *England* involved abstention by a district court, this Court has not limited *England* to that context. *See Bradley v. Pittsburgh Bd. of Educ.*, 913 F.2d 1064, 1071-72 (3d Cir. 1990); *N.J. Educ. Ass'n v. Burke*, 579 F.2d 764, 772-76 (3d Cir. 1978).

district court. Because the district court could not adjudicate Transource's state-law claims against state officials under the Eleventh Amendment, Transource then brought its state-law claims in the Commonwealth Court. The district court abstained pending the state-court decision; if the state court had construed the siting regulation in Transource's favor as a matter of state law, that would have obviated the need to return to federal court to litigate the federal constitutional issues. Transource informed the state court of its federal claims and indicated its intent to reserve those claims for decision by the federal court. JA701-04; JA706-07; JA709-12. At no point did Transource "voluntarily … and fully litigate[ ] [its] federal claims in the state courts." *England*, 375 U.S. at 421. Nor did the Commonwealth Court decide those claims. It stated that it would "not address the federal claims that Transource ha[d] reserved for consideration in the District Court." JA729-30 n.12. Accordingly, the Commonwealth Court judgment did not have claim-preclusive effect with respect to the claims reserved for federal-court adjudication.

For this reason, Appellants do not (and cannot) argue that the *Commonwealth Court* decision is preclusive. Instead, they make the novel and incorrect argument that, to raise federal claims in federal court, Transource was required to invoke *England* before *the state agency*. App. Br. 56. Appellants cite no case adopting such a rule—and for good reason. After all, the state agency's decision is what gives rise

to the federal claim in the first place, *see, e.g.*, *Keystone Redevelopment Partners, LLC v. Decker*, 674 F. Supp. 2d 629, 655 (M.D. Pa. 2009) ("[T]he claims raised by Keystone in the instant proceeding *arose out of* [a state board's] licensing decision, … meaning that they did not exist, and were incapable of resolution, prior thereto[.]"), *rev'd on other grounds*, 631 F.3d 89 (3d Cir. 2011). Transource could not have been required to reserve its federal claim before the basis for that claim even existed. JA31.[16] Moreover, the Full Faith and Credit Statute is limited by its terms to "judicial proceedings." 28 U.S.C. § 1738.

Accordingly, *England* makes clear that the reservation of federal claims must be presented to the *state court* that is reviewing the state-law claims. A litigant must "*inform the state courts* that he is exposing his federal claims there only for [compliance purposes] and that he intends, should the *state courts* hold against him on the question of state law, to return to the District Court for disposition of his federal contentions." *England*, 375 U.S. at 421 (emphases added). This Court has

---

[16] Before the district court, Appellants cited *Kentucky West Virginia Gas Co. v. Pennsylvania PUC*, 721 F. Supp. 710 (M.D. Pa. 1989). That decision is readily distinguishable. A utility was precluded from litigating issues it could have raised in previous PUC proceedings that had *already* been reviewed in federal court or to which no court challenge was made. *Id.* at 713, 715-16; *id.* at 722 (on motion for rehearing). Here, there was no prior PUC proceeding or prior federal-court review, and the time for state-court appeal had not expired when Transource filed its federal complaint.

likewise recognized that a "party may preserve its right to return to federal court by making an express reservation *in the state court*." *Instructional Sys.*, 35 F.3d at 820.[17]

Appellants cite two cases where litigants invoked *England* in state administrative proceedings. App. Br. 57-58. But neither *requires* a litigant to invoke *England* before a state agency; to the contrary, this Court considered whether a litigant reserved its federal claims "in the state court proceedings." *Bradley v. Pittsburgh Bd. of Educ.*, 913 F.2d 1064, 1071 (3d Cir. 1990); *Ivy Club v. Edwards*, 943 F.2d 270, 281 (3d Cir. 1991). Nor do Appellants' Eleventh Circuit cases, App. Br. 58, require that an *England* reservation be made before the state agency. *See Fields v. Sarasota Manatee Airport Auth.*, 953 F.2d 1299, 1305 (11th Cir. 1992) (requiring litigant to "inform the *state court*" of its federal claims); *Sharpley v. Davis*, 786 F.2d 1109, 1111-12 & n.2 (11th Cir. 1986) (applying ordinary claim preclusion rules where litigant sought review in state court before filing in federal court, and not even citing *England*).

---

[17] *See also, e.g.*, *Bernardsville Quarry v. Bor. of Bernardsville*, 929 F.2d 927, 929 (3d Cir. 1991) ("[A] party is generally required to inform the *state court* that it intends to return to federal court for litigation of its federal claims…." (emphasis added)); *Bradley*, 913 F.2d at 1071 (a party "may reserve his federal claims for federal adjudication by informing the *state court* of the nature of his federal claims…" (emphasis added)).

The district court correctly rejected Appellants' claim-preclusion arguments. JA30-31.

## B. Transource's Preemption Claim Is Not Barred by Issue Preclusion.

Appellants' issue-preclusion argument likewise fails. First, this argument was waived. The district court directed the parties to address "all the issues in this case" at summary judgment. JA31-32. Appellants nevertheless demoted issue preclusion to only a cursory footnote in their summary judgment brief, which the district court held was insufficient to preserve the issue. *Id.*; *see* Doc. 148 at 5-6 n.1. Appellants do not challenge the district court's waiver finding here. Thus, the issue has now been doubly waived. *See, e.g.*, *Garza v. Citigroup Inc.*, 881 F.3d 277, 284 (3d Cir. 2018).

Second, on the merits, there was no issue preclusion. Because the Full Faith and Credit Statute applies only to state-court judgments, federal courts have developed federal common-law rules governing when a state-agency determination is issue-preclusive on a federal court. The Supreme Court has held that a state agency's *factfinding* is entitled to "the same preclusive effect to which it would be entitled in the State's courts." *Univ. of Tenn. v. Elliott*, 478 U.S. 788, 799 (1986). But that rule does *not* apply to a state agency's unreviewed *conclusions of law*. Regarding those, courts must consider "the specific context of the rights at stake, the

power of the agency, and the relative adequacy of agency procedures." *Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104, 109-10 (1991). Appellants' arguments about the preclusive effect that *Pennsylvania* courts would give the PUC's conclusions, App. Br. 56-57, are irrelevant because the issue-preclusive effect in federal court of a state agency's unreviewed legal conclusions is governed by federal common law, not state law. *Cf. Elliott*, 478 U.S. at 794-95.

This Court has long held "an agency consisting of lay persons [does not have] the expertise to issue binding pronouncements [on] federal constitutional law." *Edmundson v. Borough of Kennett Square*, 4 F.3d 186, 193 (3d Cir. 1993). That forecloses any issue-preclusion argument here. This case involves federal constitutional claims, and the PUC is a lay commission. *See* 66 Pa. Cons. Stat. § 301(b) (imposing no qualifications other than that each PUC commissioner "shall be a resident of this Commonwealth," "shall have been a qualified elector therein for a period of at least one year," and "shall also be not less than 25 years" old). The district court correctly held that, under *Edmundson*, the PUC's unreviewed conclusions were not entitled to issue-preclusive effect. JA413.

Further, this Court has expressly held that a litigant is free to challenge a state administrative decision in federal court on preemption grounds so long as it makes an *England* reservation in a parallel state-court proceeding—a holding that cannot

be squared with Appellants' issue-preclusion argument. *See Metro. Edison Co. v. Pa. PUC*, 767 F.3d 335, 367 (2014) (confirming that a preemption litigant can "withdraw[] [its] federal issues from the state proceeding and br[ing] them in federal court"). And in *DePolo*, the Court treated a local zoning board's rejection of a preemption argument as issue preclusive in federal court only because the plaintiff had failed to seek timely review in state court as well. *DePolo v. Bd. of Supervisors Tredyffrin Twp.*, 835 F.3d 381, 383, 387 (3d Cir. 2016). The Court stated that if the litigant had timely sought state-court review (as Transource did here), that would have "allowed the District Court to narrowly address the question of preemption" without any preclusion problem. *Id.* at 387 n.18.

Moreover, in reviewing a prior PUC determination, this Court implicitly recognized that the PUC's legal determinations are not preclusive: it treated the PUC's *factual* findings as preclusive under *Elliott* but evaluated the utility's preemption and dormant Commerce Clause claims on the merits. *Ky. W. Va. Gas Co. v. Pa. PUC*, 837 F.2d 600, 606-16 (3d Cir. 1988). That approach was correct. A state agency's decision about *its own* authority under federal law should not preclude a federal-court's contrary determination. *Cf. Williams v. Pennsylvania*, 579 U.S. 1, 9 (2016) ("[N]o man can be a judge in his own case.").

Other circuits have similarly rejected the argument that a state agency

determination on preemption is issue-preclusive in federal court. *See, e.g.*, *Iowa Network Servs., Inc. v. Qwest Corp.*, 363 F.3d 683, 690-92 (8th Cir. 2004); *Evans v. Bd. of Cnty. Comm'rs of Cnty. of Boulder*, 994 F.2d 755, 761 (10th Cir. 1993). Federal courts—including the Supreme Court and this Court—also routinely implicitly reject Appellants' theory when they review state agency decisions on preemption grounds without treating the agencies' preemption conclusions as preclusive.[18] Throughout these proceedings, Appellants have not cited a single federal case according issue-preclusive effect in federal court to a state agency's unreviewed conclusion that its own actions were not preempted.[19]

---

[18] *E.g.*, *Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69, 76-77 (2013); *Verizon Md., Inc. v. Pub Serv. Comm'n of Md.*, 535 U.S. 635, 642-43, 647 (2002); *PPL Energyplus, LLC v. Solomon*, 766 F.3d 241, 249, 252-55 (3d Cir. 2014); *Freehold Cogeneration Assocs., L.P. v. Bd. of Regul. Comm'rs of N.J.*, 44 F.3d 1178, 1184-87, 1194 (3d Cir. 1995).

[19] *Crossroads Cogeneration Corp. v. Orange & Rockland Utilities, Inc.*, 159 F.3d 129 (3d Cir. 1998), does not hold that the PUC is in all cases competent to address issues of federal law. *Crossroads* involved a unique context where the relevant federal statute gave state agencies a specific role in implementing FERC regulations. *Id.* at 135; *see* 16 U.S.C. § 824a-3(f)(1). That statute does not apply here. Moreover, *Crossroads* explicitly held that it "need not resolve" whether issue preclusion applied to a claim that federal law "preempts the state agency from acting." 159 F.3d at 135.

Thus, even if Appellants' issue-preclusion argument were not waived, it would fail on the merits.

## CONCLUSION

For the foregoing reasons, the district court's judgment should be affirmed.

Dated:  July 10, 2024

Precious S. Jacobs-Perry
Jenner & Block LLP
353 N. Clark Street
Chicago, IL 60654
312-222-9350
pjacobs-perry@jenner.com


Allison N. Douglis
Jenner & Block LLP
1155 Avenue of the Americas
New York NY 10036
212-891-1600
adouglis@jenner.com

Respectfully submitted,

*/s/ Matthew E. Price*
Matthew E. Price
Arjun R. Ramamurti
Jenner & Block LLP
1099 New York Avenue, NW
Suite 900
Washington, DC 20001
202-639-6000
mprice@jenner.com
aramamurti@jenner.com


*Counsel for Transource Pennsylvania, LLC*

**CERTIFICATE OF COMPLIANCE**

Pursuant to Fed. R. App. P. 32(g), I certify that this brief complies with the type-volume limitation in Fed. R. App. P. 32(a)(7)(B).  Excluding the parts of the brief exempted by Fed. R. App. P. 32(f), this brief contains 12,994 words.

I further certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in Times New Roman 14-point font using Word for Microsoft 365.

I further certify that, pursuant to Circuit Rule 31.1(c), the text of the electronic brief is identical to the text in paper copies sent to the Court, and that the electronic brief was scanned for viruses using Palo Alto WildFire and that no viruses were detected.

*/s/ Matthew E. Price*
Matthew E. Price

**CERTIFICATE OF SERVICE**

I certify that on July 10, 2024, I filed the foregoing brief using the Court's CM/ECF system.  Service will be effected by and through the Court's CM/ECF system.

*/s/ Matthew E. Price*
Matthew E. Price
