IN THE

# United States Court of Appeals
## FOR THE THIRD CIRCUIT

TRANSOURCE PENNSYLVANIA LLC,

v.

STEVEN M. DEFRANK, CHAIRMAN, PENNSYLVANIA PUBLIC UTILITY
COMMISSION; KIMBERLY M. BARROW, VICE CHAIRMAN, PENNSYLVANIA
PUBLIC UTILITY COMMISSION; JOHN F. COLEMAN, JR., COMMISSIONER,
PENNSYLVANIA PUBLIC UTILITY COMMISSION, IN HIS OFFICIAL CAPACITY;
RALPH V. YANORA, COMMISSIONER, PENNSYLVANIA PUBLIC UTILITY
COMMISSION, IN HIS OFFICIAL CAPACITY; PENNSYLVANIA PUBLIC UTILITY
COMMISSION; KATHRYN L. ZERFUSS, COMMISSIONER, PENNSYLVANIA
PUBLIC UTILITY COMMISSION, IN HER OFFICIAL CAPACITIES,

*Appellants.*

## BRIEF FOR AMICUS CURIAE PJM INTERCONNECTION, L.L.C.
## SUPPORTING APPELLEE AND SUPPORTING AFFIRMANCE

Lauren F. Dayton
MOLOLAMKEN LLP
430 Park Avenue, Floor 6
New York, NY 10022
(212) 607-8160
ldayton@mololamken.com

Lucas M. Walker
MOLOLAMKEN LLP
The Watergate, Suite 500
600 New Hampshire Avenue, NW
Washington, D.C. 20037
(202) 556-2000
lwalker@mololamken.com

*Counsel for Amicus Curiae PJM Interconnection, L.L.C.*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(A), amicus curiae PJM Interconnection, L.L.C. ("PJM") states that it is a limited liability company organized and existing under the laws of the State of Delaware. PJM has no parent companies. Under Delaware law, the members of an L.L.C. have an "interest" in the L.L.C. *See* Del. Code Ann. tit. 6, § 18-701. PJM's members—utilities and other related entities in the business of power generation and transmission—do not purchase their interests or otherwise provide capital to obtain their interests. Rather, the PJM members' interests are determined pursuant to a formula that considers various attributes of the member, and the interests are used only for the limited purposes of: (i) determining the amount of working capital contribution for which a member may be responsible in the event financing cannot be obtained;[1] and (ii) dividing assets in the event of liquidation. PJM is not operated to produce a profit, has never made any distributions to members on account of their interests, and does not intend to do so (absent dissolution). In addition, other than through their role in the election of the PJM Board of Managers, PJM members do not take part in the management of

---

[1] Under the Amended and Restated Operating Agreement of PJM Interconnection, L.L.C., the amount of capital contributions received from all PJM members combined is capped at $5,200,000. PJM has generally financed its working capital requirements.

the business for PJM, and there are no individual entities that have a 10% or greater voting interest in the conduct of any PJM affairs.

# TABLE OF CONTENTS

Page

INTEREST OF AMICUS AND INTRODUCTION ................................................ 1

ARGUMENT .................................................................................................. 4

I.   Under the Federal Power Act and FERC-Approved Tariffs, FERC Has
     Assigned PJM Responsibility for Regional Transmission Planning .............. 4

     A.   FERC Exercises Its Exclusive Regulatory Authority Over the
          Transmission and Sale of Wholesale Electricity Through Tariffs
          That Carry the Force of Federal Law .................................................... 4

     B.   FERC Requires PJM To Engage in Regional Transmission
          Planning To Identify Needs for New Transmission Facilities ............. 5

     C.   PJM Conducts Regional Transmission Planning Through an
          Open, Transparent Process Governed by Its FERC-Approved
          Tariff .................................................................................................... 8

II.  The PAPUC's Order Impermissibly Attempts To Override PJM's
     FERC-Approved Regional Transmission Planning Process ........................ 12

     A.   The PAPUC's Rejection of PJM's FERC-Approved
          Methodology Conflicts with Federal Law and Is Therefore
          Preempted ........................................................................................... 12

     B.   States' Traditional Authority Over *Siting* Does Not Permit
          Them To Intrude on FERC's Authority Over Transmission
          *Planning* .......................................................................................... 16

III. PJM's Regional Transmission Planning Process Falls Squarely Within
     FERC's Regulatory Authority and Would Be Thwarted If the
     PAPUC's Position Were Left Uncorrected .................................................. 20

     A.   Regional Transmission Planning, Including the Determination
          of Need, Falls Squarely Within FERC's Authority Over the
          Transmission and Sale of Wholesale Electricity ................................ 20

B.     Allowing State Commissions To Reject PJM's FERC-Approved Need Methodology Would Thwart Regional Transmission Planning—As This Case Vividly Illustrates ................26

CONCLUSION ......................................................................28

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Entergy Louisiana, Inc. v. Louisiana Pub. Serv. Comm'n*,
539 U.S. 39 (2003)................................................................5

*George E. Warren LLC v. Colonial Pipeline Co.*,
50 F.4th 391 (3d Cir. 2022) ................................................5

*Hughes v. Talen Energy Mktg., LLC*,
578 U.S. 150 (2016)........................................................*passim*

*Metro. Edison Co. v. Pennsylvania Pub. Util. Comm'n*,
767 F.3d 335 (3d Cir. 2014) ................................................4

*Mississippi Power & Light Co. v. Mississippi ex rel. Moore*,
487 U.S. 354 (1988).....................................5, 13, 16, 18

*N.J. Bd. of Pub. Utils. v. FERC*,
744 F.3d 74 (3d Cir. 2014) ................................................4

*Nantahala Power & Light Co. v. Thornburg*,
476 U.S. 953 (1986)...........................................5, 16, 19

*New York v. FERC*,
535 U.S. 1 (2002)...............................................13, 20

*PPL Energyplus, LLC v. Solomon*,
766 F.3d 241 (3d Cir. 2014) .......................................5, 13

*S.C. Pub. Serv. Auth. v. FERC*,
762 F.3d 41 (D.C. Cir. 2014)....................................*passim*

## CONSTITUTIONAL & STATUTORY PROVISIONS

U.S. Const. art. VI, cl. 2........................................................13

Federal Power Act, codified at 16 U.S.C. §§ 791 *et seq.*:

Section 201(a) (codified at 16 U.S.C. § 824(a)) ................................20

16 U.S.C. § 824d(a) ...............................................................4, 19, 21

16 U.S.C. § 824d(c) ......................................................................5

16 U.S.C. § 824e(a) ........................................................4, 19, 21, 26

Section 216 (codified at 16 U.S.C. § 824p) ..............................17, 24

    16 U.S.C. § 824p(b) .............................................................17, 24

Section 217 (codified at 16 U.S.C. § 824q) ............................... *passim*

    16 U.S.C. § 824q(b)(4) ..........................................................*passim*

16 U.S.C. § 825*l*(b) ....................................................................26

Energy Policy Act of 2005, Pub. L. No. 109-58, 119 Stat. 594 (2005):

    § 1221, 119 Stat. at 946 ............................................................17

    § 1233, 119 Stat. at 957-58 .......................................................17

52 Pa. Code § 57.76(a)(2) ..............................................................17

52 Pa. Code § 57.76(a)(3) ..............................................................17

52 Pa. Code § 57.76(a)(4) ..............................................................17

## REGULATIONS

18 C.F.R. § 35.34(k) ......................................................................6

18 C.F.R. § 35.34(k)(2) ..................................................................6

## ADMINISTRATIVE ORDERS & DECISIONS

Order No. 890, *Preventing Undue Discrimination and Preference in Transmission Service*, F.E.R.C. Stats. & Regs. ¶ 31,241, 72 Fed. Reg. 12,266 (2007) ..............................................................7

Order No. 1000, *Transmission Planning and Cost Allocation by Transmission Owning and Operating Public Utilities*, 136 FERC ¶ 61,051, 76 Fed. Reg. 49,842 (2011) ......................................*passim*

Order No. 1000-A, *Transmission Planning and Cost Allocation by Transmission Owning and Operating Public Utilities*, 139 FERC ¶61,132, 77 Fed. Reg. 32,184 (2012) ............................16, 17, 18, 23

Order No. 2000, *Regional Transmission Organizations*, 89 FERC ¶61,285, 65 Fed. Reg. 810 (2000) .................................................6, 26

*PJM Interconnection, L.L.C.*, 101 FERC ¶61,345 (2002) ...............................................................................6, 7

*PJM Interconnection, L.L.C.*, 113 FERC ¶61,292 (2005) ...................................................................................11

*PJM Interconnection, L.L.C.*, 123 FERC ¶61,051 (2008) ........................................................................*passim*

*PJM Interconnection, L.L.C.*, 166 FERC ¶61,114 (2019) ...........................................................................10, 21

*PJM Interconnection, L.L.C.*, 173 FERC ¶61,258 (2020) ......................................................................10, 15, 21

*In re Application of Transource Maryland LLC*, Order No. 89571, 2020 WL 3977589 (Md. Pub. Serv. Comm'n June 30, 2020) ....................................................14, 27

### TARIFF PROVISIONS

Amended and Restated Operating Agreement of PJM Interconnection, L.L.C., https://agreements.pjm.com/oa/4773 .............................................*passim*

Schedule 6, section 1.1 .................................................................................7, 8

Schedule 6, section 1.3(a)..................................................................10, 11, 25

Schedule 6, section 1.3(b)..................................................................10, 11, 25

Schedule 6, section 1.3(c)........................................................................10, 11

Schedule 6, section 1.3(d)........................................................................10, 11

Schedule 6, section 1.3(e)........................................................................10, 11

Schedule 6, section 1.5.1(a)............................................................................8

Schedule 6, section 1.5.2 ...................................................................................11

Schedule 6, section 1.5.3 ...............................................................................8, 11

Schedule 6, section 1.5.4 ...................................................................................11

Schedule 6, section 1.5.6 ...................................................................................10

Schedule 6, section 1.5.6(a)...............................................................................11

Schedule 6, section 1.5.6(b).........................................................................11, 12

Schedule 6, section 1.5.6(d)...............................................................................11

Schedule 6, section 1.5.6(f) ....................................................................11, 12, 25

Schedule 6, section 1.5.7 .....................................................................................8

Schedule 6, section 1.5.7(a)...............................................................................11

Schedule 6, section 1.5.7(b).................................................................................8

Schedule 6, section 1.5.7(c).................................................................................8

Schedule 6, section 1.5.7(c)(i)...........................................................................11

Schedule 6, section 1.5.7(c)(ii)..........................................................................11

Schedule 6, section 1.5.7(c)(iii).........................................................................11

Schedule 6, section 1.5.7(d)............................................................................8, 9

Schedule 6, section 1.5.7(e).................................................................................8

Schedule 6, section 1.5.7(f) .............................................................................9, 11

Schedule 6, section 1.5.8(b)...............................................................................11

Schedule 6, section 1.5.8(c)...............................................................................11

Schedule 6, section 1.5.8(d)...............................................................................11

Schedule 6, section 1.5.8(k)...............................................................................11

Schedule 6, section 1.6 .......................................................................................11

**OTHER AUTHORITIES**

PJM Filing (Feb. 28, 2014), FERC Docket No. ER14-1394,
https://www.pjm.com/directory/etariff/fercdockets/1075/20140228-
    er14-1394-000.pdf ........................................................................................22, 23

## INTEREST OF AMICUS AND INTRODUCTION[1]

PJM Interconnection, L.L.C. is the federally regulated regional transmission organization for an area spanning all or portions of 13 States and the District of Columbia in the Mid-Atlantic Region. PJM is an independent entity, separate from the companies that own electric generation and transmission facilities, that has been authorized by the Federal Energy Regulatory Commission ("FERC") to provide electricity transmission service and administer the bulk power system in its region.

As relevant here, FERC requires PJM to engage in regional transmission planning to identify system needs for new transmission facilities. That process is highly regulated by PJM's tariffs—FERC-approved documents carrying the force of federal law. PJM has an interest in ensuring that it can fulfill its responsibilities in the manner FERC has directed, and that its regional transmission need determinations are implemented consistent with FERC-approved policies.

Here, PJM followed its FERC-mandated planning process to identify a need to address system constraints (*i.e.*, congestion) in the PJM Region. PJM then applied a FERC-approved benefit-cost formula to select the Transource IEC Project, which would construct new transmission facilities between Pennsylvania and Maryland, as

---

[1] No party's counsel authored this brief in whole or part. No party, party's counsel, or person other than PJM and its counsel contributed money to fund the brief's preparation or submission. All parties have consented to the filing of this brief.

the more efficient or cost-effective solution for satisfying that need. The Pennsylvania Public Utilities Commission ("PAPUC") nonetheless denied Transource permission to site the project in Pennsylvania. In doing so, the PAPUC rejected PJM's system planning need determination and substituted its own need determination, based on its disagreement with how PJM's FERC-approved tariff requires a project's benefits and costs to be measured.

PJM has great respect for the authority of the PAPUC and other state commissions. PJM recognizes that state commissions are *not* required to approve every PJM-selected transmission project presented to them. When making siting determinations, state commissions retain significant authority to grant or deny permission to construct a PJM-selected project on various grounds, including the impact of a project's route on public health and safety, natural resources, or the environment. Nothing in PJM's tariff—or the district court's decision in this case—calls into question that state siting authority.

Authority over *siting*, however, is not the same as authority over *planning*. As FERC has explained, state siting authority does *not* extend to FERC-approved processes for identifying and evaluating transmission system needs. Indeed, Congress has specifically assigned FERC responsibility for "facilitat[ing] the planning and expansion of transmission facilities to meet the reasonable needs" of utilities that serve consumers. 16 U.S.C. § 824q(b)(4). Thus, while the PAPUC possesses

state siting authority, that authority does not allow it to second-guess the FERC-approved planning processes used to identify regional transmission system needs, or PJM's determination that a particular project addresses those needs. Instead, the criteria PJM uses to make need determinations for the identification and selection of projects fall squarely within the authority FERC has assigned to PJM. State efforts to reject PJM's FERC-approved methodology, or need determinations PJM makes applying that methodology, are accordingly preempted.

The preemption question here is narrow but important: Whether a state commission can reject PJM's determination, under its FERC-approved methodology, that a transmission project meets a regional transmission system need. As the entity FERC has charged with regional transmission planning in Pennsylvania and neighboring jurisdictions, PJM has unique expertise and perspective regarding that issue. PJM accordingly participated as an amicus in district court. It now submits this brief to assist this Court in understanding PJM's role in the FERC-mandated regional planning process and the impact of the PAPUC decision on that process.

**I.** **UNDER THE FEDERAL POWER ACT AND FERC-APPROVED TARIFFS, FERC HAS ASSIGNED PJM RESPONSIBILITY FOR REGIONAL TRANSMISSION PLANNING**

This case involves PJM's responsibility for regional transmission planning—a responsibility assigned to PJM by FERC, under FERC's authority to ensure just and reasonable rates and practices for the transmission of wholesale electricity.

**A.** **FERC Exercises Its Exclusive Regulatory Authority Over the Transmission and Sale of Wholesale Electricity Through Tariffs That Carry the Force of Federal Law**

The Federal Power Act ("FPA") grants FERC exclusive jurisdiction over the transmission of wholesale electricity. 16 U.S.C. § 824d(a); *Metro. Edison Co. v. Pennsylvania Pub. Util. Comm'n*, 767 F.3d 335, 341 (3d Cir. 2014). Among other things, FERC is responsible for ensuring that all rates and practices affecting the transmission of electricity are "just and reasonable." 16 U.S.C. §§ 824d(a), 824e(a).

FERC's responsibility expressly includes *planning* to meet transmission needs. In FPA Section 217, Congress directed FERC to exercise its authority over wholesale electricity "in a manner that facilitates the *planning and expansion of transmission facilities* to meet the reasonable *needs* of load-serving entities" (*i.e.*, utilities that serve end-users). 16 U.S.C. § 824q(b)(4) (emphasis added).

FERC exercises its authority over transmission, including transmission planning, through filed "tariffs" that govern the "'classifications, practices, and regulations'" of regulated entities. *N.J. Bd. of Pub. Utils. v. FERC*, 744 F.3d 74, 83 (3d

Cir. 2014); *see* 16 U.S.C. § 824d(c). Once filed with FERC, a tariff has the force of federal law, akin to a statute or regulation. *See Mississippi Power & Light Co. v. Mississippi ex rel. Moore*, 487 U.S. 354, 373 (1988); *Nantahala Power & Light Co. v. Thornburg*, 476 U.S. 953, 966-67 (1986). FERC-filed tariffs therefore preempt contrary determinations by state utility commissions. *Entergy Louisiana, Inc. v. Louisiana Pub. Serv. Comm'n*, 539 U.S. 39, 47 (2003); *PPL Energyplus, LLC v. Solomon*, 766 F.3d 241, 253 (3d Cir. 2014) (FERC-approved tariffs "'issued pursuant to [Congressional] authority have no less preemptive effect than federal statutes'"). That principle "has an 'expansive reach.'" *George E. Warren LLC v. Colonial Pipeline Co.*, 50 F.4th 391, 395 (3d Cir. 2022). A tariff's preemptive power extends to all terms and conditions of the tariff. *See Nantahala*, 476 U.S. at 966.[2]

### B. FERC Requires PJM To Engage in Regional Transmission Planning To Identify Needs for New Transmission Facilities

FERC exercises its authority over electricity transmission—including transmission planning—in two particularly relevant ways.

---

[2] The principle that a filed tariff has the force of federal law is sometimes called the "filed rate doctrine." The "rate" that must be given preemptive effect is not limited to "prices or volumes of purchases"; it extends to all substantive aspects of the tariff. *Nantahala*, 476 U.S. at 966.

First, FERC has approved independent regional transmission organizations ("RTOs") that are responsible for managing regional electrical grids. 18 C.F.R. § 35.34(k); Order No. 2000, *Regional Transmission Organizations*, 89 FERC ¶ 61,285, 65 Fed. Reg. 810 (2000). FERC has designated PJM as the RTO for an area covering much of the Mid-Atlantic Region, including Maryland and Pennsylvania. *PJM Interconnection, L.L.C.*, 101 FERC ¶ 61,345 (2002); *see Hughes v. Talen Energy Mktg., LLC*, 578 U.S. 150, 155 (2016).

One of PJM's responsibilities as an RTO is "congestion management." 18 C.F.R. § 35.34(k)(2); Order No. 2000, 65 Fed. Reg. at 887. Congestion is caused by "transmission bottlenecks" where existing facilities lack sufficient capability for electricity to flow unimpeded between different areas. *PJM Interconnection, L.L.C.*, 123 FERC ¶ 61,051, P 26 (2008). Electricity becomes "trapped" behind the bottleneck, producing inefficiencies on both sides: Prices are artificially high in places the electricity cannot reach, and artificially low in places the electricity cannot escape. *See id.* As an RTO, PJM is required to develop mechanisms for mitigating congestion. 18 C.F.R. § 35.34(k)(2); Order No. 2000, 65 Fed. Reg. at 887-88.

Second, and relatedly, FERC requires RTOs—including PJM—to engage in regional transmission planning to identify needs for new transmission facilities. In orders adopted in 2007 and 2011, FERC recognized that existing transmission planning practices were "inadequate" and threatened to produce unjust and unreasonable

rates, because they could "thwart the identification of more efficient and cost-effective transmission solutions." *S.C. Pub. Serv. Auth. v. FERC*, 762 F.3d 41, 66-67 (D.C. Cir. 2014); *see* Order No. 890, *Preventing Undue Discrimination and Preference in Transmission Service*, F.E.R.C. Stats. & Regs. ¶31,241, 72 Fed. Reg. 12,266, 12,271, 12,275-76 (2007); Order No. 1000, *Transmission Planning and Cost Allocation by Transmission Owning and Operating Public Utilities*, 136 FERC ¶61,051, PP 78-84, 76 Fed. Reg. 49,842, 49,856-58 (2011).[3] Exercising its authority to ensure just and reasonable transmission rates and practices—including its duty under FPA Section 217 to facilitate transmission planning—FERC mandated that RTOs conduct an ongoing regional planning process to identify " 'regional solutions to regional needs.' " *S.C. Pub. Serv. Auth.*, 762 F.3d at 67 (quoting Order No. 1000, P 320, 76 Fed. Reg. at 49,897); *see id.* at 50-51, 90 (discussing Section 217).

FERC has assigned PJM responsibility for the planning process within its region. *See PJM*, 101 FERC ¶61,345 at 62,451. PJM does so under a FERC-approved tariff—specifically, Schedule 6 of PJM's Operating Agreement. *See* Amended and Restated Operating Agreement of PJM Interconnection, L.L.C., Schedule 6, section 1.1, https://agreements.pjm.com/oa/4773. That tariff, which has

---

[3] FERC Order Nos. 890 and 1000, and FERC's basis for adopting them, are discussed at length in *South Carolina Public Service Authority*, 762 F.3d at 50-54.

the force of federal law, sets out in detail the criteria PJM must apply to identify

needed transmission projects.  Schedule 6, section 1.5.7(d)-(e).[4]

### C.    PJM Conducts Regional Transmission Planning Through an Open, Transparent Process Governed by Its FERC-Approved Tariff

1.    Consistent with its congestion-management obligations, PJM's region-

al planning process includes evaluating the need to mitigate congestion-based sys-

tem constraints.  Projects designed to mitigate congestion are known as market-

efficiency projects or "Economic-based Enhancements or Expansions."  Schedule 6,

section 1.5.7(b)-(c).[5]

When PJM identifies a need for new transmission, it evaluates proposed

solutions based on criteria set forth in the tariff.  For market-efficiency projects, PJM

must apply a specific "Benefit/Cost" formula approved by FERC.  Schedule 6,

section 1.5.7(d).  Only projects that have and maintain a benefit-cost ratio of at least

1.25:1 are eligible for further consideration.  Schedule 6, section 1.5.7(d); *see* Order

No. 1000, P 646, 76 Fed. Reg. at 49,940 (prohibiting use of higher ratio absent FERC

---

[4] Among PJM's FERC-approved governing documents are its Operating Agreement, Open Access Transmission Tariff, and Reliability Assurance Agreement, all of which are referred to as "tariffs."  This brief generally uses "tariff" to refer to Schedule 6 of the Operating Agreement, which governs the regional transmission planning process at issue here.

[5] PJM has regional planning authority over transmission projects driven by reliability, market-efficiency, and public-policy needs.  *See* Schedule 6, sections 1.5.1(a), 1.5.3, 1.5.7; *see generally* Schedule 6, section 1.1.  The Transource IEC Project was selected as a market-efficiency project.

approval).  The benefit-cost assessment for a proposed project is reviewed annually. Schedule 6, section 1.5.7(f).

PJM's tariff specifies what qualifies as a "benefit" or "cost."  Benefits generally include reduced energy prices in areas currently suffering from congestion, while costs generally include amounts needed to construct new facilities.  *See* Schedule 6, section 1.5.7(d).  For lower-voltage transmission projects (like the Transource IEC Project), the tariff does *not* permit PJM to count as a "cost" the increased energy prices that some areas will experience when congestion is allevi-ated.  *See PJM*, 123 FERC ¶ 61,051, P 67.  As noted above, prices in those areas had been artificially suppressed because energy could not flow unimpeded to other, higher-cost areas.  *See* p. 6, *supra*.  Increased prices in those areas after the conges-tion is relieved thus do not represent costs of the project, but the elimination of the very inefficiency the project was designed to address.

FERC has repeatedly approved PJM's market-efficiency planning process and formula.  It has specifically approved the benefit-cost formula's inclusion of price benefits to "zones that experience reduced energy payments" and exclusion from relevant costs of "the expected energy payment increases, if any, in other zones." *PJM*, 123 FERC ¶ 61,051, P 67.  FERC has also specifically rejected objections that increased prices in some areas (*i.e.*, "zonal load costs") should be counted as costs.

*See id.*; *PJM Interconnection, L.L.C.*, 173 FERC ¶61,258 (2020); *PJM Interconnection, L.L.C.*, 166 FERC ¶61,114 (2019).[6]

2.      Consistent with FERC requirements, regional planning is an "open and transparent" process with multiple opportunities for stakeholders—including States, consumer advocates, and other interested parties—to weigh in long before any project is ultimately selected pursuant to the FERC-approved criteria.  Order No. 1000, P 108, 76 Fed. Reg. at 49,861.  PJM's tariff provides for open, transparent stakeholder meetings throughout the planning process, and requires that "any . . . interested entities or persons" have the opportunity to participate, including through various PJM committees.  Schedule 6, sections 1.3(a)-(e); *see generally* Schedule 6, section 1.5.6.

Those committees include the Planning Committee and the Transmission Expansion Advisory Committee ("TEAC").  Those committees are "open to participation" by "electric utility regulatory agencies within the States in the PJM Region" (such as the PAPUC), "State Consumer Advocates" (such as amici Pennsylvania Office of Consumer Advocate and Delaware Division of the Public Advocate), and "any other interested entities or persons."  Schedule 6, sections 1.3(a)-(b).  The

---

[6] As Transource notes, PJM does not conduct benefit-cost analysis for all transmission projects.  Transource Br. 35-36.  But here, PJM applied the FERC-approved benefit-cost formula applicable to market-efficiency projects and selected the Transource IEC Project.

TEAC, in particular, offers stakeholders an open, transparent public forum to provide advice and recommendations throughout development of the regional transmission expansion plan.[7]

PJM conducts its tariffed regional planning process by first developing the study scope and assumptions to be used in identifying system needs. Schedule 6, sections 1.5.2-1.5.4, 1.5.6(b), (d); 1.5.7(a), (c)(i)-(iii). PJM identifies and posts system needs, Schedule 6, sections 1.5.3, 1.5.8(b), and, as appropriate, solicits proposals that address those needs, Schedule 6, section 1.5.8(c). PJM then evaluates proposed solutions and vets the selection and recommendation of proposed solutions with the TEAC before presenting them to PJM's independent Board of Managers for review and approval. Schedule 6, sections 1.5.7(c)(iii), 1.5.8(d), 1.6. The TEAC is also involved in review of project modifications and annual re-evaluations of market-efficiency projects. Schedule 6, sections 1.5.7(f), 1.5.8(k).

The entire process is "open and collaborative," with ample "opportunity for meaningful participation" through the TEAC and otherwise. Schedule 6, section

---

[7] State regulatory commissions have the opportunity to participate in PJM's planning process not only individually, but also through the collective efforts of the Independent State Agencies Committee and the Organization of PJM States, Inc. ("OPSI"). *See* Schedule 6, sections 1.3(a)-(e); *PJM Interconnection, L.L.C.,* 113 FERC ¶ 61,292, PP 32, 39 (2005) (finding OPSI will "benefit market participants by coordinating consideration of issues such as reliability, facility siting, and transmission planning," and approving a PJM tariff mechanism to fund OPSI).

1.5.6(a); *see, e.g.*, Schedule 6, sections 1.5.6(b) ("open forum" to discuss initial assumptions), 1.5.6(f) ("open meetings and communications" to review proposals). Among other things, PJM must "publicly post" relevant information and "invite interested parties to submit comments" before any plan is approved.  Schedule 6, sections 1.5.6(b), (f).

Upholding PJM's FERC-approved planning process is critical to ensure the efficient movement of wholesale electricity across the PJM region.  If needed transmission projects are not built, the problems that led FERC to mandate regional planning under its authority to ensure just and reasonable rates will continue.  Relevant to this case, congestion will persist and price inefficiencies that cost customers real money will continue, despite PJM's identification of solutions to those problems.

## II.   THE PAPUC'S ORDER IMPERMISSIBLY ATTEMPTS TO OVERRIDE PJM'S FERC-APPROVED REGIONAL TRANSMISSION PLANNING PROCESS

### A.   The PAPUC's Rejection of PJM's FERC-Approved Methodology Conflicts with Federal Law and Is Therefore Preempted

Through its FERC-mandated regional planning process, PJM identified a need for additional transmission facilities in the multi-state PJM Region.  Insufficient transmission capability had produced congestion—electricity was "trapped" in Pennsylvania, producing artificially low prices in Pennsylvania and artificially high prices in Maryland, Virginia, West Virginia, and D.C.  *See* JA225.

Applying the criteria dictated by its tariff—and following its FERC-mandated transparent process—PJM selected a regional solution, the Transource IEC Project (part of a broader "Project 9A"), to alleviate that congestion. JA225-26. That determination, resulting from PJM's FERC-mandated process, carries FERC's stamp of approval. *See Hughes*, 578 U.S. at 163 (addressing PJM's FERC-approved capacity-auction process).

State regulators retain authority over siting, permitting, and construction of transmission projects included in PJM's regional plan. *See* Order No. 1000, PP 107, 161, 227, 76 Fed. Reg. at 49,861, 49,870, 49,880; *S.C. Pub. Serv. Auth.*, 762 F.3d at 62-63. Transource accordingly needed to receive permits from the Pennsylvania and Maryland public utility commissions.

Under the Supremacy Clause, however, States do not have authority to second-guess FERC's authority over transmission practices and rates—including FERC's implementation of that authority through tariffs that mandate regional transmission planning and specify the criteria to be used for evaluating whether a project is needed to relieve system congestion. *See New York v. FERC*, 535 U.S. 1, 19-20 (2002); *PPL Energyplus*, 766 F.3d at 253. "[I]f FERC has jurisdiction over a subject, the States cannot have jurisdiction over the same subject." *Mississippi Power*, 487 U.S. at 377 (Scalia, J., concurring).

Consistent with that authority, Maryland granted Transource permission to site the project.  Maryland refused to apply a "Maryland benefits-to-cost" analysis, recognizing that the project "must be evaluated" in accordance with the "regional," FERC-approved methodology for assessing benefits and costs embodied in "PJM's Tariff."  *In re Application of Transource Maryland LLC*, Order No. 89571, 2020 WL 3977589, at *41 (¶142) (Md. Pub. Serv. Comm'n June 30, 2020).

The PAPUC, by contrast, denied Transource's application because it disagreed with the criteria PJM used to determine that the project was needed to relieve system congestion.  JA274-77; JA285-86.  Specifically, the PAPUC rejected the benefit-cost approach required under PJM's FERC-approved tariff, declaring that "[t]he methodology performed by PJM to develop the benefit-cost ratio of the IEC Project is deficient" under "Pennsylvania law."  JA169 (ALJ Recommended Decision); *see* JA275 (PAPUC decision adopting ALJ findings unless expressly rejected or modified).  The PAPUC objected that PJM's FERC-approved formula does not consider as part of a project's costs the fact that "alleviat[ing] the economic congestion *on a regional level* . . . would result in higher rates *in Pennsylvania*," where congestion has kept prices artificially low.  JA281 (emphasis added).  And it criticized the "data relied upon by PJM to determine the need to alleviate congestion."  JA282.  The PAPUC ultimately determined that the Transource IEC Project was not needed because it would "lead to a substantial increase in utility rates

within the Commonwealth."  JA280-82, JA285; *see* JA171 ("increased wholesale power prices are real costs to customers that show there is no need for the project").

That is a clear conflict between federal and state law.  By approving PJM's tariff, FERC determined that price increases in areas currently benefitting from transmission inefficiencies are not to be considered when assessing the need for lower-voltage transmission projects like the Transource IEC Project.  *See PJM*, 123 FERC ¶ 61,051, P 67 (approving tariff revisions reflecting the method "not to include the expected energy payment increases, if any, in other zones" when calculating costs of proposed transmission projects).[8]  In rejecting the Transource IEC Project, the PAPUC substituted its own methodology (which factored in those price increases) for the FERC-sanctioned methodology (which excludes them).  JA281. The conflict with federal law is apparent.

The Supreme Court has found similar state actions preempted because they interfered with processes governed by FERC-approved tariffs.  In *Hughes*, a State dissatisfied with PJM's FERC-approved auction process for capacity sales established a program that guaranteed certain generators a rate different from what they would receive under PJM's tariffed process.  578 U.S. at 157-61.  The Supreme

---

[8] *See also PJM*, 173 FERC ¶ 61,258, P 10 (approving revisions to PJM's benefit-cost methodology despite objection that the methodology would continue to "ignore the increased zonal load costs that a project may create").

Court held that impermissibly "interfere[d] with FERC's authority." *Id.* at 165; *see id.* at 163-65. By "[d]oubting FERC's judgment" about how to produce "just and reasonable rates" and substituting its own preferred approach, the State impermissibly "invade[d] FERC's regulatory turf." *Id.* at 163. The same reasoning applies here. FERC approved PJM's planning process—including its criteria for determining the need to alleviate system congestion—under its authority to facilitate transmission planning and ensure that transmission rates and practices are just and reasonable. By second-guessing that FERC-sanctioned process and substituting its own approach for the need determination—based on concerns about "increased wholesale power prices," JA171, no less—the PAPUC impermissibly "invade[d] FERC's regulatory turf," *Hughes*, 578 U.S. at 163; *see also Mississippi Power*, 487 U.S. at 370-74; *Nantahala*, 476 U.S. at 966-69.

**B.    States' Traditional Authority Over *Siting* Does Not Permit Them To Intrude on FERC's Authority Over Transmission *Planning***

1.    PJM acknowledges state authority over siting, permitting, and construction of transmission facilities. *See* Order No. 1000-A, *Transmission Planning and Cost Allocation by Transmission Owning and Operating Public Utilities*, 139 FERC ¶61,132, P189, 77 Fed. Reg. 32,184, 32,215 (2012). State commissions like the PAPUC play an important role in transmission siting, including determining what routes transmission lines will follow and where new facilities will be constructed. In making its determination here, the PAPUC could have legitimately considered

various factors, such as a project's impact on public health and safety (would high-voltage lines run through a dense neighborhood?), natural resources (would the project require clearcutting timberland?), and environmental impact. *Cf.* 52 Pa. Code § 57.76(a)(2)-(4).

But the PAPUC expressly disclaimed reliance on any of those other factors. JA286. It denied Transource's application based *solely* on its view that there was no "need" to alleviate congestion, based on its substitution of its own methodology for the FERC-approved one. Such a decision cannot stand.

Authority over *siting* is not the same as authority over *planning*. The Federal Power Act clearly distinguishes between transmission "planning," which is assigned to FERC under Section 217 (16 U.S.C. § 824q(b)(4)), and "siting," which is initially assigned to States with FERC only as a limited backstop under Section 216 (16 U.S.C. § 824p(b)). Indeed, Congress drew that distinction especially sharply by enacting Section 216 (concerning siting) and Section 217 (concerning planning) in separate sections of the very same legislation—the Energy Policy Act of 2005 ("EPACT 2005"). *See* Pub. L. No. 109-58, § 1221, 119 Stat. 594, 946 (2005) (enacting FPA Section 216); *id.* § 1233, 119 Stat. at 957-58 (enacting FPA Section 217). And as FERC has explained, state "'siting, permitting, and construction authority'" does *not* extend to FERC's required "'processes used to identify and evaluate transmission system needs and potential solutions to those needs.'" Order

No. 1000-A, P186, 77 Fed. Reg. at 32,215; *see* Order No. 1000, P107, 76 Fed. Reg. at 49,861 (same).

Accordingly, while the PAPUC possesses siting authority, that authority does not allow the PAPUC to second-guess the FERC-sanctioned processes used to identify and evaluate "'transmission system needs,'" or PJM's determination that a particular project addresses those needs. Order No. 1000-A, P186, 77 Fed. Reg. at 32,215. Instead, the criteria PJM uses to arrive at need determinations for the identification and selection of projects fall squarely within FERC's authority.

2. That a state commission is acting in an area of "traditional state power," such as siting, PAPUC Br. 35; *see id.* at 24, 27-33; Members of General Assembly Br. 7, does not insulate it from a federal tariff's preemptive force. States similarly have "traditional authority over retail [electricity] rates" and "in-state [electricity] generation." *Hughes*, 578 U.S. at 165. The Supreme Court nonetheless held in *Hughes* that States cannot exercise their "traditional authority" over "in-state generation" in a way that "interfere[s] with," or "disregards" the result of, a FERC-approved process for ensuring "just and reasonable" wholesale energy rates. *Id.* at 163-66; *see* pp. 15-16, *supra*. Similarly, the Court held in *Mississippi Power* that States cannot exercise their traditional authority over retail rates in a way that interferes with FERC's authority over wholesale rates or disagrees with FERC's exercise of that authority. 487 U.S. at 370-71. In particular, the Court held that a State cannot

reject "FERC-mandated" determinations regarding just and reasonable wholesale rates by asserting that those rates were "not prudently incurred" as a matter of *state* law. *Id.* at 370. Efforts to deem such FERC-approved determinations deficient under state law are "pre-empted." *Id.*; *see Nantahala*, 476 U.S. at 966-69.

Likewise here. FERC mandated regional transmission planning, and approved PJM's benefit-cost methodology for determining need, under its authority to facilitate transmission planning and to ensure just and reasonable rates. *See S.C. Pub. Serv. Auth.*, 762 F.3d at 56 (citing Order No. 1000, P112, 76 Fed. Reg. at 49,862); 16 U.S.C. §§ 824d(a), 824e(a), 824q(b)(4). "[E]ven when [it] exercise[s] [its] traditional authority over" siting, the PAPUC can neither disregard the outcome of FERC's approved process for ensuring just and reasonable rates, nor deem that process deficient under state law. *Hughes*, 578 U.S. at 165. That is particularly true here, where the PAPUC's decision was based solely on its rejection of how PJM's FERC-approved methodology addresses wholesale price impacts, and not on other siting factors or the consideration of alternative routes. The PAPUC directly rejected FERC's regional planning authority and PJM's implementation of its federally approved tariff. As in *Hughes* and *Mississippi Power*, that effort is preempted.

### III. PJM's REGIONAL TRANSMISSION PLANNING PROCESS FALLS SQUARELY WITHIN FERC'S REGULATORY AUTHORITY AND WOULD BE THWARTED IF THE PAPUC's POSITION WERE LEFT UNCORRECTED

#### A. Regional Transmission Planning, Including the Determination of Need, Falls Squarely Within FERC's Authority Over the Transmission and Sale of Wholesale Electricity

The PAPUC and its amici offer a host of arguments seeking to avoid pre-emption here. None is persuasive.

1. The PAPUC invokes Federal Power Act Section 201(a)'s statement that federal regulation of transmission is "to extend only to those matters which are not subject to regulation by the States." 16 U.S.C. § 824(a); *see* PAPUC Br. 29. As the Supreme Court has explained, however, that prefatory language is "a mere policy declaration that cannot nullify a clear and specific grant of jurisdiction" to FERC. *New York*, 535 U.S. at 22 (internal quotation marks omitted). "Because the FPA contains such 'a clear and specific grant of jurisdiction' to FERC over interstate transmissions"—and PJM's regional transmission planning process falls squarely within that authority—"the prefatory language" the PAPUC and its amici cite "does not undermine FERC's jurisdiction." *Id.*

FPA Section 217 directs FERC to "facilitate[] the planning and expansion of transmission facilities to meet the reasonable needs of load-serving entities" (*i.e.*, utilities that serve end-users). 16 U.S.C. § 824q(b)(4). Regional transmission planning also falls squarely within FERC's authority to regulate the "transmission"

of electricity and ensure that all "rates" and "practice[s]" affecting transmission are "just and reasonable." 16 U.S.C. §§ 824d(a), 824e(a). Because "transmission planning practices directly affect rates," they fall comfortably within FERC's regulatory authority. *S.C. Pub. Serv. Auth.*, 762 F.3d at 56 (citing Order No. 1000, P 112, 76 Fed. Reg. at 49,862). The D.C. Circuit rejected challenges to FERC's "authority over transmission planning matters" on that basis. *Id.* at 63-64, 90.

2. The Pennsylvania Office of Consumer Advocate ("PA OCA") contends that PJM's benefit-cost methodology "was never formally approved by FERC." PA OCA Br. 11. That is mistaken. For lower-voltage market-efficiency projects like the Transource IEC Project, PJM's tariff has provided since 2008 that increased energy prices in areas where prices had been artificially suppressed by congestion do not qualify as project "costs." *See PJM*, 123 FERC ¶ 61,051, P 67; JA91 (¶ 45). In 2008, FERC approved that approach in a reasoned order, specifically rejecting objections that increased prices in some areas should be counted as costs. *See PJM*, 123 FERC ¶ 61,051, P 67; pp. 9-10, *supra*. FERC has since repeatedly rejected similar objections. *See PJM Interconnection, L.L.C.*, 173 FERC ¶ 61,258 (2020); *PJM Interconnection, L.L.C.*, 166 FERC ¶ 61,114 (2019).

While the PA OCA invokes a 2014 tariff amendment that FERC " 'accepted' " without formally "approv[ing]," it concedes that amendment involved *other* kinds of projects ("Regional Facilities" and "Necessary Lower Voltage Facilities")—*not*

lower-voltage market-efficiency projects like the Transource IEC Project. *See* PA OCA Br. 12-14 & n.4; JA91 (¶45) (recognizing that the Transource IEC Project is a "Lower Voltage Market Efficiency Project"). Moreover, as PJM explained (in a sentence the PA OCA replaces with an ellipsis, *see* PA OCA Br. 13), the 2014 amendment "conform[ed]" those other projects to the methodology that FERC had already expressly approved for lower-voltage projects in 2008. *See* PJM Filing 8 (Feb. 28, 2014), FERC Docket No. ER14-1394, https://www.pjm.com/directory/ etariff/fercdockets/1075/20140228-er14-1394-000.pdf.[9] In all events, what matters is that PJM's methodology is embodied in its federal tariff, which carries the force of federal law by virtue of being filed with FERC. *See* pp. 4-5, *supra*.

The PA OCA also misapprehends the purpose of excluding from a market-efficiency project's "costs" the increased prices that may result in other areas. It is not, as the PA OCA contends, simply to ensure that more projects will be approved. PA OCA Br. 13. Rather, as PJM explained (in another sentence the PA OCA elides), that approach "appropriately align[s] the *benefits* with the *costs* of the facilities by placing the cost of [building] such upgrades on the zones where costs [*i.e.*, prices]

---

[9] PJM's 2014 filing is also available in FERC's eLibrary at https://elibrary.ferc.gov/ eLibrary/filelist?accession_number=20140228-5268 ("Transmittal Letter"). The 2014 amendment also adjusted the "benefit" side of the calculation for lower-voltage market-efficiency projects. PJM Filing 9 (Feb. 28, 2014), FERC Docket No. ER14-1394. The PA OCA does not argue that amendment is relevant here.

are being reduced." PJM Filing 8 (Feb. 28, 2014), FERC Docket No. ER14-1394 (emphasis added). Specifically, the costs of constructing an approved market-efficiency project are allocated (through charges to ratepayers) only to areas that "experience reduced energy payments"—*i.e.*, receive benefits—as a result of the project. *PJM*, 123 FERC ¶ 61,051, P 67. Given that, PJM's benefit-cost methodology appropriately focuses on the project's benefits and costs *for those areas*, and not other areas that will not be responsible for financing the project.

The filings the PA OCA invokes thus underscore the crucial role that regional transmission planning plays in promoting FERC's ability to ensure just and reasonable wholesale energy and transmission rates. FERC requires that the benefit-cost methodology used for regional planning follow the *same* approach as later cost allocations, because "it is through the planning process that benefits, which are central to cost allocation, can be assessed." Order No. 1000, P 559, 76 Fed. Reg. at 49,929. Likewise, the "appropriate place for th[e] consideration" of a project's "cost impacts" is "the regional transmission planning process." *Id.* P 562. If States could impose a *different* benefit-cost methodology from the one FERC approved, that "fundamental link" between need determinations and cost allocations would be broken. *Id.* P 559. That, in turn, would "undermin[e] the entire purpose of the transmission planning process, namely, the development of efficient and cost-effective transmission solutions." Order No. 1000-A, P 52, 77 Fed. Reg. at 32,194.

3.　　The PAPUC and its amici also invoke FPA Section 216 (originally enacted as part of EPACT 2005). *See* PAPUC Br. 30-31; PA OCA Br. 7-9; NARUC Br. 11-24; p. 17, *supra*. That reliance is misplaced. Section 216 allows FERC, in limited circumstances, to "*issue . . . permits* for the construction or modification of electric transmission facilities" in national interest electric transmission corridors. 16 U.S.C. § 824p(b) (emphasis added). In other words, where it applies, Section 216 allows FERC to *completely bypass* a state commission's siting authority by issuing permits itself. All agree that authority is inapplicable here. But that is not remotely what PJM (or Transource) is arguing for.

PJM does not contend that FERC—or PJM by "delegat[ion]"—can "exercise siting authority" and grant a permit for the Transource IEC Project. PA OCA Br. 9. PJM greatly respects state commissions' authority over siting, and agrees that authority to grant or deny a permit for the Transource IEC Project in Pennsylvania ultimately rests with the PAPUC. PJM simply contends that the PAPUC may *not* deny a permit based on its disagreement with PJM's FERC-approved benefit-cost methodology. FERC approved that methodology under its broad authority to ensure just and reasonable rates and practices, including its authority to facilitate transmission *planning* under FPA Section 217—not its limited *siting* authority under FPA Section 216. *S.C. Pub. Serv. Auth.*, 762 F.3d at 50-51, 56, 90 (citing Order No. 1000, P 112, 76 Fed. Reg. at 49,862; 16 U.S.C. § 824q(b)(4)).

PJM likewise does not argue that the PAPUC must "rubber stamp" every project approved through PJM's regional transmission planning authority, PAPUC Br. 39, or that "PJM's decision is determinative of whether the line should be built," PA OCA Br. 10, 16; Stop Transource Franklin County Br. 2 ("STFC Br."). PJM agrees the PAPUC may legitimately consider (and, where appropriate, deny permits based on) a wide range of factors, including public health and safety, natural resources, and the environment. *See* pp. 16-17, *supra*. It may not, however, deny a permit simply because it rejects PJM's FERC-sanctioned determination that a project will meet a regional need to relieve system congestion.

4.      The PA OCA and others assert that PJM's regional transmission planning process lacks "a robust process for public involvement (including an open process for intervenors like consumer advocates)." PA OCA Br. 10-11; *see* STFC Br. 2-7; PAPUC Br. 44-45. They identify no authority suggesting that would be relevant to whether a federal tariff has preemptive effect. Regardless, they overlook the open, transparent process that PJM's tariff prescribes. As explained above, that process expressly provides for participation by state commissions (including the PAPUC), "State Consumer Advocates" (including the PA OCA), and "any other interested entities or persons" (which could include affected landowners and state and local officials). Schedule 6, sections 1.3(a)-(b), 1.5.6(f); *see* pp. 10-12, *supra*. Should affected persons later wish "to challenge PJM's need determination on the

merits," STFC Br. 6, they may seek review before FERC—and ultimately a federal court of appeals—by filing a "complaint" alleging that a relevant "rule, regulation, practice, or contract" is "unjust, unreasonable, unduly discriminatory or preferential," 16 U.S.C. § 824e(a); *see* § 825*l*(b) (judicial review of FERC orders).

Affected persons thus have a more-than-adequate *federal* "forum to challenge PJM's determination" that a project meets regional system needs. STFC Br. 3. And insofar as they may object to a project on *other* grounds (such as a route's effect on public safety or the environment), they may always raise those objections and propose alternative routing during the PAPUC permitting process.

## B. Allowing State Commissions To Reject PJM's FERC-Approved Need Methodology Would Thwart Regional Transmission Planning—As This Case Vividly Illustrates

Allowing state commissions to displace the need-determination factors FERC requires PJM to apply would undermine the regional planning process that FERC has declared necessary to ensure just and reasonable rates. Order No. 1000, P 12, 76 Fed. Reg. at 49,846. FERC has directed that "a single entity"—here, PJM as the region's "RTO"—"must coordinate" and have "ultimate responsibility for both transmission planning and expansion within its region," "to ensure a least cost outcome" for the region as a whole. Order No. 2000, 65 Fed. Reg. at 909.

Consistent with that directive, PJM selects transmission projects through a transparent, years-long process that provides ample opportunities for public and state

input, with the purpose of identifying "regional solutions to regional needs." Order No. 1000, P320, 76 Fed. Reg. at 49,897. The point of *regional* transmission planning is that transmission needs and solutions must be assessed at a *regional* level. That exhaustive, federally mandated process would be thwarted if a State could effectively veto the outcome based solely on its own, state-centric concept of "need."

This case vividly illustrates that danger. PJM identified the Transource IEC Project as a regional solution to regional transmission needs in 2016. JA85 (¶¶10-11). Specifically, PJM determined that the project—running through Pennsylvania and Maryland—would meet a need to alleviate congestion that had artificially suppressed prices in Pennsylvania and artificially inflated prices in surrounding areas. Maryland granted Transource permission to site the project, specifically recognizing that "regional" need, as determined under PJM's FERC-approved tariff, must supersede any "state-specific" "benefits-to-cost" analysis. *Transource Maryland*, 2020 WL 3977589, at *41 (¶142); *see* p. 14, *supra*. Yet the PAPUC refused permission, based entirely on its own, Pennsylvania-centric reweighing of the project's costs and benefits. *See* JA281-82; pp. 14-15, *supra*. Consequently, the project remains in limbo eight years after it was identified through PJM's federally approved process as a regional solution to regional transmission needs. If left unimpeded, any individual State could similarly frustrate development of the interstate transmission

grid and the needs of consumers in neighboring States—replicating the problems that led Congress and FERC to pursue transmission planning at a *regional* level.

This Court should make clear that state commissions may not deny permits based on their disagreement with the benefit-cost methodology FERC has approved for determining whether a transmission project meets a regional need to relieve system congestion. Prescribing that methodology falls squarely within FERC's authority over the transmission of electricity, including transmission planning, and its duty to ensure just and reasonable rates for all Americans. Whatever else state commissions may consider when making permitting decisions, they must respect that federal judgment.

## **CONCLUSION**

The district court's judgment should be affirmed.

July 17, 2024

Respectfully submitted,

/s/ Lucas M. Walker
Lucas M. Walker
MOLOLAMKEN LLP
The Watergate, Suite 500
600 New Hampshire Avenue, NW
Washington, D.C.  20037
(202) 556-2014
lwalker@mololamken.com

Lauren F. Dayton
MOLOLAMKEN LLP
430 Park Avenue, Floor 6
New York, NY  10022
(212) 607-8160
ldayton@mololamken.com

*Counsel for Amicus Curiae PJM Interconnection, L.L.C.*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation set out in Fed. R. App. P. 29(a)(5) because this brief contains 6115 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f). This brief further complies with the typeface and the type-style requirements of Fed. R. App. P. 27(d)(1)(E), 32(a)(5), and 32(a)(6), because it has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 14-point font.

## CERTIFICATE OF SERVICE

I certify that today, July 17, 2024, I electronically filed the foregoing Brief for Amicus Curiae PJM Interconnection, L.L.C. with the Clerk of Court for the U.S. Court of Appeals for the Third Circuit using the appellate CM/ECF system. All other participants in the case are registered CM/ECF users and will be served by the CM/ECF system in accordance with Third Circuit Local Appellate Rule 113.4.

## CERTIFICATE OF BAR MEMBERSHIP

I certify, pursuant to Third Circuit Local Appellate Rule 28.3(d), that I am a member of the bar of this Court.

**CERTIFICATION OF VIRUS SCAN**

I certify, pursuant to Third Circuit Local Appellate Rule 31.1(c), that a virus detection program has been run on this file and that no virus was detected. The virus detection program utilized was Microsoft Defender Antivirus, version 1.415.143.0.

**CERTIFICATE OF IDENTITY**
**BETWEEN ELECTRONIC AND PAPER COPIES**

I certify, pursuant to Third Circuit Local Appellate Rule 31.1(c), that the text of the electronic version of this brief is identical to the text of the paper copies submitted to the Clerk's Office.

July 17, 2024

/s/ Lucas M. Walker
Lucas M. Walker