IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 24-1045

_____

**TRANSOURCE PENNSYLVANIA LLC**

v.

**STEVEN M. DEFRANK, Chairman, Pennsylvania Public Utility
Commission; KIMBERLY M. BARROW, Vice Chairman, Pennsylvania
Public Utility Commission; JOHN F. COLEMAN, JR., Commissioner,
Pennsylvania Public Utility Commission, in his official capacity;
RALPH V. YANORA, Commissioner, Pennsylvania Public Utility
Commission, in his official capacity; PENNSYLVANIA PUBLIC UTILITY
COMMISSION; KATHRYN L. ZERFUSS, Commissioner, Pennsylvania
Public Utility Commission, in her official capacities,**

_____

**THE PETITION OF INTERVENORS THE COMMONWEALTH OF
PENNSYLVANIA AND CONSUMER ADVOCATE FOR REHEARING EN
BANC**

_____

APPEAL FROM THE JUDGMENT OF THE UNITED STATES
DISTRICT COURT FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
ENTERED DECEMBER 6, 2023

DAVID W. SUNDAY, JR.
*Attorney General*

Office of Attorney General
15th Floor, Strawberry Square      BY:   MICHAEL J. SCARINCI
Harrisburg, PA 17120                           *Senior Deputy Attorney General*
Phone: (717) 857-2184
FAX:  (717) 772-4526                     DANIEL B. MULLEN
                                                         *Chief Deputy Attorney General*
DATE:  November 20, 2025                 *Appellate Litigation Section*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................... ii

RULE 35.1 STATEMENT .................................................................................. 1

INTRODUCTION .............................................................................................. 2

BACKGROUND ................................................................................................ 3

The PUC's Defense of its Statute and its Decision to Deny a Siting Permit. .......... 3

The Attorney General Seeks to Intervene to Defend Pennsylvania Law. ................ 7

REASONS FOR GRANTING THE PETITION ..................................................... 8

I.     The Panel's Denial of the Attorney General's Motion to Intervene
Contravenes the Supreme Court's Decision in *Cameron*. ............................. 8

A.     Both the Attorney General and the Consumer Advocate Have a
Substantial Legal Interest at Stake in this Litigation. ................................... 11

    1.     The Attorney General Has a Substantial Legal Interest in the
Enforceability of Pennsylvania Law Regulating Land Use ................ 11

    2.     The Consumer Advocate Has a Substantial Legal Interest in
Protecting Consumers From Increased Energy Prices. ...................... 14

B.     The Motion to Intervene was Timely. ........................................................ 15

C.     Intervention Would Not Prejudice the Parties' Rights. ............................... 16

CONCLUSION ................................................................................................ 18

CERTIFICATE OF COUNSEL ......................................................................... 19

CERTIFICATE OF SERVICE ........................................................................... 20

i

# TABLE OF AUTHORITIES

Page

**Cases**

*Allegheny Reproductive Health Ctr. v. Pennsylvania Dep't of Human Servs.*,
No. 26 M.D. 2019 (Pa. Cmwlth. 2025)...............................................................13

*Berger v. N.C. State Conference of the NAACP*,
597 U.S. 179 (2022)..............................................................................................9

*Cameron v. EMW Women's Surgical Center, P.S.C.*,
595 U.S. 267 (2022).....................................................................................passim

*City of Phila. v. Commonwealth*,
838 A.2d 566 (Pa. 2003) ...................................................................................12

*Eakin v. Adams Cty. Bd. of Elections*,
149 F.4th 291 (3d Cir. 2025 ...............................................................................13

*Energy Reserves Grp. v. Kansas Power & Light Co.*,
459 U.S. 400 (1983)............................................................................................15

*Federal Energy Regulatory Comm'n v. Mississippi*,
456 U.S. 742, 767 (1982) ......................................................................................2

*Hollingsworth v. Perry*,
570 U.S. 693 (2013).............................................................................................8

*Krasner v. Attorney General*,
309 A.3d 265 (Pa. Cmwlth. 2024).....................................................................12

*Maine v. Taylor*,
477 U.S. 131 (1986).............................................................................................8

*NAACP v. New York*,
413 U.S. 345 (1977)......................................................................................10, 15

*Printz v. United States*,
521 U.S. 898 (1997).............................................................................................8

*Rapanos v. U.S.*,
   547 U.S. 715 (2006) ................................................................................ 2

*Samantar v. Yousuf*,
   560 U.S. 305 (2010) ...............................................................................14

*Synthes, Inc. v. Commonwealth*,
   289 A.3d 846 (Pa. 2023). .......................................................................12

*United Airlines, Inc. v. McDonald*,
   432 U.S. 385 (1977) ...............................................................................11

**Statutes**

66 Pa.C.S. § 1103 ...................................................................................... 3

66 Pa.C.S. § 1501 ...............................................................................2, 3, 13

71 P.S. § 309-4 ................................................................................1, 14, 15

71 P.S. § 732-201 ...................................................................................11, 14

71 P.S. § 732-204 ................................................................................passim

**Other Authorities**

FERC Order 1000, 76 Fed.Reg. 49842-01 (Aug. 11, 2011) ................................... 5

FERC Order 1000-A, 77 Fed.Reg. 32184-01 (May 31, 2012) ............................... 5

FERC Order 890, 72 Fed.Reg. 12266-01 (Mar. 15, 2007)................................... 5

*PJM Interconnection, LLC*, 191 FERC P 116576 (Apr. 17, 2025) ........................ 6

The Federalist No. 39 (J. Madison) ...................................................... 8

**Rules**

Fed.R.App.P. 40...............................................................................1, 7

**Regulations**

52 Pa.Code § 57.76 ...................................................................................... 2, 3, 4, 13

**Constitutional Provisions**

PA. CONST., Art. IV, § 4.1 ................................................................................. 1, 11

# RULE 35.1 STATEMENT

I express a belief, based on a reasoned and studied professional judgment, that the panel decision is contrary to a decision of the Supreme Court of the United States, and that consideration by the full court is necessary to secure and maintain uniformity of decisions in this court, *i.e.*, the panel's decision is contrary to *Cameron v. EMW Women's Surgical Center, P.S.C.*, 595 U.S. 267 (2022).

This appeal involves exceptionally important questions of state sovereignty. Fed.R.App.P. 40(b)(2)(D). The panel denied the Pennsylvania Attorney General's motion to intervene seeking further appellate review of this matter on behalf of the Commonwealth and the Consumer Advocate. This denial deprived the Commonwealth of its sovereign authority, through its "chief law officer," to defend the continued enforceability of Pennsylvania law. *See* PA. CONST., Art. IV, § 4.1; 71 P.S. § 732-204(a)(3). This denial also deprived the Commonwealth, through its Consumer Advocate, of its sovereign authority to protect consumers. *See* 71 P.S. § 309-4(a).

**INTRODUCTION**

The panel's decisions have dealt a double blow to state sovereignty. The first was the panel's decision that federal law preempts the Pennsylvania Public Utility Commission's ("PUC") authority to determine whether an interstate electrical transmission line is needed. *See* 66 Pa.C.S. § 1501; 52 Pa.Code § 57.76(a). That decision deprived the Commonwealth of the power to regulate land use—a State's most "quintessential" power. *See Rapanos v. U.S.*, 547 U.S. 715, 738 (2006); *Federal Energy Regulatory Comm'n v. Mississippi*, 456 U.S. 742, 767 n.30 (1982).

The second blow to state sovereignty followed when the panel denied the Attorney General's request to intervene after the PUC refused to seek further appellate review. The Attorney General, on behalf of the Commonwealth and its Consumer Advocate, sought to step in and continue to defend the constitutionality of state law and protect consumers, but the panel denied the motion to intervene without any explanation.

That denial was contrary to the United States Supreme Court's decision in *Cameron v. EMW Women's Surgical Center, P.S.C.*, 595 U.S. 267 (2022) (holding that the Kentucky Attorney General was entitled to intervene to defend the enforceability of a Kentucky law when the Cabinet Secretary for Health and Family Services declined to continue defending that law). The proposed intervenors satisfy all the requirements for appellate intervention: a legal interest in this litigation; a

2

timely motion for intervention; and a lack of prejudice to the original parties' rights. *See id.* at 278-82. Indeed, like *Cameron*, "this is a textbook case for intervention." *Id.* at 292 (Kagan, J., concurring). Because the panel's decision denying intervention cannot be reconciled with *Cameron* and prevents the Attorney General—on behalf of the proposed intervenors—from defending this important state law and protecting consumers from harm, *en banc* review is warranted.

## BACKGROUND

### The PUC's Defense of its Statute and its Decision to Deny a Siting Permit.

Transource Pennsylvania, LLC, proposed building interstate electrical transmission lines costing $500 million through parts of Pennsylvania and Maryland. These lines would carry Pennsylvania's affordable and reliable energy generation resources to Northern Virginia, the District of Columbia, and Maryland, to meet the increased demand of power by data centers in those areas. JA73 (ALJ Dec.); JA579 (Herling Report); JA680 (PJM White Paper).

Like every other state, Pennsylvania law requires an applicant seeking to construct an electrical transmission line to apply for a certificate of public convenience from the PUC. *See* 66 Pa.C.S. §§ 1103, 1501; 52 Pa.Code § 57.76(a). The PUC will grant a certificate of public convenience when it "is *necessary* or proper for the service, accommodation, convenience, or safety of the public." *See* 66 Pa.C.S. §§ 1103, 1501 (emphasis added). The PUC's determination of whether an

electrical transmission line is needed is made in the context of a state siting proceeding. *See* 52 Pa.Code § 57.76(a). Transource filed an application for a siting permit from the PUC. JA73.

Ultimately, however, the PUC determined that Transource's project was not needed. This was because the project would cost $500 million to build and provide only $32 million in benefits. JA94, JA168 (ALJ Dec.). This determination took into account both the regions, such as Northern Virginia, the District of Columbia, and Maryland, that would see a reduction in power costs ($845 million) and the regions, such as Pennsylvania, that would see an increase in power costs ($812 million). JA94 (ALJ Dec.) The PUC concluded that spending $500 million to realize $32 million in benefits made "no sense." JA168 (ALJ Dec.).

Transource then filed actions in state and federal court. The PUC represented itself in state court, while the Attorney General represented the PUC in federal court. In the federal forum, Transource asserted that the PUC's determination violated the Supremacy Clause and the Dormant Commerce Clause. JA326-67.[1] Regarding the former, Transource claimed that the PUC's determination was preempted because a non-governmental entity, PJM Interconnection, LLC, a regional transmission

---

[1] The panel did not address the Dormant Commerce Clause claim and, so, we do not detail it here.

organization that operates portions of the electrical grid, had included the Transource project in its 2014/15 regional transmission expansion plan. JA358-59.

Pursuant to several FERC orders, public utilities must participate in a "regional transmission planning process that produces a regional transmission plan." FERC Order 1000, 76 Fed.Reg. 49842-01, Summary (Aug. 11, 2011); *see* FERC Order 890, 72 Fed.Reg. 12266-01, ¶¶425, 440, 444 (Mar. 15, 2007). The federal objective behind this regional plan is to identify "transmission system needs and potential solutions to those needs" in a more "open," "transparent" and "efficient" process. FERC Order 1000, ¶¶49, 107; FERC Order 1000-A, 77 Fed.Reg. 32184-01, ¶¶, 188, 190, 285 (May 31, 2012). This is in contrast to what used to occur before Order 1000 when utility companies were not required to participate in the development of a regional transmission plan—they planned for only their own commercial interests. This was an "ineffective, inefficient and chaotic and balkanized process." JA676 (2009 PUC Comment); *see* JA467-82 (Horger dep.); JA687 (Transmission Expansion Advisory Committee Recommendations).

FERC, however, never intended for the regional planning process to preempt a state's need determination. When FERC issued Order 1000, it emphasized that substantive decisions "regarding the siting, permitting, and construction of transmission facilities" are "made at the state level" by state regulators. Order 1000-A, ¶188. As one FERC Commissioner noted in response to this very case, the "mere

fact that PJM planned a project that was put into the PJM regional transmission plan" does not preempt "a state's sovereign police power authority . . . to determine whether the project [i]s needed." *PJM Interconnection, LLC*, 191 FERC P 116576, ¶3-4 (Apr. 17, 2025) (Chairman Christie, concurring). Any claim to the contrary, that Commissioner added, is "frankly, outrageous." *Id.*, ¶4.

And yet, the district court ruled against the PUC, awarding summary judgment to Transource on its claim under the Supremacy Clause. JA42-57. According to the district court, because FERC had approved the methodology that PJM used to determine whether a project should be included in its regional plan, Pennsylvania was preempted from determining whether the project was needed. JA45-46. Pursuant to PJM's costs-benefits methodology, it does not include those regions, such as Pennsylvania, that would experience an increase in power costs (by $812 million) because of their lower-cost power being dispatched to the Beltway area. JA94, ¶¶61-62 (ALJ Rec. Dec.); JA491, ¶45.

The PUC (still represented by the Attorney General) took an appeal to this Court. A panel affirmed in a 65-page precedential opinion issued on September 5, 2025. The panel held that the PUC's decision that Transource's project is not needed is preempted because FERC approved PJM's costs-benefits methodology for determining when a project should be included in PJM's regional plan. Opinion at 47.

Given the complexity of this case, the length of the panel's decision, and the 14-day limitation for filing a petition for *en banc* review, the PUC requested a 30-day extension for the filing of that petition. *See* Fed.R.App.P. 40(d)(1). This Court granted that request on September 12, 2025. The PUC then suddenly changed course.

**The Attorney General Seeks to Intervene to Defend Pennsylvania Law.**

It was not until September 29, 2025, while undersigned counsel was preparing an *en banc* petition, that the Office of Attorney General learned for the first time from the PUC that it did not want to pursue further appellate review. The Office of Attorney General inquired regarding the basis for this sudden change of course after years of vigorous litigation, and the Attorney General spoke personally with the PUC Chairman. The PUC did not fully articulate its rationale until a meeting with the Attorney General's Office during the week of October 13. On October 16, 2025, the PUC released a public letter addressed to several legislators, explaining its reasons for not pursuing further appellate review. Doc. 92, Exhibit A.

The very next day, the Attorney General, on behalf of the Commonwealth and the Consumer Advocate, moved to intervene in this appeal for purposes of filing an *en banc* petition and, if denied, a petition for a writ of certiorari to the United States Supreme Court, as it is the "duty of the Attorney General to uphold and defend the constitutionality of *all* statutes so as to prevent their suspension or abrogation . . . ."

71 P.S. § 732-204(a)(3) (emphasis added). Doc. 88. The proposed intervenors met all the requirements for appellate intervention: a legal interest in the litigation; a timely motion to intervene; and a lack of prejudice. *See Cameron*, 595 U.S. at 278-82. The PUC did not oppose the motion of the Commonwealth and the Consumer Advocate to intervene, but Transource did. Doc. 92. Without any explanation, the panel denied leave to intervene. Doc.94.

## REASONS FOR GRANTING THE PETITION

### I. The Panel's Denial of the Attorney General's Motion to Intervene Contravenes the Supreme Court's Decision in *Cameron*.

As a separate sovereign state under the Constitution, the Commonwealth possesses "'a residuary and inviolable sovereignty.'" *Printz v. United States*, 521 U.S. 898, 918-19 (1997) (quoting The Federalist No. 39 at 245 (J. Madison)). A core part of the States' retained sovereignty is the authority to enact and enforce their own laws so long as they do not conflict with the Constitution. *See Cameron*, 595 U.S. at 277. Thus, "a State 'clearly has a legitimate interest in the continued enforceability of its own statutes.'" *Id.*, quoting *Maine v. Taylor*, 477 U.S. 131, 136 (1986). "No one doubts" this. *Hollingsworth v. Perry*, 570 U.S. 693, 709-10 (2013).

As a corollary to the States' power to enforce their own laws is the power to choose who defends those laws when they are challenged in court. It follows then that the federal courts must not only respect, but also abide by, a State's decision about who represents its interests in court. *See id.* at 710 ("[A] State must be able to

8

designate agents to represent it in federal court"). Typically, the agent who represents the State's interests is its Attorney General, although "state law may provide for other officials to speak for the State in federal court." *See id.* The reason why a State permits multiple officials to defend state interests is because "leaders in different branches of government may see the State's interests at stake in litigation differently. Some States may judge that important public perspectives would be lost without a mechanism allowing multiple officials to respond." *Berger v. N.C. State Conference of the NAACP*, 597 U.S. 179, 185 (2022).

In *Cameron*, the Commonwealth of Kentucky conferred on its Attorney General, who is the "chief law officer," "the authority to represent the Commonwealth 'in all cases.'" *Cameron*, 595 U.S. at 278, quoting Ky. Rev. Stat. Ann. §§ 15.020(1), (3). When the Kentucky Legislature passed a law regulating abortion, a medical clinic and two doctors sued in federal district court challenging that law. *Id.* at 271. The Cabinet Secretary for Health and Family Services defended the law in the district court and through appeal to the Sixth Circuit. *Id.* at 272.

However, a week after the panel issued a divided decision, the Secretary informed the Attorney General that he would not seek further appellate review. *Id.* at 273. Nevertheless, the Secretary agreed not to oppose the Attorney General if he moved to intervene. *Id.* Two days later, the Attorney General moved to withdraw as counsel for the Secretary and to intervene on behalf of the Commonwealth. *Id.* As

agreed, the Secretary did not oppose the motion, although the respondents did. *Id.* By the same divided vote, the panel denied the Attorney General's motion, concluding that no substantial legal interest was at stake, the motion was untimely, and allowing intervention would prejudice the respondents. *Id.*

The Supreme Court reversed the Sixth Circuit. *Id.* at 282. The Court began with the legal interest that the Attorney General sought to protect through intervention on appeal—"the continued enforceability of [a State's] own statutes." *Id.* at 277. This is a "substantial legal interest that sounds in deeper, constitutional considerations." *Id.* And respect for state sovereignty requires a federal court to "take into account the authority of a State to structure its executive branch in a way that empowers multiple officials to defend its sovereign interests." *Id.* A federal court should not "lightly cut off" a "State's opportunity to defend its laws." *Id.* And the Sixth Circuit "failed to account for the strength of the Kentucky attorney general's interest in taking up the defense" of this law "when the secretary . . . elected to acquiesce." *Id.* at 279.

Turning to timeliness, that factor had to "'be determined from all the circumstances,' and 'the point to which a suit has progressed is not solely dispositive.'" *Cameron*, 595 U.S. at 1012, quoting *NAACP v. New York*, 413 U.S. 345, 365-66 (1977). The Attorney General sought to intervene two days after "'it became clear'" that the parties would not protect the Commonwealth's interests. *Id.*

10

This was "[t]he most important circumstance" and, therefore, the Attorney General's motion to intervene was timely. *See id.* at 279-80, quoting *United Airlines, Inc. v. McDonald*, 432 U.S. 385, 394 (1977).

Finally, there was no unfair prejudice in permitting the Attorney General to intervene. The plaintiffs had "no legally cognizable expectation" that the Secretary or the Attorney General would give up defense of Kentucky law until "all available forms of review had been exhausted." *Id.* at 282.

A.    **Both the Attorney General and the Consumer Advocate Have a Substantial Legal Interest at Stake in this Litigation.**

The Attorney General, on behalf of the Commonwealth, has a substantial legal interest in the enforceability of Pennsylvania law, while the Consumer Advocate has a substantial legal interest in protecting Pennsylvania consumers. The Commonwealth has empowered the Attorney General and the Consumer Advocate "to defend" these "sovereign interests in federal court." *Cameron*, 595 U.S. at 277; *see* 71 P.S. §§ 732-201(b), 732-204(a)(3), (c).

1.    **The Attorney General Has a Substantial Legal Interest in the Enforceability of Pennsylvania Law Regulating Land Use.**

The Commonwealth Attorneys Act established the Office of Attorney General as an "independent department," and it is "headed by the Attorney General." 71 P.S. § 732-201(a). The Attorney General is a constitutional state officer who is independently elected every four years. *See* PA. CONST., Art. IV, § 4.1.

The Commonwealth Attorneys Act further details the duties and powers of the Attorney General. The Attorney General is required to "represent the Commonwealth and all Commonwealth agencies and upon request, the Departments of Auditor General and State Treasury and the Public Utility Commission in any action brought by or against the Commonwealth or its agencies, and may intervene in any other action, including those involving charitable bequests and trusts or the constitutionality of any statute." 71 P.S. § 732-204(c). As the Pennsylvania courts have recognized, the Commonwealth Attorneys Act "'unambiguously gives the [Attorney General] the authority to represent . . . the Commonwealth' in any civil litigation." *Krasner v. Attorney General*, 309 A.3d 265, 275 (Pa. Cmwlth. 2024), quoting *Synthes, Inc. v. Commonwealth*, 289 A.3d 846, 859 (Pa. 2023).

The Commonwealth Attorneys Act also places a "duty" on "the Attorney General to uphold and defend the constitutionality of *all* statutes so as to prevent their suspension or abrogation in the absence of a controlling decision by a court of competent jurisdiction." 71 P.S. § 732-204(a)(3) (emphasis added). The Attorney General has this duty "regardless of the nature of the constitutional challenge or the opinion of any other state official concerning a statute's validity." *City of Phila. v. Commonwealth*, 838 A.2d 566, 583 (Pa. 2003).

The Commonwealth Attorneys Act, thus, establishes the interest of the Attorney General in defending state law from constitutional attack. *See Cameron*,

595 U.S. at 279. There can be no question that Transource has leveled an as-applied constitutional attack on 66 Pa.C.S. § 1501 and 52 Pa.Code § 57.76(a). Transource is claiming that the PUC's application of these laws, requiring a showing of need for the proposed electrical transmission lines and resulting in a denial of a siting permit, are preempted by federal law. Because of the panel's decision, going forward, any time PJM includes in its regional plan a project for the construction of interstate electrical transmission line, the PUC is preempted from addressing the need for that line. This type of constitutional challenge authorizes the Attorney General, on behalf of the Commonwealth, to step in and defend state law when no one else will. The Attorney General has a "duty . . . to uphold and defend the constitutionality of all statutes." 71 P.S. § 732-204(a)(3); *See e.g., Eakin v. Adams Cty. Bd. of Elections*, 149 F.4th 291, 304 (3d Cir. 2025); *Allegheny Reproductive Health Ctr. v. Pennsylvania Dep't of Human Servs.*, No. 26 M.D. 2019 (Pa. Cmwlth. 2025) (in both cases Attorney General Sunday intervened to defend Pennsylvania statutes).

Although the panel did not explain its reason for denying intervention, perhaps it was swayed by Transource's argument that the Attorney General cannot intervene in litigation involving the PUC unless it requests representation from the Attorney General. Doc. 92 at 7, citing 71 P.S. § 732-204(c). But, as the Attorney General explained in his reply, Doc. 93 at 1-4, this argument confuses representation of the PUC with the Attorney General's obligation to defend the constitutionality of

Pennsylvania laws. These are separate duties under the Commonwealth Attorneys Act. And, again, the Attorney General's right to intervene includes a challenge to "the constitutionality of *any* statute." 71 P.S. § 732-204(c) (emphasis added). Transource's argument ignores these broad terms, "any" and "all," violating fundamental principles of statutory interpretation that a statute must be construed "as a whole." *See e.g. Samantar v. Yousuf*, 560 U.S. 305, 319 (2010). So while the Attorney General does not represent the PUC unless—as it did here—the PUC requests representation, the Commonwealth Attorneys Act empowers the Attorney General to intervene when a state statue is attacked and left undefended, including one administered by the PUC, even when PUC is separately represented.

## 2. The Consumer Advocate Has a Substantial Legal Interest in Protecting Consumers From Increased Energy Prices.

The Consumer Advocate also has a substantial legal interest at stake in pursuing further appellate review. *See Cameron*, 595 U.S. at 277. The Attorney General is statutorily required to appoint a Consumer Advocate, subject to the approval of a majority of the Senate. 71 P.S. § 732-201(b). The Consumer Advocate has the duty "to represent the interest of consumers as a party . . . before the [PUC] . . . before any court or agency . . . in connection with any matter involving regulation by the [PUC]." 71 P.S. § 309-4(a).

The Consumer Advocate intervened in this matter when it was before the PUC, but declined to participate as a party when the matter was before the district

court because the PUC was then adequately representing the interests of consumers. *See* 71 P.S. § 309-4(b) (affording the Consumer Advocate discretion as to when to intervene). That is no longer true, necessitating the Consumer Advocate's intervention. Consumers clearly have an interest in litigation that would raise their power bills by $400 million. JA166. And the Commonwealth has designated the Consumer Advocate as an agent who will defend the Commonwealth's sovereign interest in protecting consumers from rising energy prices. *See Cameron*, 595 U.S. at 277; *see also Energy Reserves Grp. v. Kansas Power & Light Co.*, 459 U.S. 400, 416-17 (1983) (noting that the State of Kansas "exercised its police power to protect consumers from the escalation of natural gas prices by deregulation").

**B.    The Motion to Intervene was Timely.**

Timeliness must "'be determined from all the circumstances,' and 'the point to which a suit has progressed is not solely dispositive.'" *Cameron*, 595 U.S. at 1012, quoting *NAACP*, 413 U.S. at 365-66 "[T]he most important circumstance relating to timeliness is that the attorney general sought to intervene as soon as it became clear that the Commonwealth's interests would no longer be protected." *See Cameron*, 595 U.S. at 279-80.

As noted, the Attorney General first learned of the PUC's refusal to seek further review on September 29, 2025. It was not until two weeks later, during the week of October 13, that the PUC explained its rationale. The Attorney General

could not properly determine whether to intervene until he could evaluate the PUC's rationale. "The attorney general's need to seek intervention did not arise until the [PUC] ceased defending the state law," and explained its rationale for not pursuing further appellate review. *Id.* at 280. The timeliness of the Attorney General's "motion should be assessed in relation to that point in time." *Id.* Thus, the fact that this litigation has "proceeded for years . . . is not dispositive." *Id.* Rather, what is dispositive is that just a few days after learning of the PUC's rationale for not seeking further review, the Attorney General moved to intervene. Under these circumstances, the proposed intervenors' motion was timely. *See Cameron*, 595 U.S. at 280-81.

### C.    Intervention Would Not Prejudice the Parties' Rights.

Permitting the Attorney General to intervene would not prejudice the parties' rights. Indeed, there is no conceivable prejudice because the Attorney General was simply seeking to intervene to maintain the legal defense of the law and had previously represented the PUC.

Further, when the Attorney General moved to intervene, the time for filing an *en banc* petition had not expired. And, indeed, as part of the Attorney General's motion to intervene, he requested a further extension. Transource did not oppose that request, and this Court granted it. Doc. 91. The time for filing a petition for certiorari with the United States Supreme Court has also not expired.

The PUC itself did not oppose the Attorney General's motion to intervene. That is because the PUC recognizes the authority of the Attorney General to intervene and the lack of prejudice to the parties. The Attorney General's motion "did nothing to delay the suit's normal progress" or "otherwise prejudice" the parties. *See Cameron*, 595 U.S. at 292 (Kagan, J., concurring).

## CONCLUSION

The Court should grant *en banc* review of the panel's decision, summarily award intervention, recall the mandate, and afford the Attorney General an additional 30 days to seek *en banc* review on the merits.

Respectfully submitted,

DAVID W. SUNDAY
Attorney General

By:  /s/ Michael J. Scarinci

MICHAEL J. SCARINCI
Senior Deputy Attorney General
Bar No. 323816 (Pa.)

DANIEL B. MULLEN
Chief Deputy Attorney General
Appellate Litigation Section

Office of Attorney General
15th Floor, Strawberry Square
Harrisburg, PA 17120
Phone: (717) 857-2184
FAX:   (717) 772-4526

DATE: November 20, 2025

# CERTIFICATE OF COUNSEL

I, Michael J. Scarinci, Senior Deputy Attorney General, hereby certify as follows:

1. That I am a member of the bar of this Court.

2. That the text of the electronic version of this brief is identical to the text of the paper copies.

3. That the following virus detection program – SYBARI ANTIGEN Version 8.00.1470 – was run on the file and no virus was detected.

4. That this brief contains 3,858 words within the meaning of Fed. R. App. Proc. 32(a)(7)(B). In making this certificate, I have relied on the word count of the word-processing system used to prepare the brief.

/s/ Michael J. Scarinci

MICHAEL J. SCARINCI
Senior Deputy Attorney General

# CERTIFICATE OF SERVICE

I, Michael J. Scarinci, Senior Deputy Attorney General, do hereby certify that I have this day served the foregoing Petition for Rehearing *En Banc*, via electronic service, on all registered CM/ECF users.

/s/ Michael J. Scarinci
_____
MICHAEL J. SCARINCI
Senior Deputy Attorney General

DATE: November 20, 2025

UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

No. 24-1045

TRANSOURCE PENNSYLVANIA, LLC

v.

STEVEN M. DEFRANK, Chair, Pennsylvania Public Utility Commission;
KIMBERLY M. BARROW, Vice Chair, Pennsylvania Public Utility Commission;
JOHN F. COLEMAN, JR.; RALPH V. YANORA; and KATHRYN L. ZERFUSS,
Commissioners, Pennsylvania Public Utility Commission, all in their official capacities;
and the PENNSYLVANIA PUBLIC UTILITY COMMISSION,
                                                    Appellants

(M.D. Pa. No. 1:21-cv-01101)

Present:  SHWARTZ, MATEY, and MCKEE, <u>Circuit Judges</u>

   1.  Motion by the Attorney General of Pennsylvania to withdraw as counsel for
      Appellants, to intervene in this appeal and extend the time for the Proposed
      Intervenor to file a Petition for En Banc Review;

   2.  Response by Appellee Transource Pennsylvania LLC to the Attorney
      General's motion to extend the time for the proposed intervenor to file a
      Petition for En Banc Review;

   3.  Response by Appellee Transource Pennsylvania LLC in Opposition to
      Pennsylvania Attorney General's Omnibus Motion to withdraw as counsel,
      intervene in this appeal and extend the time for the proposed Intervenor to file
      a Petition for En Banc Review;

   4.  Reply by the Attorney General of Pennsylvania in further support of the
      Omnibus Motion.

Respectfully,
Clerk/JK

_____ORDER_____

The foregoing Motion to Withdraw as Counsel and Intervene in this Appeal filed by the Pennsylvania Attorney General is DENIED.   The 30-day extension of time to file a petition for rehearing *en banc* included in the October 21, 2025, order is vacated as MOOT.

By the Court,

s/Theodore A. McKee
Circuit Judge

Dated:  November 6, 2025
JK/cc: All Counsel of Record

**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

————————

No. 24-1045

————————

TRANSOURCE PENNSYLVANIA, LLC

v.

STEVEN M. DEFRANK, Chair, Pennsylvania Public Utility
Commission, KIMBERLY M. BARROW, Vice Chair,
Pennsylvania Public Utility Commission, JOHN F.
COLEMAN, JR., RALPH V. YANORA, and KATHRYN L.
ZERFUSS, Commissioners, Pennsylvania Public Utility
Commission, all in their official capacities, and the
PENNSYLVANIA PUBLIC UTILITY COMMISSION,
                                              Appellants

————————

On Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. No. 1:21-cv-01101)
District Judge: Honorable Jennifer P. Wilson

————————

Argued December 5, 2024

Before: SHWARTZ, MATEY, and McKEE, *Circuit Judges*

(Opinion filed:  September 5, 2025)

Kriss E. Brown
Joseph P. Cardinale, Jr.
Christopher F. Van de Verg
Pennsylvania Public Utility Commission
400 North Street
Harrisburg, PA 17120

Michael J. Scarinci [ARGUED]
Mary Katherine M. Yarish
Office of the Attorney General of Pennsylvania
Strawberry Square 15th Floor
Harrisburg, PA 17120
            *Counsel for Appellants Steven M. DeFrank,
            Kimberly M. Barrow, John F. Coleman, Jr.,
            Ralph V. Yanora, Kathryn L. Zerfuss, and
            Pennsylvania Public Utility Commission*

Melanie J. El Atieh
Darryl A. Lawrence
Office of Consumer Advocate
555 Walnut Street
5th Floor, Forum Place
Harrisburg, PA 17101
            *Counsel for Amicus Curiae Pennsylvania Office
            of Consumer Advocate, Delaware Division of
            Public Advocate, Citizens Utility Board of
            Wisconsin, and Wyoming Office of Consumer
            Advocate in Support of Appellants*

James B. Ramsay

National Association of Regulatory Utility Commissioners
1101 Vermont Avenue NW
Suite 400
Washington, DC 20005
>*Counsel for Amicus Curiae National Association of Regulatory Utility Commissioners in Support of Appellants*

Shannon A. Sollenberger
Senate of Pennsylvania
Main Capitol
Harrisburg, PA 17120
>*Counsel for Amicus Curiae Select Members of the Pennsylvania General Assembly in Support of Appellants*


Benjamin C. Dunlap, Jr.
Cohen Seglias Pallas Greenhall & Furman
240 N Third Street
7th Floor
Harrisburg, PA 17101
>*Counsel for Amicus Curiae Stop Transource Franklin County in Support of Appellants*

Zachary B. Cohen
Matthew Price* [ARGUED]
Jenner & Block
1099 New York Avenue NW

---

* Matthew Price, Esq. was granted leave to withdraw his appearance on December 17, 2024.

Suite 900
Washington, DC 20001

Allison N. Douglis
Jenner & Block
1155 6th Avenue
New York, NY 10036

Precious S. Jacobs-Perry
Jenner & Block
353 N Clark Street
Suite 4500
Chicago, IL 60654

Anthony D. Kanagy
Erin R. Kawa
James J. Kutz
Post & Schell
17 N 2nd Street
12th Floor
Harrisburg, PA 17101
   *Counsel for Appellee Transource Pennsylvania*
   *LLC*

Lauren F. Dayton
MoloLamken
430 Park Avenue
Floor 6
New York, NY 10022

Lucas M. Walker
MoloLamken
600 New Hampshire Avenue NW

The Watergate, Suite 500
Washington, DC 20037

*Counsel for Amicus Curiae PJM Interconnection LLC in Support of Appellee*

---

OPINION OF THE COURT

---

McKEE, *Circuit Judge.*

This appeal arises from an order of the Pennsylvania Public Utility Company denying plaintiff-appellee Transource Pennsylvania LLC's applications to build electricity-transmission lines in Pennsylvania. Transource's applications were part of a project selected through a federal process aimed at identifying and relieving regional congestion. The District Court held that the PUC order was invalid under the Supremacy Clause of the U.S. Constitution, because it posed an obstacle to federal objectives. The court also held the application invalid under the dormant Commerce Clause, because it was driven by economic protectionism and because it impermissibly burdened interstate commerce. Defendants-appellants the PUC, its Chairman, Vice Chairman, and Commissioners appeal those decisions. They also argue that Transource was precluded from raising its federal constitutional arguments before the District Court.

For the reasons that follow, we will affirm the District Court's order. Because we hold that the PUC's actions clearly violate the Supremacy Clause, we need not reach the issues raised under the dormant Commerce Clause.

## I.  Background[1]

As is usually the case, context is helpful.  Accordingly, we begin with the evolution of the electricity-transmission industry.  In the early twentieth century, "most electricity was sold by vertically integrated utilities that had constructed their own power plants, transmission lines, and local delivery systems."[2]  These utility systems operated primarily as "local monopolies" within the states.[3]  "States possessed broad authority to regulate public utilities," subject to the dormant Commerce Clause's limitation on regulations burdening interstate commerce.[4]  Short of such Commerce Clause concerns, however, states exercised general police powers over electricity generation, transmission, and distribution.[5]

In 1927, the Supreme Court invalidated a Rhode Island utility commission's order purporting to set rates for electricity sold from a Rhode Island plant to a Massachusetts supplier (the Attleboro Steam & Electric Company).[6]  The Rhode Island

---

[1] Because our discussion necessarily involves numerous acronyms for various agencies and organizations, a glossary of terms is included at the end of this opinion for the convenience of the reader.

[2] *New York v. FERC*, 535 U.S. 1, 5 (2002).

[3] *Id.*

[4] *Id.*

[5] *See FERC v. Elec. Power Supply Ass'n*, 577 U.S. 260, 265–66 (2016).

[6] *Pub. Util. Comm'n v. Attleboro Steam & Elec. Co.*, 273 U.S. 83 (1927), *overruled in part by Ark. Elec. Co-op. Corp. v. Ark. Pub. Serv. Comm'n*, 461 U.S. 375, 391–93 (1983).

commission's order would have overridden the parties' contractual rate, which the commission found to be inadequate and therefore unreasonable.[7]  "The Attleboro Company was . . . the only customer of the [Massachusetts supplier] to which this new schedule would [have applied]."[8]  The Rhode Island utility's rate impacted an interstate rate, thus "plac[ing] a direct burden upon interstate commerce."[9]  The Court observed that this type of interstate transmission could only be regulated through "the power vested in Congress."[10]  In reaching this conclusion, the Court identified a regulatory vacuum that came to be known as the "*Attleboro* gap."[11]  The Court explained:

> [T]he paramount interest in the interstate business carried on between the two companies is not local to either state, but is essentially national in character.  The rate is therefore not subject to regulation by either of the two states in the guise of protection to their respective local interests; but, if such regulation is required it can only be attained by the exercise of the power vested in Congress.[12]

## A.  Federal Power Act

---

[7] *Id.* at 85–86.

[8] *Id*. at 85.

[9] *Id.* at 89.

[10] *Id.* at 90.

[11] *New York*, 535 U.S. at 6.

[12] *Attleboro*, 273 U.S. at 90.

In 1935, Congress enacted the Federal Power Act (FPA).[13] In 1938, it enacted similar legislation concerning natural gas, the Natural Gas Act (NGA).[14] "Congress adopted the FPA . . . and the NGA . . . to close the regulatory gaps the Constitution imposed on states regulating interstate energy markets beyond their borders."[15] The NGA is not germane to our discussion as it is concerned with regulation and transmission of natural gas. We mention it only because it is part of the regulatory history of the interstate regulation and transmission of energy and was part of the congressional attempt to fill the *Attleboro* gap.

The FPA was aimed at regulating transmission of electricity and electricity sales in interstate commerce.[16] The FPA "declared that the business of transmitting and selling electric energy for ultimate distribution to the public is affected with a public interest," and that federal regulation of that business "is necessary in the public interest."[17]

The FPA empowered the Federal Power Commission, the predecessor to the Federal Energy Regulatory Commission (FERC), with new authority and responsibility over interstate

---

[13] *See* Ch. 687, §§ 201–13, 49 Stat. 803, 847–63 (1935) (codified as amended at 16 U.S.C. § 791a, *et seq.*).

[14] Ch. 556, 52 Stat. 821 (1938) (codified as amended at 15 U.S.C. § 717 *et seq.*).

[15] Jim Rossi, *The Brave New Path of Energy Federalism*, 95 Tex. L. Rev. 399, 407 (2016).

[16] *See* Federal Power Act § 201(a) (codified at 16 U.S.C. § 824(a)).

[17] *Id.*

transmission and wholesale sales.[18]  The Commission was instructed "to divide the country into regional districts for the voluntary interconnection and coordination of facilities for the generation, transmission, and sale of electric energy" and "to promote and encourage such interconnection and coordination."[19]  In addition, the Commission became responsible for ensuring that rates for electricity transmissions or sales within the Commission's jurisdiction, as well as rules and practices pertaining to such rates, be "just and reasonable."[20]  To that end, the FPA prohibited public utilities from granting "any undue prejudice or disadvantage" or "maintain[ing] any unreasonable difference in rates, charges,

---

[18] *See id.* § 201(b) (codified at 16 U.S.C. § 824(b)); *Metro. Edison Co. v. Pa. Pub. Util. Comm'n*, 767 F.3d 335, 341 n.2 (3d Cir. 2014).

[19] Federal Power Act § 202(a) (codified at 16 U.S.C. § 824a(a)).

[20] *Id.* § 205(a) (codified at 16 U.S.C. § 824d(a)) ("All rates and charges made, demanded, or received by any public utility for or in connection with the transmission or sale of electric energy subject to the jurisdiction of the Commission, and all rules and regulations affecting or pertaining to such rates or charges shall be just and reasonable[.]"); *see also id.* § 206(a) (codified at 16 U.S.C. § 824e(a)) ("Whenever the Commission . . . shall find that any rate, charge, or classification . . . [or] any rule, regulation, practice, or contract affecting such rate, charge, or classification is unjust, unreasonable, unduly discriminatory or preferential, the Commission shall determine the just and reasonable rate, charge, classification, rule, regulation, practice, or contract to be thereafter observed and in force, and shall fix the same by order.").

service, facilities, or in any other respect, either as between localities or as between classes of service."[21]

Congress noted that this new federal authority would extend "only to those matters which are not subject to regulation by the States."[22] Notwithstanding this provision—which the Supreme Court later described as "a mere policy declaration"[23]—the FPA did reach areas that had historically been the province of state regulation. States previously could regulate aspects of interstate wholesale sales that did not directly burden interstate commerce.[24] The FPA authorized FERC to regulate precisely such wholesale sales "that had been *previously subject* to state regulation."[25] The Supreme Court subsequently resolved any tension between states' historical authority to regulate certain local matters and FERC's apparent grant of authority to FERC to regulate intrastate sales. The Court explained, the "policy declaration" in the FPA "cannot nullify a clear and specific grant of jurisdiction [to FERC]."[26] The FPA also authorized FERC to regulate interstate transmission, which was not at issue in *Attleboro*.[27] The law therefore did much more than fill the *Attleboro* gap. It marked a significant shift in the balance of state and federal authority.

_____

[21] *Id.* § 205(b) (codified at 16 U.S.C. § 824d(b)).

[22] *Id.* § 201(a) (codified at 16 U.S.C. § 824(a)).

[23] *New York*, 535 U.S. at 22 (quotation marks omitted).

[24] *See id.* at 21 (discussing *Attleboro*, 273 U.S. at 85–86).

[25] *Id.*

[26] *Id*. at 22 (quotation marks omitted).

[27] *See id.* at 20, 22.

## B. The Evolution of the Electricity Industry and FERC's Responses

In the decades following the enactment of the FPA, technological advancements transformed the production and transmission of electricity. Electricity came to be "delivered over three major networks, or 'grids,' in the continental United States."[28] As a result, "any electricity that enters the grid immediately becomes a part of a vast pool of energy that is constantly moving in interstate commerce."[29] Accordingly, "it is now possible for power companies to transmit electric energy over long distances at a low cost."[30] By the mid-1990s, "long-distance transmission had become increasingly economical, and smaller, lower-cost plants had begun to emerge as competitors to the vertically integrated utilities."[31] Yet the state utilities retained control over much of the transmission infrastructure, including "transmission lines that must be used by their competitors to deliver electric energy to wholesale and retail customers."[32] FERC became concerned that state utilities' economic interest lay in "denying

---

[28] *Id.* at 7.

[29] *Id.*

[30] *Id.* at 7–8.

[31] *S.C. Pub. Serv. Auth. v. FERC*, 762 F.3d 41, 49–50 (D.C. Cir. 2014) (per curiam) (citing Order No. 888, Promoting Wholesale Competition Through Open Access Non-Discriminatory Transmission Services by Public Utilities, 61 Fed. Reg. 21540, 21543–46 (May 10, 1996) (codified at 18 C.F.R. pts. 35, 385)).

[32] *New York*, 535 U.S. at 8.

transmission or offering it only on inferior terms to emerging competitors."[33]

FERC responded by issuing a series of orders aimed at checking state utilities' promotion of their own self-interest. The FERC orders promoted transparency and regional coordination. In 1996, Order No. 888[34] required each transmission provider to "file an open-access transmission tariff . . . containing minimum terms of non-discriminatory transmission service."[35] In other words, this order compelled utilities to offer transmission services to other market actors at the same rates as would be charged to the utilities themselves.[36] In addition, "[t]o promote development of competitive markets, [FERC] encouraged the formation of regional transmission organizations ('RTOs') . . . to coordinate transmission planning, operation, and use on a regional and interregional basis."[37] We explain the role of RTOs in greater detail in the following section.

---

[33] *S.C. Pub. Serv. Auth.*, 762 F.3d at 50 (paraphrasing Order No. 888, 61 Fed. Reg. at 21567).

[34] 61 Fed. Reg. 21540.

[35] *S.C. Pub. Serv. Auth.*, 762 F.3d at 50 (citing Order No. 888, 61 Fed. Reg. at 21541, 21551–52).

[36] *See* Order No. 888, 61 Fed. Reg. at 21541; *see also Metro. Edison Co.*, 767 F.3d at 342 ("Each electric utility must apply the same rate for wholesale transmission services to itself and others so as to provide open access to transmission services.").

[37] *S.C. Pub. Serv. Auth.*, 762 F.3d at 50 (citing Order No. 888, 61 Fed. Reg. at 21552, 21666–67).

FERC built on these reforms in 2007 with Order No. 890.[38] Opining once again on the anticompetitive tendencies of the transmission market, FERC explained that "vertically-integrated utilities do not have an incentive to expand the grid to accommodate new entries or to facilitate the dispatch of more efficient competitors."[39] At the same time, there was a "critical need for new transmission infrastructure," as existing systems could not support the increase in consumer demand.[40] To this end, Order No. 890 called for "an open, transparent, and coordinated transmission planning process,"[41] and required providers "to open their transmission planning process to customers, coordinate with customers regarding future system plans, and share necessary planning information with customers."[42]

Order No. 890 also responded to FERC's growing concern that grid congestion imposed "significant cost impacts on consumers."[43] "Congestion" refers to limits on the electricity grid's ability to carry traffic, which restricts the flow of energy from where it is generated to where it is needed.[44]

---

[38] Order No. 890, Preventing Undue Discrimination and Preference in Transmission Service, 72 Fed. Reg. 12266 (Mar. 15, 2007) (codified at 18 C.F.R. pts. 35, 37).

[39] *Id.* at 12275.

[40] *Id.*

[41] *Id.* at 12267.

[42] *Id.*

[43] *Id.* at 12276.

[44] *See Transource Penn., L.L.C. v. DeFrank*, 705 F. Supp. 3d 266, 274 (M.D. Pa. 2023) ("Congestion occurs when the least

When congestion exists downstream of cheap power generation, it can force consumers to purchase from a more expensive power source.[45] Order No. 890, responding to "increasing transmission congestion," sought to develop a planning process that would prevent and deter "undue discrimination" that arises from congestion.[46]

Notwithstanding Order No. 890's reforms, concerns persisted about the capacity of the nationwide grid to reliably meet rising demand for electricity.[47] In 2011, FERC issued Order No. 1000,[48] which built upon Order No. 890 by requiring that: (1) each transmission provider participate in a regional transmission planning process that would identify "regional solutions to regional needs,"[49] and "produce[] a regional transmission plan"[50]; (2) neighboring regions establish interregional coordination procedures for transmission

_____

costly resources that are available to serve load in a given region cannot be dispatched because transmission facility limits constrain power flow on the system.") (quotation marks omitted).

[45] *See* Order No. 890, 72 Fed. Reg. at 12276 (discussing studies showing that "[t]ransmission congestion has created fairly small local load pockets" and "can have significant cost impacts on consumers").

[46] *Id.*

[47] *See S.C. Pub. Serv. Auth.*, 762 F.3d at 51–52.

[48] Order No. 1000, Transmission Planning and Cost Allocation by Transmission Owning and Operating Public Utilities, 76 Fed. Reg. 49842 (Aug. 11, 2011) (codified at 18 C.F.R. pt. 35).

[49] *Id.* at 49897.

[50] *Id.* at 49854.

planning;[51] (3) transmission providers relinquish rights of first refusal for incumbent transmission developers to construct new facilities included in regional transmission plans;[52] and (4) regional planning processes set qualification criteria for developers and use a selection process that is transparent and not unduly discriminatory.[53]  The preemption issue in this appeal arises from this federally mandated regional planning process.

## C. RTOs and the Regional Planning Process

RTOs, or regional transmission organizations, supervise interstate transmission and planning of electricity. FERC encouraged the formation of RTOs by requiring utilities to report their progress towards developing and participating in RTOs to FERC.[54]  FERC explained that its objective was "for all transmission-owning entities in the Nation, including non-public utility entities, to place their transmission facilities under the control of appropriate RTOs in a timely manner."[55]

The purposes of RTOs include "promoting efficiency and reliability in the operation and planning of the electric transmission grid and ensuring non-discrimination in the

---

[51] *Id.* at 49846, 49907.

[52] *Id.* at 49846, 49895–96.

[53] *Id.* at 49846, 49897–99; *see also S.C. Public Serv. Auth.*, 762 F.3d at 52–53 (summarizing key provisions of Order No. 1000).

[54] *See* Order No. 2000, Regional Transmission Organizations, 65 Fed. Reg. 810, 811 (Jan. 6, 2000) (codified at 18 C.F.R. pt. 35).

[55] *Id.* at 811.

provision of electric transmission services."[56]  To that end, FERC regulations require that each RTO have "operational authority for all transmission facilities under its control"[57] and "exclusive authority for maintaining the short-term reliability of the grid that it operates."[58]  FERC further has mandated that RTOs (1) administer transmission tariffs,[59] (2) "ensure the development and operation of market mechanisms to manage transmission congestion,"[60] (3) provide for objective market-monitoring to ensure "reliable, efficient and not unduly discriminatory transmission service,"[61] and (4) "be responsible for planning, and for directing or arranging, necessary transmission expansions, additions, and upgrades that will enable [provision of] efficient, reliable and non-discriminatory transmission service."[62]

---

[56] 18 C.F.R. § 35.34(a) (2025).

[57] *Id.* § 35.34(j)(3).

[58] *Id.* § 35.34(j)(4).

[59] *Id.* § 35.34(k)(1).  In this context, a tariff is a published rule concerning the provision of electric service "offered on a generally applicable basis," and the rates, charges, classifications, practices, rules, or regulations relating to that service.  *Id.* § 35.2(c)(1); *see also N.J. Bd. of Pub. Utils. v. FERC*, 744 F.3d 74, 83 (3d Cir. 2014) (noting that a tariff is "the term of art used to refer to the classifications, practices, and regulations a public utility uses to establish electricity rates") (internal quotation marks omitted).

[60] 18 C.F.R. § 35.34(k)(2).

[61] *Id.* § 35.34(k)(6).

[62] *Id.* § 35.34(k)(7).

PJM Interconnection, LLC, is the RTO responsible for maintaining the bulk electricity transmission system of a 13-state region that includes most of Pennsylvania.[63]  Pursuant to the FERC-mandated regional planning process, PJM produces an annual Regional Transmission Expansion Plan (RTEP) that identifies areas of congestion and proposes solutions to reduce that congestion.[64]

In 2007, FERC directed PJM to submit a proposal for evaluating the benefits and costs of congestion-mitigation projects for inclusion in the RTEP.[65]  Such projects are also known as "market-efficiency projects."[66]  PJM proposed that market-efficiency projects could be considered cost-justified if the benefit-cost ratio over a 15-year span exceeded 1.25 to 1.0.[67]  PJM proposed to calculate the benefit of a project by

---

[63] *See PJM Interconnection, L.L.C.*, 101 FERC ¶ 61345, 62444–45 (2002) (FERC order granting PJM status as an RTO).

[64] *See* PJM Interconnection L.L.C, *Amended and Restated Operating Agreement of PJM Interconnection, L.L.C.*, sched. 6, §§ 1.1, 1.5 (2025) [hereinafter PJM Operating Agreement], https://perma.cc/S3GD-3D44; Order No. 1000, 76 Fed. Reg. at 49842 (requiring utilities to "participate in a regional transmission planning process that produces a regional transmission plan").

[65] *PJM Interconnection, L.L.C.*, 119 FERC ¶ 61265, 62488 (2007).

[66] PJM Operating Agreement, sched. 6, § 1.5.7(b)–(c).

[67] *See PJM Interconnection, L.L.C.*, 123 FERC ¶ 61051, 61409–10 (2008).  The parties do not dispute that this methodology applies to the project at issue in this litigation.

accounting for the decreases in wholesale electricity costs in regions previously experiencing congestion—that is, regions downstream of the congestion.[68] But PJM's methodology would exclude from the calculation price increases in regions that previously enjoyed low prices as a result of congestion— that is, regions on the same side of the congestion as the cheap electricity.[69] FERC approved this approach in 2008, deeming it reasonable to exclude price-increases in regions that previously benefited from congestion because those regions would not have to shoulder the costs of constructing the new facilities.[70] PJM accordingly has continued to apply this methodology in the intervening years, and FERC has rejected requests to revisit the methodology.[71]

-------

[68] *Id.* at 61409–10, 61416.

[69] *Id.*

[70] *Id.* at 61416.

[71] *See PJM Interconnection, L.L.C.*, 173 FERC ¶ 61258, 62725 (2020) (FERC declining intervenor's request to revisit methodology on the basis that it "ignore[s] the increased zonal load costs that a project may create"). Amicus the Pennsylvania Office of Consumer Advocate (OCA) asserts that FERC did not, in fact, approve this methodology. For support, OCA notes that in 2014, PJM submitted a letter to FERC proposing revision of the market-efficiency calculation for Regional Facilities and Necessary Lower Voltage Facilities to account only for zones where customer load payments were projected to decrease. According to OCA, while FERC accepted this letter for filing, it never expressly approved it. But OCA does not provide support for its premise that the project at the heart of this dispute falls into the category of

## D. State Siting Authority

Even though FERC has come to exercise increasingly broad authority over interstate aspects of electricity transmission, especially regional transmission planning and expansion, state regulators retain spheres of authority over intrastate aspects of the industry. In particular, the states historically have held exclusive authority over siting,[72] permitting, and construction of transmission lines.[73]

The FPA as originally enacted did not authorize FERC to exercise any siting authority. In 2005, Congress amended

---

projects covered by this 2014 filing. Instead, the parties agree that the methodology approved in 2008 applied to Transource's project and was unaffected by the 2014 filing. *PJM Interconnection, L.L.C.*, 123 FERC at 614416).

[72] "[S]iting" is not clearly defined in relevant law. We use that term to refer to the decision to approve building transmission facilities in a particular place, consistent with how FERC uses the term. *See, e.g.*, Order No. 1000, 76 Fed. Reg. at 49885 n.231 (referring to state regulation of "construction of transmission facilities, including but not limited to authority over siting or permitting of transmission facilities").

[73] *See* Order No. 1000, 76 Fed. Reg. at 49861 (noting that "there is longstanding state authority over . . . matters relevant to siting, permitting, and construction"); *id.* at 49880 ("[N]othing in this Final Rule is intended to limit, preempt, or otherwise affect state or local laws or regulations with respect to construction of transmission facilities, including but not limited to authority over siting or permitting of transmission facilities.").

the FPA by enacting the Energy Policy Act,[74] which for the first time authorized FERC to exercise limited authority over transmission-line siting. This Act directed the Department of Energy to designate transmission-constrained or congested areas of the country as National Interest Electric Transmission Corridors (NIETCs).[75] Within NIETCs, FERC could issue permits to construct or modify electricity transmission facilities, but only under specified conditions, such as if the state in question withheld approval for more than a year after the filing of a permit application.[76] This is sometimes referred to as FERC's "backstop siting authority." An NIETC may be designated based on a finding that a geographic area experiences or is expected to experience "electric energy transmission capacity constraints or congestion that adversely affects consumers."[77] In other words, the Energy Policy Act carved out a unique circumstance wherein FERC could supersede the states' traditional authority over siting decisions.

Outside of NIETCs, however, siting remains the province of the states. The PUC reviews and rules upon the application of any public utility to construct high-voltage electricity transmission lines in Pennsylvania.[78] State law

---

[74] Energy Policy Act, Pub. L. No. 109–58, 119 Stat. 594 (2005).

[75] *Id.* § 1221(a) (codified at 16 U.S.C. § 824p(a)).

[76] *Id.* § 1221(b)(1)(C)(i) (codified at 16 U.S.C. § 824p(b)(1)(C)(i)).

[77] *Id.* § 1221(a)(2) (codified as amended at 16 U.S.C. § 824p(a)(2)(i)–(ii)).

[78] 52 Pa. Code §§ 57.71–76.

requires the PUC to hold a hearing[79] and make the following findings before approving the construction of any such line:

> (1) That there is a need for it.
>
> (2) That it will not create an unreasonable risk of danger to the health and safety of the public.
>
> (3) That it is in compliance with applicable statutes and regulations providing for the protection of the natural resources of [Pennsylvania].
>
> (4) That it will have minimum adverse environmental impact, considering the electric power needs of the public, the state of available technology and the available alternatives.[80]

### E. Summary of Regulatory Scheme

The aforementioned evolution of electricity regulation can thus be summed up as follows: The federal government, through FERC, regulates interstate electricity transmission and interstate wholesale sales. FERC has directed RTOs to manage regional transmission planning and develop regional plans to reduce congestion and ensure grid reliability. Concomitantly,

---

[79] *Id.* § 57.75.
[80] *Id.* § 57.76(a).

with the limited exception of NIETCs, states retain authority over transmission-line siting, permitting, and construction, and apply state law in reviewing transmission-line applications.

## II. Factual and Procedural History[81]

### A. Project 9A

PJM conducted studies that identified "persistent congestion" along the Pennsylvania-Maryland border affecting a subregion called the AP South Reactive Interface (APSRI).[82] APSRI is "a set of four 500 kV transmission lines that originate in West Virginia and terminate in Maryland."[83] PJM assessed that this congestion had "imposed economic transmission constraint costs totaling approximately $800 million from 2012 through 2016."[84] PJM further determined that the costs of congestion were "borne by residents, commercial businesses and industrial customers" in the eastern part of PJM's region.[85] As explained in the report of Transource's expert witness:

> The fundamental problem on the AP South reactive interface is how to avoid having too much energy flowing across the lines that make up the interface, which would

---

[81] The parties largely do not dispute the ALJ's factual findings, with very limited exceptions not relevant to the facts recounted here.

[82] JA 681 (PJM 2018 white paper).

[83] *Id.* at 84 ¶ 7.

[84] *Id.* at 681.

[85] *Id.*

22

result in unacceptable low voltages
. . . . If [flows] are low enough,
lower-cost generation may be
dispatched from Pennsylvania or
states to the West to serve a need
for power in Maryland, Virginia,
and the District of Columbia. If
the anticipated flow across the
interface is too high, however,
PJM operators will direct
increased higher-cost generation
from Maryland and Virginia, and
will limit lower-cost generation
output from Pennsylvania and
elsewhere to prevent the flow
across the interface from
exceeding the voltage-based
limits. In other words, lower-cost
power is "trapped" and cannot get
to where there is a demand for that
power in other portions of the PJM
region, due to the constraints on
the AP South reactive interface.[86]

Relieving this congestion would reduce electricity costs in
Maryland, Virginia, West Virginia, and the District of
Columbia. It would, however, increase the cost of electricity
in areas, such as Pennsylvania, currently benefiting from this
congestion in the form of lower electricity costs.

------------------------

[86] *Id.* at 580 (expert report of Steven R. Herling).

In October 2014, as part of its RTEP process, PJM solicited proposals for "technical solutions" to alleviate this congestion.[87]   PJM selected a proposal submitted by Transource Energy, L.L.C., to build, among other things, two new transmission lines spanning the Pennsylvania-Maryland border.[88]   The Transource proposal is known as Project 9A. The Pennsylvania-specific portions of the proposal are known as the Independence Energy Connection Project, comprising the IEC East Project, which would connect to a proposed substation in York County, Pennsylvania, and the IEC West Project, which would connect to a proposed substation in Franklin County, Pennsylvania.   PJM evaluated Project 9A according to its FERC-approved benefit-cost methodology, described *supra* in Section I.C.  PJM concluded that Project 9A would be expected to provide economic benefits that exceed the 1.25 threshold over the 15-year horizon.   Although the precise figures have shifted as the project is periodically reevaluated, PJM estimates that the project could lower wholesale electricity costs in congestion-constrained regions by as much as $845 million over 15 years.  At the same time, the cost of constructing the project would be roughly $509–528 million.   PJM's periodic reevaluations of the project

---

[87] *Id.* at 681.

[88] Transource Energy, L.L.C. is the parent company to Transource Pennsylvania, L.L.C., the plaintiff-appellee in this litigation.   Transource Pennsylvania, L.L.C. is an electricity transmission company and public utility that was established for the purpose of building Project 9A.  This opinion refers to Transource Pennsylvania, L.L.C. as "Transource."

consistently have yielded a benefit-cost ratio greater than 1.25 to 1.[89] PJM initially calculated the ratio at 2.48.

It is undisputed that Project 9A also would yield higher wholesale electricity costs for customers currently benefiting from the congestion that the project seeks to alleviate. In practice, this would mean that customers in regions including central and eastern Pennsylvania, where low-cost electricity has been trapped, would see their costs increase by as much as $812 million over 15 years. As explained above, PJM's FERC-approved methodology for evaluating benefits and costs does not account for this increase in costs to Pennsylvania consumers.

PJM's Board approved Project 9A "as the more efficient, cost-effective project to address persistent congestion identified in forward-looking economic studies on the AP-South Interface."[90] In January 2017, FERC approved the

---

[89] Periodic reevaluations have yielded ratios of 1.30, 1.32, 1.42, 1.40, 2.17, and 2.10. But, as will be discussed *infra*, the Administrative Law Judge who reviewed Transource's siting applications emphasized that congestion costs may have declined by as much as $400 million without Project 9A being built. In addition, Defendants contend in their reply that PJM's most recent evaluation—conducted after the District Court ruled in this case—fell below the 1.25 threshold.

[90] JA 683.

project, determining that it would "reduce the cost of delivered power by reducing transmission congestion."[91]

## B.  Administrative Proceeding

Transource applied to the PUC for all necessary certificates and approvals to construct Project 9A.  Transource obtained a provisional "certificate of public convenience," which would confer status as a public utility and enable it to file siting applications.[92]  Transource proceeded to file siting applications for the East Portion and West Portion of Project 9A.  Transource also filed eminent-domain applications for the property that would need to be condemned to construct Project 9A.  Numerous private organizations and individuals obtained intervenor status in the proceeding and filed objections to Transource's applications.

An ALJ received written submissions and presided over an evidentiary hearing concerning Transource's applications. Thereafter, the ALJ issued a recommended decision advising the PUC to deny Transource's applications.  The ALJ's analysis focused on the first of the four elements that the PUC would need to consider under Pennsylvania law before approving the siting applications: the need for the project.[93]

---

[91] *Transource*, 705 F. Supp. 3d at 275 (citation omitted); *see also PJM Interconnection, L.L.C.*, 158 FERC ¶ 61089, 2017 WL 444174, at *5 (Jan. 31, 2017).

[92] JA 73, 227.

[93] As noted, Pennsylvania law provides that the PUC may approve an application if it finds: "(1) That there is a need for it.  (2) That it will not create an unreasonable risk of danger to

The ALJ framed the need inquiry as "broad," noting that while the PUC "may consider regional needs," a primary focus is on "impacts to Pennsylvania."[94]

First, the ALJ rejected the premise that congestion was a problem in the APSRI, finding that "[a]ctual congestion costs" had decreased since PJM approved Project 9A.[95] Specifically, the ALJ found that while congestion costs on the APSRI totaled $486.8 million in 2014, in subsequent years, these costs hovered between $14.5–21.6 million. According to the ALJ, at the time of the administrative proceeding, "there [wa]s no longer significant congestion for the IEC Project to resolve on the AP South Interface."[96] The ALJ also rejected the notion that the purported congestion caused discriminatory prices, characterizing congestion as "an appropriate market-based response to the wholesale power market."[97]

Next, the ALJ explained that even if congestion were an issue in the region, "those concerns would be weighed against

────────────────

the health and safety of the public. (3) That it is in compliance with applicable statutes and regulations providing for the protection of the natural resources of [Pennsylvania]. (4) That it will have minimum adverse environmental impact, considering the electric power needs of the public, the state of available technology and the available alternatives." 52 Pa. Code. § 57.76(a).

[94] JA 153.

[95] *Id.* at 154.

[96] *Id.* at 155; *see also id.* at 162 ("[T]he IEC Project is no longer needed for the purpose for which it was designed in 2016.").

[97] *Id.* at 163.

the detrimental impacts" of the project within Pennsylvania.[98] Whereas PJM had selected Transource's project based on its FERC-approved benefit-cost methodology, the ALJ characterized that methodology as "deficient when measured against the constitutional, statutory, and regulatory standards of Pennsylvania law."[99] The ALJ thus rejected PJM's approach of comparing the cost of building the project to the benefits only in regions that would pay for the project. According to the ALJ, the $812 million in increased costs to Pennsylvania consumers—which would result from relieving the congestion—should be considered as a counterweight to the $845 million in efficiency gains in other states. The ALJ therefore assessed the benefit of the project to be only $32.5 million over 15 years, against a cost of at least $509 million to build.[100] Thus, the ALJ wrote, "[t]his is a costly project to Pennsylvania compared to the net benefit to address vague constraints."[101]

The ALJ recommended denying the applications because "no need has been proven."[102] The ALJ also found that Transource failed to establish two of the other elements required under Pennsylvania law for approval of the siting applications: protection of natural resources and minimal environmental impact.

---

[98] *Id.* at 166.

[99] *Id.* at 169.

[100] This number is reached by subtracting the $812.5 million in increased costs from the $845 million in savings from relieving the congestion.

[101] *Id.* at 168.

[102] *Id.* at 195.

Transsource filed exceptions to the ALJ's recommended decision before the PUC. The PUC subsequently issued an order denying Transource's siting applications and adopting and incorporating the ALJ's ruling. This denial turned on Transource's "fail[ure] to establish . . . the need for the proposed HV transmission lines."[103] The PUC held that Pennsylvania law authorizes and requires the PUC to conduct its own need analysis, which is not necessarily coterminous with PJM's benefit-cost determination. The PUC wrote:

> The premise underlying Transource's arguments that the element of need has been satisfied under the Pennsylvania standards is Transource's assertion that the factors relied upon by PJM and the methodology and process for PJM-approval of a project should be the only criteria relevant to this Commission's review and such criteria is not subject to critical analysis. However, Transource's argument is flawed in a material respect: need, established under the applicable federal standards imposed by FERC and implemented by PJM, do[es] not necessarily satisfy the requirement for "need" as that element is

---

[103] *Id.* at 224.

examined and weighed under [Pennsylvania law].[104]

The PUC—like the ALJ—evaluated the issue of "need" by focusing primarily on "[t]he potential negative and practical impact on the citizens and consumers of Pennsylvania."[105] Despite acknowledging that PJM's planning may not account for the most current data, particularly when a project is tied up in years of litigation, the PUC deemed it appropriate to consider purported declines in congestion levels since PJM selected Project 9A because "[Pennsylvania] is expected to suffer serious consequences" if the project is built.[106] The PUC therefore adopted the ALJ's recommended conclusion that Transource had failed to establish the requisite "need" for Project 9A, explaining,

> [W]e find that the ALJ properly construed the state versus federal roles regarding regional transmission planning in the analysis and application of the relevant statutory authority, applicable regulations, and case law to the present case . . . . [W]e conclude that in the present circumstances Transource fails to carry the burden of persuasion by a preponderance of the evidence to establish need for the proposed

---

[104] *Id.* at 276.
[105] *Id.* at 281.
[106] *Id.* at 282.

siting Applications, pursuant to . . . . 52 Pa. Code Section 57.76(a)(1).[107]

Relying on this conclusion, the PUC denied Transource's siting applications, as well as the accompanying petitions for zoning exemptions and eminent domain. The PUC also rescinded Transource's provisional certificate of public convenience.

## C. Federal and State Court Proceedings

Transource responded by suing the PUC, along with its Chairman, Vice Chairman, and Commissioners in federal district court. Transource's complaint asserted that the PUC decision violated the Supremacy Clause and the dormant Commerce Clause of the U.S. Constitution. It pled causes of action pursuant to 28 U.S.C. § 2201 and 42 U.S.C. § 1983. The complaint asked the District Court to declare the PUC's need determination unlawful, and to enjoin enforcement of the PUC order.

The day after filing its federal-court complaint, Transource filed a petition for review of the agency determination in the Pennsylvania Commonwealth Court. Transource sought reversal on the grounds that the ruling contained errors of law, was not supported by substantial evidence, and constituted an abuse of agency discretion. Transource's submissions to the Commonwealth Court expressly reserved Transource's Supremacy Clause and dormant Commerce Clause claims and explained that

---

[107] *Id.* at 285.

Transource intended to litigate those issues in federal court if it did not prevail before the Commonwealth Court.

The District Court stayed the federal proceeding pending resolution of the state proceeding. Several months later, the Commonwealth Court affirmed the PUC decision. Accordingly, the federal District Court lifted the stay, denied Defendants' motion to dismiss, and authorized limited discovery. Upon completion of discovery, both sides moved for summary judgment.

### D. District Court Summary Judgment Ruling

The District Court entered summary judgment for Transource. The District Court began its analysis in a very thorough and well-reasoned opinion, by rejecting Defendants' arguments that preclusion doctrines prevented it from reaching the merits of the dispute. First, the District Court held that, consistent with the Supreme Court's opinion in *England v. Louisiana State Board of Medical Examiners*,[108] Transource had avoided claim preclusion in state court by informing the Pennsylvania court that it was reserving its constitutional claims for adjudication in federal court. Second, the District Court declined to reach the merits of Defendants' issue-preclusion argument, concluding that argument had not been properly raised as it was presented only in a footnote in Defendants' summary-judgment brief.

In analyzing the Supremacy Clause claim, the District Court explained that the FPA grants FERC "the power to

---

[108] 375 U.S. 411 (1964).

regulate regional transmission planning."[109] The District Court declined to rule on whether the PUC order created a direct conflict with federal law. Instead, the District Court concluded that the PUC order must fall under the doctrine of implied conflict preemption because it erected an obstacle to federal objectives. As the District Court explained, a core goal of federal regulation in the area of interstate electricity transmission is for RTOs such as PJM to analyze, select, and ultimately build "congestion-reducing projects with benefits that exceed their costs by the required ratio," subject to local permitting constraints.[110] The District Court reasoned that "by disagreeing with PJM's FERC-approved benefit-cost methodology," the PUC "undercut the foundational goal of congestion-alleviating projects."[111] The court concluded, "[b]ecause the PUC's decision presents an obstacle to achieving federal objectives, it is conflict preempted and violates the Supremacy Clause."[112]

The District Court also held that "the PUC's decision was a *per se* violation of the dormant Commerce Clause driven by economic protectionism."[113] The court explained that the purpose of Project 9A is "to better facilitate commerce across regional and state boundaries," whereas the PUC's opposition was rooted in maintaining Pennsylvania's "access to low-priced electricity" resulting from congestion.[114] Yet the PUC

---

[109] *Transource*, 705 F. Supp. 3d at 285.
[110] *Id.* at 288.
[111] *Id.* at 288–89.
[112] *Id.* at 289.
[113] *Id.* at 296.
[114] *Id.*

failed to show, as it must under the dormant Commerce Clause, that this discriminatory policy was narrowly tailored to advance a legitimate state purpose.[115] The District Court also concluded that the PUC decision would violate the dormant Commerce Clause pursuant to the balancing test described in *Pike v. Bruce Church, Inc.*,[116] noting that "if other states adopted a regime similar to the PUC, it would eviscerate FERC's attempts to reduce congestion."[117]

The District Court therefore granted Transource's motion for summary judgment and entered final judgment in favor of Transource. Defendants now appeal that order.[118]

---

[115] *Id.* at 296–97.

[116] 397 U.S. 137 (1970).

[117] *Transource*, 705 F. Supp. 3d at 297.

[118] In addition to the issues addressed in Section III, Defendants in their reply contend that Transource's theory in this litigation violates the major questions doctrine. "As a general matter, the courts of appeals will not consider arguments raised on appeal for the first time in a reply brief." *Hoxworth v. Blinder, Robinson & Co., Inc.*, 903 F.2d 186, 204 n.29 (3d Cir. 1990). We see no "exceptional circumstances," *id.*, that would justify deviating from that standard default rule here. Defendants offer no explanation for raising this issue late. Nor can we readily discern such a reason, as their arguments concerning the major questions doctrine rely upon case law decided before they filed their opening brief. *See id.* This issue also does not appear to have been raised before the District Court, making it even more inappropriate for appellate consideration. *See Harris v. City of Philadelphia*, 35 F.3d 840, 845 (3d Cir. 1994). We therefore do not address the major questions doctrine.

### III.  Discussion[119]

#### A. Preclusion

We first address Defendants' contention that issue preclusion bars Transource from raising its preemption argument.[120]   The District Court declined to consider issue preclusion because the argument was raised only in a footnote in Defendants' summary judgment briefing.  Defendants offer no basis for concluding that the argument is not now forfeited, and this is reason enough for us to reject it.[121]

---

[119] The District Court exercised jurisdiction over Transource's claims pursuant to 28 U.S.C. § 1331.  We have appellate jurisdiction over the District Court's final order pursuant to 28 U.S.C. § 1291.  We review a grant of summary judgment *de novo*, applying the same standard as a district court.  *Levy v. Sterling Holding Co., L.L.C.*, 544 F.3d 493, 501 (3d Cir. 2008).  Summary judgment is appropriate when there is no genuine dispute of material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).

[120] Defendants also argue that claim preclusion bars consideration of Transource's dormant Commerce Clause claim because Transource could have raised this argument in the agency proceeding before the PUC but failed to do so.  Because we do not reach the dormant Commerce Clause issue, we need not analyze this preclusion argument.

[121] *See In re Niaspan Antitrust Litig.*, 67 F.4th 118, 135–36 (3d Cir. 2023) (declining to consider argument presented to the district court in a footnote and therefore forfeited); *Higgins v. Bayada Home Health Care Inc.*, 62 F.4th 755, 763 (3d Cir. 2023) (same).

However, even if the argument had been preserved, it would not succeed. Issue preclusion bars relitigation of previously decided issues where, among other requirements, "there was a final adjudication on the merits," and the issue was "essential to the judgment."[122] The PUC did not address federal preemption. The PUC did use the word "preempted" in "reject[ing] any argument that the authority [to resolve siting applications] is preempted."[123] However, the PUC never analyzed the Supremacy Clause or federal preemption case-law. It is not clear that such authorities were even presented to the PUC, as Defendants' description of Transource's argument in the administrative proceeding conspicuously omits mention of the Supremacy Clause.

Moreover, the PUC order was not a "final adjudication."[124] The PUC is not a tribunal of last resort, and Transource pursued review of the PUC decision in the Commonwealth Court. We have held that a federal court "should grant preclusive effect to *a state court decision upholding*" an agency's determination when that state-court

---

[122] *Metro. Edison Co.*, 767 F.3d at 351 (explaining that Pennsylvania law governs the issue-preclusive effect of a state-court decision reviewing a PUC order, and summarizing requirements under Pennsylvania law) (quoting *Off. Disciplinary Counsel v. Kiesewetter*, 889 A.2d 47, 50–51 (Pa. 2005)).

[123] JA 278.

[124] *Metro. Edison Co.*, 767 F.3d at 351.

decision would have preclusive effect in state court.[125]  But the Commonwealth Court never reviewed the PUC decision through the lens of federal preemption.  Instead, Transource filed an *England* reservation, preserving its federal-law arguments for review in federal court.  Pursuant to *England*, a party required to litigate in state court may reserve parallel federal claims for resolution in federal court so long as the party "inform[s] those [state] courts what his federal claims are, so that the state statute may be construed in light of those claims."[126]  Because Transource made a proper *England* reservation, "the traditional rules of res judicata and collateral estoppel . . . do not apply to [the] state proceeding[]" with respect to those federal claims.[127]

Defendants do not question the validity of Transource's *England* reservation.  Instead, their argument seems to be that to the extent the PUC order touched at all on preemption, the PUC order is preclusive, despite the fact that the Commonwealth Court never reached the issue.  Defendants write that "Transource could have challenged the PUC's decision [on preemption] in the Commonwealth Court, but did not."[128]  This is irreconcilable with *England*, which made clear that a party who properly invokes federal-court jurisdiction may not be compelled to forego the federal forum even if his

---

[125] *Dici v. Pennsylvania*, 91 F.3d 542, 547 (3d Cir. 1996) (emphasis added).

[126] 375 U.S. at 420 (quotation marks omitted).

[127] *Instructional Sys., Inc. v. Comput. Curriculum Corp.*, 35 F.3d 813, 822 (3d Cir. 1994).

[128] Appellants Br. 56.

claims require parallel state proceedings.[129]    Defendants
identify no authority to support issue preclusion applying
where the state agency's decision has been challenged but not
affirmed on the at-issue grounds, and the cases they rely upon
are readily distinguishable.[130]

---

[129] *See England*, 375 U.S. at 415 ("There are fundamental
objections to any conclusion that a litigant who has properly
invoked the jurisdiction of a Federal District Court to consider
federal constitutional claims can be compelled, without his
consent and through no fault of his own, to accept instead a
state court's determination of those claims.").

[130] *See City of McKeesport v. Pa. Pub. Util. Comm'n*, 442 A.2d
30, 31 (Pa. Commw. Ct. 1982) (explaining that a PUC decision
that was *never* appealed could have *claim-preclusive* effect in
the Commonwealth Court, where the issue had been briefed,
considered, and decided by an ALJ and adopted by the PUC
and "the reasons for the uses of the rule in court proceedings
are present in full force"); *Phil. Elec. Co. v. Pa. Pub. Util.
Comm'n*, 433 A.2d 620, 625–26 (Pa. Commw. Ct. 1981)
(concluding that, in the particular case, "the desirability of
giving finality to decisions and preventing the relitigation of
issues involving precisely the same facts as those in *finished*
litigation . . . apply") (emphasis added); *Crossroads
Cogeneration Corp. v. Orange & Rockland Utilities, Inc.*, 159
F.3d 129, 135 (3d Cir. 1998) (concluding that a decision by a
New York agency concerning the terms of a purchase
agreement held preclusive effect because of the "substantial
role given state utility agencies by Congress in enacting [their
enabling statute]"); *Edmundson v. Borough of Kennett Square*,
4 F.3d 186, 193 (3d Cir. 1993) (holding state civil service

Defendants therefore fail to establish that issue preclusion poses a bar to our review of Transource's preemption argument.

## B. Preemption

The District Court held that the PUC order denying Transource's siting applications was preempted because it posed an obstacle to federal objectives by "undercut[ting] the foundational goal of congestion-alleviating projects."[131] Defendants challenge this determination on appeal, arguing that the PUC order was an exercise of Pennsylvania's siting authority, which is distinct from regional planning and over which the federal government lacks jurisdiction.

### 1. The Supremacy Clause

The Supremacy Clause of the U.S. Constitution provides:

> This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme

---

commission's resolution of a First Amendment issue *did not* have preclusive effect because the agency lacked "the expertise to issue binding pronouncements in the area of federal constitutional law").

[131] *Transource*, 705 F. Supp. 3d at 288–89.

> Law of the Land; and the Judges in
> every State shall be bound thereby,
> any Thing in the Constitution or
> Laws of any State to the Contrary
> notwithstanding.[132]

This means that "any state law, however clearly within a State's acknowledged power, which interferes with or is contrary to federal law, must yield."[133] Federal law may preempt state law either expressly—by declaring an intent to displace state law—or implicitly.[134] Implied preemption occurs either when Congress legislates so as to "foreclose any state regulation in the area," known as field preemption, or when federal law conflicts with state law, known as conflict preemption.[135] Conflict preemption, at issue in this appeal, "exists where 'compliance with both state and federal law is impossible,' or where 'the state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'"[136] Where such conflict exists, "federal law must prevail."[137]

---

[132] U.S. Const. art. VI, cl. 2.

[133] *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 108 (1992) (quoting *Felder v. Casey*, 487 U.S. 131, 138 (1988)).

[134] *See Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373, 376–77 (2015).

[135] *Id.* at 377 (emphasis omitted) (quoting *Arizona v. United States*, 567 U.S. 387, 401 (2012)).

[136] *Id.* (quoting *California v. ARC Am. Corp.*, 490 U.S. 93, 100, 101 (1989)).

[137] *Id.*

We have identified "two principles" that guide our analysis "[i]n every preemption case."[138]  "First, the intent of Congress is the 'ultimate touchstone' of preemption analysis."[139]  Congress's purpose may be apparent from the face of a statute.  We also may consider the "structure and purpose of the statute as a whole," analyzing "the way in which Congress intended the statute and its surrounding regulatory scheme to affect business, consumers, and the law."[140]  To this end, we have observed that "regulatory situations in which an agency is required to strike a balance between competing statutory objectives lend themselves to a finding of conflict preemption."[141]  In such situations, Congress "intends the agency to use its reasoned judgment to weigh the relevant considerations and determine how best to prioritize between these objectives."[142]  Permitting state authorities to "impose a different standard" would undermine this congressional intent by "re-balancing" the considerations already weighed by the agency.[143]

---

[138] *Farina v. Nokia Inc.*, 625 F.3d 97, 115 (3d Cir. 2010).

[139] *Id.* (quoting *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996)); *see also Deweese v. Nat'l R.R. Passenger Corp. (Amtrak)*, 590 F.3d 239, 246 (3d Cir. 2009) ("In analyzing a potential conflict between federal and state law, we must be 'guided . . . by the rule that the purpose of Congress is the ultimate touchstone in every preemption case.'") (quoting *Holk v. Snapple Beverage Corp.*, 575 F.3d 329, 334 (3d. Cir. 2009)).

[140] *Farina*, 625 F.3d at 115 (quoting *Medtronic*, 518 U.S. at 486).

[141] *Id.* at 123.

[142] *Id.*

[143] *Id.*

The second guiding principle is "the basic assumption that Congress did not intend to displace state law."[144]  This presumption against preemption does not apply in all cases, however.  It does not apply "where state regulation has traditionally been absent."[145]  And the presumption is "overcome where . . . the existence of a conflict is clear and manifest."[146]

### 2. Federal Electricity-Industry Objectives

To determine whether the PUC order stands as an obstacle to federal objectives, we first must distill the federal objectives in regulating the electricity industry, as revealed through acts of Congress and FERC rulemaking.[147]  As explained *supra* in Section I, the FPA directed FERC to (1) exert "jurisdiction over all facilities for such [interstate] transmission or [wholesale] sale of electric energy"[148]; (2) "divide the country into regional districts" and "promote and

---

[144] *Id.* at 116.

[145] *Id.*

[146] *Id.* at 117 (quoting *Fellner v. Tri-Union Seafoods, L.L.C.*, 539 F.3d 237, 249 (3d Cir. 2008) (quotation marks omitted).

[147] *See Holk*, 575 F.3d at 339 ("Both federal statutes and regulations have the force of law and can preempt contrary state law."); *Fellner*, 539 F.3d at 243–44 (discussing circumstances in which federal agency actions have preemptive effect, which include but are not limited to the formal, notice-and-comment rulemaking at issue in this appeal).

[148] 16 U.S.C. § 824(b)(1).

encourage [regional] interconnection and coordination"[149]; (3) ensure "just and reasonable" rates for transmission and sales subject to FERC's jurisdiction,[150] and (4) prevent any undue preferences or advantages in connection with such rates.[151] With the Energy Policy Act, Congress instructed FERC to "facilitate[] the planning and expansion of transmission facilities to meet the reasonable needs of load-serving entities."[152]

FERC's orders pursuant to this legislation explain that carrying out these mandates entails counteracting state utilities' naturally anticompetitive tendencies. With the evolution of the transmission industry, FERC "concluded that the economic self-interest of electric transmission monopolists lay in denying transmission or offering it only on inferior terms to emerging competitors."[153] FERC construed its mandate of ensuring just and reasonable rates as requiring it to foster a competitive, interconnected marketplace.[154]

The regional planning process is one tool that FERC developed to support competition and deter preferential practices. FERC has explained that it "encouraged the creation of RTOs to address important operational and reliability issues and *eliminate any residual discrimination* in transmission

---

[149] *Id.* § 824a(a).
[150] *Id.* § 824d(a).
[151] *Id.* § 824d(b); *see also id.* § 824e(a).
[152] *Id.* § 824q(b)(4).
[153] *S.C. Pub. Serv. Auth.*, 762 F.3d at 50 (citing Order No. 888, 61 Fed. Reg. at 21567).
[154] *See id.*

services that can occur when the operation of the transmission system remains in the control of a vertically integrated utility."[155] As for the objective of reducing congestion, FERC noted that "the ability and incentive to discriminate increases as the transmission system becomes more congested."[156] These priorities serve the purpose of "ensur[ing] that transmission infrastructure is constructed on a nondiscriminatory basis and is otherwise sufficient to support reliable and economic service to all eligible customers."[157] In other words, the regional planning process developed as a counterweight to state interests, and precisely because FERC determined that it could not depend on the states to address regional concerns such as congestion and grid reliability.

FERC acted in furtherance of these considerations when it directed PJM to propose a benefit-cost ratio for evaluating market-efficiency projects that reduce congestion.[158] FERC insisted that PJM come up with a fixed, "bright-line" formula for evaluating the economics of a project, explaining that such a formula was necessary to provide fairness and certainty to investors and to avoid relitigating each project approved by

---

[155] Order No. 890, 72 Fed. Reg. at 12270 (emphasis added).
[156] *Id.* at 12275.
[157] *Id.*; *see also* Order No. 1000, 76 Fed. Reg. at 49845 (explaining FERC's purpose in building on Order No. 890 with Order No. 1000 "to ensure that rates for [FERC]-jurisdictional service are just and reasonable in light of changing conditions in the industry" and to "address opportunities for undue discrimination by public utility transmission providers").
[158] *See PJM Interconnection, L.L.C.*, 119 FERC at ¶ 62488.

PJM.[159] FERC explained in approving the benefit-cost methodology that it provided the requisite certainty and was "consistent with the FPA because it promotes an economically efficient transmission system, and is not unduly discriminatory."[160]

Carrying out these objectives requires FERC to balance competing policy considerations. FERC is tasked on the one hand with ensuring just and reasonable rates and facilitating regional interconnection, while on the other hand regulating "only . . . those matters which are not subject to regulation by the States."[161] FERC repeatedly has articulated its intent not to impinge the authority of state utilities and regulators over certain predominantly intra-state aspects of the electricity-transmission industry, including siting.[162] At the same time,

---

[159] *Id.* at ¶ 62492–93.

[160] *PJM Interconnection, L.L.C.*, 123 FERC at ¶ 61412.

[161] 16 U.S.C. § 824(a).

[162] *See* Order No. 1000, 76 Fed. Reg. at 49861 ("We acknowledge that there is longstanding state authority over certain matters that are relevant to transmission planning and expansion, such as matters relevant to siting, permitting, and construction. However, nothing in this Final Rule involves an exercise of siting, permitting, and construction authority."); Order No. 1000-A, Transmission Planning and Cost Allocation by Transmission Owning and Operating Public Utilities, 77 Fed. Reg. 32184, 32215 (May 31, 2012) (affirming that "[FERC] may undertake Order No. 1000's reforms without intruding on state jurisdiction," including the states' role in "siting, permitting, and construction of transmission

FERC considers one of its core objectives to be countering state utilities' economic self-interest, which it repeatedly has characterized as a force that undermines the goal of nondiscriminatory rates and practices.[163] Thus, the Supreme Court has observed that FERC is entitled to "great deference" in effectuating "[t]he statutory requirement that rates be 'just

_____

facilities"); Order No. 2000, 65 Fed. Reg. at 910 ("Currently, state and local governments . . . have exclusive authority over the siting process. Therefore, an RTO's planning and expansion process must be designed to be consistent with these state and local responsibilities."); Order No. 890, 72 Fed. Reg. at 12328 (describing "State siting issues" as an area "over which [FERC] does not have jurisdiction"); *id.* at 12336 (noting that states "have primary transmission siting authority").

[163] *See* Order No. 888, 61 Fed. Reg. at 21567 (identifying FERC's objective to correct "unduly discriminatory and anticompetitive practices" resulting from "the economic self-interest of transmission monopolists . . . to deny transmission or to offer transmission on a basis that is inferior to that which they provide themselves"); Order No. 890, 72 Fed. Reg. at 12318 (explaining that FERC needed to build on the provisions of Order No. 888 because "[w]e cannot rely on the self-interest of transmission providers to expand the grid in a nondiscriminatory manner"); Order No. 1000, 76 Fed. Reg. at 49886 (identifying a need to eliminate incumbent rights of first refusal because "it is not in the economic self-interest of incumbent transmission providers to permit new entrants to develop transmission facilities").

and reasonable,'" for that phrase entails judgment calls and policy considerations "incapable of precise definition."[164]

To summarize, Congress intended to establish a system of federal supervision over interstate electricity transmission and wholesale sales to ensure just, reasonable, and nondiscriminatory rates and practices, while promoting regional interconnection. FERC reasonably construed its mandate to comprise facilitating competitive transmission and wholesale markets, in part by checking the inherent economic self-interest of state utilities, while reducing regional congestion and ensuring grid reliability.

### 3. The Conflict Between the PUC Ruling and Federal Objectives

The conflict between the PUC order at issue here and the foregoing federal objectives is clear. As described herein, PJM, acting pursuant to its mandate to "ensure the development and operation of market mechanisms to manage transmission congestion,"[165] identified the need to reduce congestion in the APSRI region. PJM evaluated Transource's proposal, Project 9A, according to the FERC-mandated benefit-cost methodology. PJM selected Transource's proposal because it "provided the most benefits" by reducing congestion while complying with the approved benefit-cost ratio.[166] The PUC applied a different benefit-cost analysis— explicitly departing from the methodology FERC had directed

---

[164] *Morgan Stanley Cap. Grp. Inc. v. Pub. Util. Dist. No. 1*, 554 U.S. 527, 532 (2008).

[165] 18 C.F.R. § 35.34(k)(2).

[166] JA 688 (PJM 2016 white paper).

PJM to apply. It concluded that there was no "need" for the project. Based on this determination, the PUC declined to issue Transource a permit for the project, foreclosing construction of the IEC lines in Pennsylvania.

The problem with the PUC's denial is that it is the result of second-guessing the FERC-approved benefit-cost methodology. FERC's methodology serves the broader purpose of reducing regional congestion to ensure just, reasonable, and nondiscriminatory rates. The PUC, however, disagreed with PJM's evaluations of regional congestion and with FERC's determination of how the consequences of that congestion should be weighed. No party disputes—and the PUC expressly acknowledged—that the congestion at issue here results in lower rates for Pennsylvania customers at the expense of out-of-state customers. It thus contributes to a regional rate disparity that Project 9A seeks to remedy. However, this objective is thwarted by the PUC order based upon an impermissible "re-balancing of those considerations"[167] that FERC has already weighed in mandating the regional-planning process and approving PJM's benefit-cost methodology. Moreover, FERC has considered—but declined to adopt—the very approach that the PUC applied by treating price increases from relieving congestion as a "cost" of the project.[168] Thus, FERC's ability to fulfill its

---

[167] *Farina*, 625 F.3d at 123.

[168] *See PJM Interconnection, L.L.C.*, 123 FERC at ¶ 61416 (considering but rejecting objections to the exclusion of "the expected energy payment increases, if any," in zones that would not pay for the project); *PJM Interconnection, L.L.C.*,

mandates would be fatally undermined if state agencies could veto congestion-reducing projects based on a disagreement with the federal actors' reasons for selecting or approving a project. The PUC order therefore "poses an obstacle to the full achievement of federal purposes."[169]

In a different but instructive context, the Supreme Court has consistently found "the States' attempts to second-guess the reasonableness" of FERC tariffs preempted pursuant to the filed-rate doctrine.[170] That doctrine provides "'that interstate power rates filed with FERC or fixed by FERC must be given binding effect by state utility commissions determining intrastate rates' . . . as a matter of federal pre-emption through

───────────────

173 FERC at ¶ 62725 (declining intervenor's request to revisit methodology because it "ignore[s] the increased zonal load costs that a project may create").

[169] *MD Mall Assocs. v. CSX Transp., Inc.*, 715 F.3d 479, 495 (3d Cir. 2013).

[170] *Hughes v. Talen Energy Mktg.*, 578 U.S. 150, 165 (2016); *see id.* at 163 (holding preempted a Maryland program that effectively set an interstate wholesale rate because it "invade[d] FERC's regulatory turf"); *see also Miss. Power & Light Co. v. Mississippi ex rel. Moore*, 487 U.S. 354, 369–74 (1988) (holding preempted a Mississippi agency's "prudence inquiry" into nuclear power plant expenses that FERC had ordered utilities to purchase); *Nantahala Power & Light Co.*, 476 U.S. 953 (1986) (holding preempted North Carolina agency's order allocating power between power plant operators in manner that differed from FERC's allocation).

the Supremacy Clause."[171]  Once FERC determines that a rate is "reasonable," state utilities cannot impose any inconsistent rate—even when acting in an area of exclusive state jurisdiction.[172]  Thus, in *Nantahala Power and Light Co. v. Thornburg*, a state utility was preempted from reallocating power between plant operators based on the utility's belief "that [one of the operators] should have obtained more of the low-cost, FERC-regulated power than [it was] in fact entitled to claim under FERC's order."[173]  FERC had issued a tariff setting the allocation of power between the operators.[174] Because the state utility's order rested on a premise "directly counter to FERC's order," it "c[ould ]not withstand the preemptive force of FERC's decision."[175]

Similarly, in *Mississippi Power & Light Co. v. Mississippi ex rel. Moore*, FERC had allocated the costs of constructing a power plant among several utilities, requiring each to purchase a portion of the plant's output at FERC-determined rates.[176]  The Mississippi Supreme Court directed a state agency to conduct a "prudence" review of the underlying construction of the plant,[177] which could be relevant

---

[171] *Entergy La., Inc. v. La. Pub. Serv. Comm'n*, 539 U.S. 39, 47 (2003) (quoting *Nantahala*, 476 U.S. at 962).

[172] *Id.*; *see also Montana-Dakota Utils. Co. v. Nw. Pub. Serv. Co.*, 341 U.S. 246, 251 (1951) ("[T]he right to a reasonable rate is the right to the rate which the Commission files or fixes.").

[173] 476 U.S. at 968.

[174] *Id.* at 956.

[175] *Id.* at 968.

[176] 487 U.S. at 362–63.

[177] *Id.* at 368.

to whether the FERC-mandated payments could be passed on to consumers through state retail rates.[178]  The Supreme Court held this state action preempted because, even though Mississippi had authority over retail rates, "[o]nce FERC sets [a wholesale] rate, a State may not conclude in setting retail rates that the FERC-approved wholesale rates are unreasonable."[179]  The Supremacy Clause prohibited "any proceedings that challenge the reasonableness of FERC's allocation."[180]

The Supreme Court reinforced these principles in *Hughes v. Talen Energy Marketing, LLC*.[181]  At issue there was a PJM capacity auction, which FERC had approved "as the sole ratesetting mechanism for sales of capacity to PJM."[182]  Maryland sought to encourage in-state generation by guaranteeing a new power plant a set price for its capacity.[183]  This had the effect of overriding the auction price, established through a process that FERC had determined made the price just and reasonable.[184]  The Supreme Court explained that while the FPA left certain zones of authorities to the states, "States may not seek to achieve ends, however legitimate," in a manner that would effectively undermine a FERC-determined rate.[185]

---

[178] *Id.* at 372 n.12.

[179] *Id.* at 373 (quoting *Nantahala*, 476 U.S. at 966).

[180] *Id.* at 374.

[181] 578 U.S. 150.

[182] *Id.* at 163.

[183] *Id.* at 158–59.

[184] *Id.* at 163.

[185] *Id.* at 164.

Like the state agencies in *Nantahala*, *Mississippi Power*, and *Hughes*, the PUC here would substitute its determination for that of FERC on an issue that federal law places squarely in FERC's hands: identifying regional planning needs and selecting projects to relieve congestion. FERC determined that the benefit-cost methodology PJM used in this case was "a just and reasonable means by which to measure whether an economic-based enhancement or expansion should be included in the RTEP."[186] The PUC's rejection of that measure arose from its disagreement with constructing the project. Much like the prudence inquiry in *Mississippi Power*, the PUC order here would "substitute[ the PUC's] own determination[] of what would be just and fair" for that of FERC.[187]

The PUC order raises an obstacle to accomplishing federal objectives in a manner the Supremacy Clause does not permit. Because the conflict is clear and manifest, it overcomes our usual presumption against preemption. It is clearly preempted.[188]

### 4. State Authority Over Siting

Defendants' central argument for reversal is that the PUC, in denying Transource's applications, was simply

---

[186] *PJM Interconnection, L.L.C.*, 123 FERC at ¶ 61417.
[187] *Mississippi Power*, 487 U.S. at 371.
[188] *See Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 374 n.8 (2000) (explaining that state law presented "a sufficient obstacle to the full accomplishment of Congress's objectives" to overcome any presumption against preemption).

exercising traditional state siting authority. According to Defendants, the states have "longstanding historical authority to approve or deny siting permits for the construction of electric transmission facilities," which Congress has never disturbed beyond granting FERC limited "backstop siting authority."[189] Thus, Defendants would have us confine the federal sphere to the regional planning *process*—i.e., identifying the need for projects—while leaving to states the *substantive* determination of whether a project ultimately can be built.

We agree that the task of approving construction in a particular place falls to state authorities. This is clear from the FPA, which in its original form did not empower the federal government with any authority over siting. Siting decisions therefore remained, by default, the province of the states.[190] Moreover, we realize that when Congress amended the FPA in 2005 by enacting the Energy Policy Act, it authorized FERC to exercise siting authority involving designated NIETCs, but only in select circumstances not applicable here.[191] We therefore appreciate that this limited and highly restrictive authorization arguably gives rise to a negative inference that FERC otherwise lacks plenary authority over siting.[192] FERC

_____

[189] Appellants Br. 31.

[190] *See* 16 U.S.C. § 824(a).

[191] *Id.* § 824p(b).

[192] *Cf. Lindh v. Murphy*, 521 U.S. 320, 336 (1997) (finding specific provision in one portion of statute, but absence of such provision elsewhere, gave rise to negative inference that application was limited to circumstances specifically described).

moreover has repeatedly reaffirmed that its regulations are not intended to intrude upon states' traditional siting authority.[193] Even Transource agrees that "states retain authority over siting and construction."[194]

That is not the end of the inquiry, however. Implied conflict preemption occurs when states act in ways that impede the federal government from carrying out federal objectives, "even when [s]tates exercise their traditional authority."[195] What matters for preemption purposes is that the PUC's reasons for denying the siting applications amounted to "second-guess[ing] the reasonableness"[196] of PJM's FERC-approved approach to determining which projects should be built. We appreciate that a state-law savings provision, like the one in the FPA, may "indicate Congress envisioned some role for state law in the field."[197] However, that "does not 'bar the ordinary working of conflict pre-emption principles.'"[198] The question before us is not whether the PUC was acting within the ordinary scope of state authority, but whether its action

---

[193] *See* Order No. 1000, 76 Fed. Reg. at 49861; Order No. 1000-A, 77 Fed. Reg. at 32215; Order No. 2000, 65 Fed. Reg. at 910; Order No. 890, 72 Fed. Reg. at 12328, 12336.

[194] Appellee Br. 15.

[195] *Hughes*, 578 U.S. at 165.

[196] *Id.*

[197] *Farina*, 625 F.3d at 121.

[198] *Id.* at 131 (quoting *Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 869 (2000)).

poses an obstacle to the accomplishment of federal objectives.[199]  As we explained above, it clearly does.

If state siting authority permitted the PUC to reject a federal project on the same basis that the federally authorized RTO selected the project, the regional planning process would do nothing to check state utilities' core economic self-interest. Congress recognized a need for federal regulation precisely because ensuring just and reasonable rates and reliable service on an interstate grid could not be left to the individual states.[200] And FERC concluded that to ensure nondiscriminatory service, it needed to check states' interests in advantaging domestic actors.

Defendants emphasize that states must retain the ability to reject siting applications on the basis of local concerns.  To be clear, the PUC may, consistent with our opinion today, "grant[] or deny[]" a siting application for reasons other than a disagreement with PJM's FERC-approved basis for selecting the project.[201]  Pennsylvania law indicates that such reasons may include public safety and environmental concerns.[202]

---

[199] We therefore need not go so far as the District Court in characterizing the PUC's decision as something other than siting.  *See Transource*, 705 F. Supp. 3d at 293.  Even assuming, *arguendo*, that the PUC was engaged in the siting process when it denied Transource's applications, this does not obviate the conflict for preemption purposes.

[200] *See supra* Section III.B.2.

[201] 52 Pa. Code § 57.76(a).

[202] *Id.* §§ 57.76(a)(2)–(4).

As Defendants emphasize, Pennsylvania law also instructs the PUC to conduct its own need determination.[203] Our holding today need not render state "need" inquiries entirely superfluous. According to Transource, "the vast majority of new transmission lines" did not originate with an RTO's regional planning process, and instead address "local problems."[204] Defendants do not rebut this assertion or the evidence Transource cites in support. Accordingly, it is at least

---

[203] *Id.* § 57.76(a)(1). Defendants note that other siting state laws include similar "need" elements. *See, e.g.*, Fla. Stat. § 403.537; Me. Stat. 35-A § 3132(6); M.D. Code Ann., Pub. Util. § 7-207(f)(1)(i); Mont. Code Ann. § 75-20-301(1)(a); N.Y. Pub. Serv. Law § 122(1)(d). Defendants emphasize that FERC Commissioner Mark Christie has expressed a conviction that states' historic siting authority properly comprises a need determination. *See Balt. Gas & Elec. Co.*, 187 FERC ¶ 61030, 2024 WL 2272575, at *7 (Apr. 23, 2024) (Christie, dissenting); *Duquesne Lighting Co., PJM Interconnection, L.L.C.*, 189 FERC ¶ 61181, ¶ 16 n.268, 2024 WL 5006632, at *34 (Dec. 6, 2024) (Christie, concurring in part and concurring in the result in part); *PJM Interconnection, L.L.C.*, 191 FERC ¶ 61056, 2025 WL 1165765, at *5 (Apr. 17, 2025) (Christie, concurring).

[204] Appellee Br. 4; *see also id.* at 36 n.10 (citing PJM document explaining that "supplemental projects" are developed outside of PJM's process and "[t]ransmission owners develop these [supplemental] projects themselves to address local reliability needs"); *id.* at 36 (citing FERC notice of proposed rulemaking from 2022, which observes that the majority of investments since Order No. 1000 have gone toward local transmission facilities, not regional projects).

arguable that when the PUC reviews siting applications that do *not* originate with RTO regional planning, the PUC may evaluate need without running afoul of the Supremacy Clause and preemption issues.

On the other hand, when an RTO has selected a project for inclusion in a regional transmission plan as part of its federal mandate, a state regulator cannot, consistent with the Supremacy Clause, reject the project based on a lack of "need." FERC explained in Order No. 1000 that regional planning was essential to "identify and evaluate transmission alternatives at the regional level that may resolve the region's needs more efficiently or cost-effectively than solutions identified in the local transmission plans of individual public utility transmission providers."[205] FERC was understandably concerned that it could not rely upon local public utilities to fill this role. Local utilities "may not adequately assess the potential benefits of alternative transmission solutions at the regional level."[206] If local authorities cannot be depended upon to "adequately assess"[207] regional planning goals, the other side of that coin is that they cannot veto regional projects because the project appears insufficiently valuable from a local perspective, as the PUC did here.

Defendants argue, however, that the PUC's independent need determination was necessary to prevent a "wasteful and counterproductive project,"[208] citing a purported decrease in

_____

[205] Order No. 1000, 76 Fed. Reg. at 49856.
[206] *Id.* at 49857.
[207] *Id.*
[208] Reply 23.

57

congestion in the years since Project 9A was approved. Defendants assert that as of June 2024—after the District Court rendered its decision—PJM evaluated Project 9A and concluded that it then fell below the requisite 1:1.25 benefit-cost ratio. Nevertheless, the PUC's attempt to weigh in on the current need for the project by recalculating congestion levels is just another way of redoing PJM's benefit-cost evaluation. Transource has represented that PJM annually reevaluates RTEP projects to determine whether a project should be cancelled based on changing congestion patterns. The record supports that assertion. In addition, we note that federal law provides a process for challenging particular projects before FERC.[209] This process has been used to challenge the inclusion of particular projects in PJM's RTEP.[210] These are important tools in checking construction of a project that may no longer make economic sense because of changed conditions. Because the need determination falls in the first instance to PJM, however, the task of reevaluating need based on changing congestion patterns likewise belongs with PJM and not with the PUC.

### 5. Due Process and Eminent Domain Concerns

Finally, Defendants and amici National Association of Regulatory Utility Commissioners (NARUC), OCA, Members

---

[209] *See* 16 U.S.C. § 824e(a) (providing that a concerned party may file a "complaint" with FERC alleging that a "rule, regulation, practice, or contract" is "unjust, unreasonable, unduly discriminatory or preferential").
[210] *See PJM Interconnection L.L.C.*, 156 FERC ¶ 61120, 2016 WL 4466386, at *2 (2016).

of the Pennsylvania General Assembly, and Stop Transource Franklin County (STFC) raise concerns about how the District Court's ruling impacts the due process rights of Pennsylvania property owners.  These parties emphasize that states are better equipped than federal regulators to weigh the public need for siting projects alongside local interests.   They also raise concerns that the District Court's opinion allows PJM to effectively wield eminent-domain power by determining whether a regional project is needed.  Amici emphasize that PJM's process for selecting market-efficiency projects pursuant to a FERC-approved methodology does not afford adequate procedural protections to affected landowners and other citizens.

Landowners are of course entitled to procedural protections before their property can be condemned.[211]  We would therefore be concerned if PJM were wielding Pennsylvania's eminent-domain power, but it is not.  This becomes clear when we consider how eminent domain works in Pennsylvania in the context of constructing transmission lines.  Although the parties and amici failed to adequately address this in their briefing, we think it will be helpful for us to describe this process.

Pennsylvania's Business Corporations Law provides that a public utility may "condemn property"[212] for purposes

---

[211] *Rogin v. Bensalem Twp.*, 616 F.2d 680, 694 (3d Cir. 1980) ("Before a governmental body may deprive a landowner of a property interest, it must provide due process.").
[212] 15 Pa. Cons. Stat. § 1511(a).

that include "[t]he transportation of . . . electricity."[213] However, a purported utility such as Transource—not PJM— only has the status of a public utility if it maintains a certificate of public convenience.[214] Thus, holding a certificate of public convenience is a prerequisite to exercising-eminent domain authority.[215] The PUC grants a certificate of public convenience only upon a finding that "such certificate is necessary or proper for the service, accommodation, convenience, or safety of the public."[216]

A public utility may apply to the PUC to exercise eminent domain in siting a transmission line.[217] The proceedings on such an application may be consolidated with proceedings related to the underlying siting application.[218] The

───────────────

[213] *Id.* § 1511(a)(2).

[214] 66 Pa. Cons. Stat. § 1101 (explaining that upon the approval of a certificate of public convenience, a "proposed public utility" may "begin to offer, render, furnish, or supply service" as a public utility).

[215] *See id.* § 1104 ("[N]o domestic public utility or foreign public utility authorized to do business in this Commonwealth shall exercise any power of eminent domain within this Commonwealth until it shall have received the certificate of public convenience[.]"); *Clean Air Council v. Sunoco Pipeline L.P.*, 185 A.3d 478, 482–83 (Pa. Commw. Ct. 2018) ("[Under] the Public Utility Code, Sunoco must possess [a certificate of public convenience] in order to exercise its eminent domain power as a public utility.").

[216] 66 Pa. Cons. Stat. § 1103(a).

[217] *See* 52 Pa. Code §§ 57.75(i)(1)–(2).

[218] *See id.*

PUC's guidelines for reviewing siting applications and, if applicable, corresponding eminent-domain applications, provide for (1) notice to persons and property owners affected by a prospective project,[219] and (2) a hearing before the PUC, in which individuals and entities with "substantial interest in the proceeding" may participate.[220]  The hearing entails presentation of evidence and argument on the need, safety, and environmental impact of the proposed line, and the availability of alternative routes.[221]

Even "[a]fter the PUC authorizes a utility to exercise the power of eminent domain, a condemnation is far from final."[222] Rather, the utility must still "prevail in a condemnation action at the Court of Common Pleas."[223]  The condemnor must file "a declaration of taking" and appropriate security with the court,[224] in response to which the condemnee "may file

---

[219] *See id.* § 57.72(c)(4); *see also id.* § 57.74(c).

[220] *Id.* §§ 57.75(b), (d).

[221] *See id.* § 57.75(e).

[222] *Clean Air Council*, 185 A.3d at 487 (quoting *Se. Pa. Transp. Auth. v. Pa. Pub. Util. Comm'n*, 991 A.2d 1021, 1023 (Pa. Commw. Ct. 2010)).

[223] *Id.* (quoting *Se. Pa. Transp. Auth.*, 991 A.2d at 1023); *see also id.* ("[A]lthough the issuance of the [certificate of public convenience] allows the public utility to commence proceedings under the Eminent Domain Code, success in the common pleas court is not guaranteed."); 15 Pa. Cons. Stat. § 1511(g) (describing procedure for eminent-domain proceedings).

[224] 26 Pa. Cons. Stat. § 302(a)(1).

preliminary objections,"[225] which are "the exclusive method of challenging" the condemnation.[226]

These provisions of Pennsylvania law demonstrate that PJM—which is not a public utility—does not exercise the power of eminent domain. Moreover, no party has explained how requiring the PUC to accept PJM's benefit-cost determination would *ipso facto* authorize PJM to exercise eminent-domain authority over any particular plot of land. Amici's argument seems to be that PJM, by determining whether a project is needed, would predetermine approval of the corresponding eminent-domain applications. But as we have explained, a public utility must also prevail in the hearing before the PUC and in an adversarial process before the Court of Common Pleas. Only then may a public utility like *Transource*—distinct from PJM—condemn private property.

Our opinion therefore cannot reasonably be read to suggest that the PUC is required to rubber-stamp either a siting application or an eminent-domain application related to a project that PJM has approved. It thus does not undermine the value of Pennsylvania's "robust process for public involvement"[227] in siting and eminent-domain applications. Nor does it improperly empower any private party to wield the sovereign power of eminent domain.

---

[225] *Id.* § 306(a)(1).

[226] *Id.* § 306(a)(3); *see also Se. Pa. Transp. Auth.*, 991 A.2d at 1023–24 (explaining that any "challenge to the authority of the utility to condemn is properly raised in proceedings before common pleas, not the PUC").

[227] OCA Br. 10.

## IV.    Conclusion

For the foregoing reasons, we conclude that Transource is not precluded from raising its preemption claim.  We hold that the PUC's order rejecting Transource's siting applications runs afoul of the Supremacy Clause because it poses an obstacle to accomplishing federal objectives.  The PUC's order therefore is preempted, and we will affirm the District Court's entry of judgment in favor of Transource.

Because our conclusion on preemption independently resolves the appeal, we need not discuss the question of whether the PUC's order also violates the dormant Commerce Clause.

## V.    Glossary of Terms

| Term | Description |
|------|-------------|
| APSRI | AP South Reactive Interface, the subregion including the Pennsylvania-Maryland border experiencing the congestion that prompted PJM to solicit proposals for what became Project 9A. |
| FERC | Federal Energy Regulatory Commission, the federal agency with jurisdiction over, among other things, interstate wholesale electricity transmission. |
| FPA | Federal Power Act, the 1935 law that empowered the agency that became FERC to |

| | |
|---|---|
| | regulate interstate wholesale electricity rates and transmission. |
| NARUC | National Association of Regulatory Utility Commissioners, whose membership comprises state public utilities and who filed an amicus brief in support of Defendants in this appeal. |
| NIETC | National Interest Electric Transmission Corridor, a region designated by the federal government where FERC may exercise backstop siting authority. |
| OCA | Pennsylvania's Office of Consumer Advocate, a state agency that represents the interests of consumers, including before the PUC, and that filed an amicus brief in support of Defendants in this appeal. |
| PJM | The regional transmission organization for the region comprising most of Pennsylvania, empowered by FERC to develop projects to reduce congestion in interstate transmission. PJM conducted the benefit-cost analysis for Project 9A and filed an amicus brief in support of Transource in this appeal. |
| PUC | The Pennsylvania Public Utility Commission, the entity responsible for making siting decisions within Pennsylvania and a defendant-appellant in this litigation. |
| RTEP | Regional Transmission Expansion Plan, an annual project that PJM conducts to identify |

| | |
|---|---|
| | areas of congestion and projects to address them. |
| RTO | Regional Transmission Organization, an organization empowered by FERC to supervise interstate transmission planning and to develop projects to reduce regional congestion. |
| STFC | Stop Transource Franklin County, an interest group that filed an amicus brief in support of Defendants in this appeal. |

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 24-1045

_____

TRANSOURCE PENNSYLVANIA, LLC

v.

STEVEN M. DEFRANK, Chair, Pennsylvania Public Utility Commission, KIMBERLY
M. BARROW, Vice Chair, Pennsylvania Public Utility Commission, JOHN F.
COLEMAN, JR., RALPH V. YANORA, and KATHRYN L. ZERFUSS, Commissioners,
Pennsylvania Public Utility Commission, all in their official capacities, and the
PENNSYLVANIA PUBLIC UTILITY COMMISSION,
Appellants

_____

On Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. No. 1:21-cv-01101)
District Judge:  Honorable Jennifer P. Wilson

_____

Argued December 5, 2024

Before: SHWARTZ, MATEY, and McKEE, *Circuit Judges*

_____

JUDGMENT

_____

This cause came to be considered on the record from the U.S. District Court for the
Middle District of Pennsylvania and was argued on December 5, 2024.

On consideration whereof, it is hereby ORDERED and ADJUDGED by this Court
that the order of the District Court entered on December 6, 2023, is AFFIRMED.  All of the
above in accordance with the Opinion of this Court.

Costs shall be taxed against the appellants.

ATTEST:


s/ Patricia S. Dodszuweit
Clerk

Dated:  September 5, 2025



OFFICE OF THE CLERK

**PATRICIA S. DODSZUWEIT**

**CLERK**



Uɴɪᴛᴇᴅ Sᴛᴀᴛᴇs Cᴏᴜʀᴛ ᴏғ Aᴘᴘᴇᴀʟs

21400 UNITED STATES COURTHOUSE
601 MARKET STREET
PHILADELPHIA, PA 19106-1790
Website: www.ca3.uscourts.gov

TELEPHONE
215-597-2995

November 6, 2025

Mr. Peter J. Welsh
United States District Court for the Middle District of Pennsylvania
Sylvia H. Rambo United States Courthouse
1501 N 6th Street
Harrisburg, PA 17102

RE: Transource Pennsylvania LLC v. Steven DeFrank, et al
Case Number: 24-1045
District Court Case Number: 1:21-cv-01101

Dear District Clerk

Enclosed herewith is the certified judgment together with copy of the opinion in the above-captioned case(s). The certified judgment is issued in lieu of a formal mandate and is to be treated in all respects as a mandate.

Counsel are advised of the issuance of the mandate by copy of this letter. The certified judgment shows costs taxed, if any.

Very truly yours,
Patricia S. Dodszuweit, Clerk

By: s/ James King
Case Manager
267-299-4958

cc:  Kriss E. Brown, Esq.
  Joseph P. Cardinale Jr., Esq.

Zachary B. Cohen, Esq.
Lauren F. Dayton, Esq.
Benjamin C. Dunlap Jr., Esq.
Melanie J. El Atieh, Esq.
Anthony D. Kanagy, Esq.
Erin R. Kawa, Esq.
James J. Kutz, Esq.
Darryl A. Lawrence, Esq.
James B. Ramsay, Esq.
Michael J. Scarinci, Esq.
Zachary C. Schauf, Esq.
Shannon A. Sollenberger, Esq.
Christopher F. Van de Verg, Esq.
Lucas M. Walker, Esq.